ACCEPTED
05-15-01002-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
12/10/2015 12:29:40 PM
LISA MATZ
CLERK

No. 05-15-01002-CV

## FIFTH COURT OF APPEALS

## DALLAS, TEXAS

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
12/10/2015 12:29:40 PM
LISA MATZ
Clerk

2012 PROPERTIES, LLC,

Appellant

V.

DALLAS COUNTY, CITY OF GARLAND, GARLAND ISD, CHARLES HOBBS, TONYA BROYLES, LISA GREUNKE, AND CROW'S NEST, INC.

Appellees

FROM THE 134TH JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS
CAUSE NO. TX-12-40136

## BRIEF OF APPELLANT

Ian Ghrist
State Bar No. 24073449
ian@ghristlaw.com

Ghrist Law Firm
1210 Hall Johnson Road, Suite 100C
Colleyville, Texas 76034
Ph. (817) 778-4136
Fax (817) 485-1117

ATTORNEY FOR APPELANT

## ORAL ARGUMENT REQUESTED

# **TABLE OF CONTENTS**

IDENTITY OF PARTIES AND COUNSEL ....................................................................3

TABLE OF AUTHORITES .......................................................................................5

REQUEST FOR ORAL ARGUMENT ......................................................................7

GLOSSARY OF DEFINED TERMS ........................................................................8

ABBREVIATIONS AND RECORD REFERENCES ...............................................9

STATEMENT OF THE CASE...................................................................................9

ISSUES PRESENTED..............................................................................................11

STATEMENT OF FACTS .......................................................................................12

SUMMARY OF ARGUMENT ................................................................................12

STANDARD OF REVIEW ......................................................................................15

ARGUMENT AND AUTHORITIES.......................................................................17

CONCLUSION AND PRAYER ..............................................................................18

# IDENTITY OF PARTIES AND COUNSEL

| **Appellant** | **Counsel for Appellant** |
|---|---|
| 2012 Properties, LLC | Ian Ghrist<br>State Bar No. 24073449<br>ian@ghristlaw.com<br><br>Ghrist Law Firm<br>1210 Hall Johnson Road, Suite 100C<br>Colleyville, Texas 76034<br>Telephone:  (817) 778-4136<br>Fax:          (817) 485-1117 |

| **Appellees** | **Counsel for Appellees** |
|---|---|
| Dallas County, Texas | Evelyn Conner Hicks<br>State Bar No. 09575900<br>Linebarger, Goggan, Blair & Sampson<br>2777 Stemmons Freeway, Suite 1000<br>Dallas, Texas 75207<br>Phone: (214) 880-0089<br>Fax (469) 221-5171<br>dallas.litigation@lgbs.com |
| City of Garland<br>Garland Independent School District | Dustin L. Banks<br>State Bar No. 24064344<br>Perdue, Brandon, Fielder, Collins & Mott, LLP<br>1919 S. Shiloh Road, Suite 310, LB 40<br>Garland, Texas 75042<br>Phone: (972) 278-8282<br>Fax    (972) 278-8222<br>dbanks@pbfcm.com |
| Attorney Ad Litem for<br>for Lisa Greunke and Crow's Nest, Inc. | G. Walter McCool<br>McCool Law Firm, P.C.<br>9090 Skillman, Suite 182-A-256 |

Dallas, Texas 75243-8262
Phone:      (214) 256-3673
Fax    (214) 206-1081
walt@mccoollaw.com

Charles Hobbs

James Bellevue
Law Office of James Bellevue
6705 W Hwy 290, Suite 502-295
Austin, Texas 78735
Phone : (512) 288-0317
Fax     (512) 288-0317
jim@landlawtexas.com

Tonya Broyles

Michael Savage
Ackerman and Savage, LLC
8226 Douglas Ave, Suite 330
Dallas, Texas 75225
Phone:      (214) 346-4201
Fax    (214) 346-4201
mtsavage@ackermansavage.com

# TABLE OF AUTHORITES

**Cases**

*Lyda Swinerton Builder, Inc. v. Cathay Bank*, 409 S.W.3d 221 (Tex. App.—Houston 14th Dist. 2013)……………………………………………………………………………15, 17, 18, 19, 20, 28, 30

*Bank of Am. v. Babu*, 340 S.W.3d 917 (Tex. App. Dallas 2011)……………………15, 17, 21, 30

*Cash Am. Int'l, Inc. v. Bennett*, 35 S.W.3d 12 (Tex. 2000)..........................................................18

*Satterfield v. Satterfield*, 448 S.W.2d 456 (Tex. 1969)……………………….....................….18

*Chicago Title Ins. Co. v. Lawrence Invs., Inc.*, 782 S.W.2d 332 (Tex. App.—Fort Worth 1989, writ ref'd)………………………………………………………………..…...20, 27

*McDermott v. Steck Co.*, 138 S.W.2d 1106 (Tex. Civ. App.—Austin 1940, writ ref'd)…..……20

*Yancy v. United Surgical Partners Int'l, Inc.*, 236 S.W.3d 778 (Tex. 2007)………..……….21, 27

*Smart v. Tower Land & Inv. Co.*, 597 S.W.2d 333 (Tex. 1980)……….……20, 22, 23, 27, 28, 33

*Frymire Eng'g Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140 (Tex. 2008)………………….21, 31, 32

*Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765 (Tex. 2007)………………..20

*Murray v. Cadle Co.*, 257 S.W.3d 291 (Tex. App.—Dallas 2008)…………………………….21

*Benchmark Bank v. Crowder*, 919 S.W.2d 657, 662 (Tex. 1996)……………......……21, 27, 32

*Diversified Mortg. Investors v. Lloyd D. Blaylock General Contractor*, 576 S.W.2d 794 (Tex. 1978)………………………………………………………………………….……20

*Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 20 S.W.3d 692 (Tex. 2000)………………………………………………………………………….…28

**Statutes**

Texas Tax Code § 32.01…………………………………………………………………...12

Texas Tax Code § 32.06…………………………………………………………..………….19

Texas Tax Code § 32.07…………………………………………………………...…….12

Texas Tax Code § 34.04……………………………………………….……12, 23, 26

**Legislation**

Act of June 17, 2011, 82nd Leg., R.S., ch. 508, 2011 Tex. ALS 508, 2011 Tex. Gen. Laws 508, 2011 Tex. Ch 508, 2011 Tex. HB 1674 (to be codified in various parts of the Family, Tax, and Criminal Procedure Codes)………………………………………………..………..…27

# REQUEST FOR ORAL ARGUMENT

Under Tex. R. App. P. 39, Appellant respectfully requests oral argument. Equitable subrogation doctrine has been applied to Section 32.06 of the Texas Tax Code, but not Section 34.04 of the Texas Tax Code, making this case a matter of first impression. The outcome will affect tax foreclosure sale buyers across the State. Thus, oral argument will assist this Court in considering these issues and reaching a decision in this case.

# GLOSSARY OF DEFINED TERMS

2012 Properties, LLC ("2012 Properties")

# <u>ABBREVIATIONS AND RECORD REFERENCES</u>

[Vol.#] RR [page #]     Reporter's Record

 [Vol.#] CR [page#]     Clerk's Record

Appx. [Tab#]       Appellant's Appendix

App. Br. [page#]      Appellant's Brief

Appx. Ex. [letter]      Appellant's Exhibit

# STATEMENT OF THE CASE

This is an appeal from a petition for excess proceeds filed in a delinquent property tax suit after the sale of the subject property. 2012 Properties, LLC petitioned the Court for reimbursement for taxes paid on the former owner's behalf. Two of the three former owners also petitioned the Court for disbursement of excess proceeds held in the registry. The petition of 2012 Properties, LLC was denied by order executed on August 13th, 2015. 2012 Properties, LLC appeals the order denying the relief requested in its petition.

# <u>ISSUES PRESENTED</u>

1.  Is equitable subrogation allowed under Texas Tax Code § 34.04?

# STATEMENT OF FACTS

The property known as 5618 Marina Drive, City of Garland, Dallas County, Texas was sold by the Dallas County Constable to 2012 Properties, LLC to pay delinquent property taxes owed to Dallas County, the City of Garland, and Garland Independent School District.[1] The property sold for $35,100.[2] After all amounts recovered in the Judgment obtained by the taxing authorities were paid, excess funds in the amount of $28,130.27 were deposited into the registry of the Court.[3]

Because of the delay between the date of judgment and the date of sale, property taxes typically accrue that are not paid off out of the proceeds of the sale.[4] These property taxes are an *in personam* obligation of the owner of the property and an *in rem* obligation attached to the property itself.[5] The tax sale buyer purchases the property subject to those taxes not included in the judgment. Consequently, if the former owners do not pay the taxes that they are personally liable for, then the tax sale buyer must pay those taxes if the tax sale buyer wants to protect its interest in the property from the lien that attached due to the former owner's nonpayment. The tax sale buyer does not assume the former owner's

---

[1] 1 CR 73.
[2] 1 CR 78.
[3] *Id.*
[4] Which is why Tex. Tax. Code § 34.04 provides that these accruals be paid out of the excess proceeds through the procedure set out in Section 34.04 of the Texas Tax Code.
[5] Texas Tax Code § 32.01, 32.07.

personal liability on the tax debt and is only personally liable for taxes accruing after acquiring ownership of the property.[6]

In this case, 2012 Properties, LLC paid the taxes that accrued after the judgment promptly upon purchasing the property. 2012 Properties, LLC had no personal liability on these taxes because 2012 Properties, LLC did not own the property at the time that the taxes accrued. Regardless, the taxes created a lien against the property purchased by 2012 Properties, LLC.

2012 Properties, LLC paid off the lien, not as a gift to the former owners, but solely to protect the property from the lien.[7] The former owners now have no liability for these property taxes. Thus, a debt for which they alone were personally liable was extinguished.

Two of the former owners petitioned the Court for disbursement of excess proceeds from the excess funds held in the Court's registry under Section 34.04 of the Texas Tax Code.[8] 2012 Properties, LLC also petitioned the Court to reimburse 2012 Properties, LLC for the taxes paid for periods where 2012 Properties, LLC did not own the property.[9] Under Texas Tax Code Section 32.01, a tax lien attaches for all taxes due that year on January 1st of the year. 2012 Properties, LLC's

---

[6] Texas Tax Code § 32.07.
[7] 2 RR 18–19.
[8] 1 CR 78, 111.
[9] 1 CR 154.

petition for excess proceeds claimed equitable subrogation to that tax lien. 2012

Properties, LLC pled the elements of equitable subrogation and offered evidence of

each element.[10] If 2012 Properties, LLC is equitably subrogated to that tax lien,

then 2012 Properties, LLC is authorized by Sections 34.04(c)(2), (3), or (4) of the

Texas Tax Code to petition for and recover excess proceeds.

The former owners and the taxing authorities disputed (a) whether equitable

subrogation is available under Tax Code Section 34.04, and (b) whether 2012

Properties, LLC met its burden of proof on the elements of equitable subrogation.

The Court sided with the former owners and the taxing authorities, denying the

petition of 2012 Properties, LLC. This appeal ensued.

---

[10] 2 RR 9–22, 3 RR 3–14.

## SUMMARY OF ARGUMENT

Texas caselaw favors equitable subrogation and overwhelmingly establishes that equitable subrogation is an available remedy in this situation. Moreover, 2012 Properties, LLC amply demonstrated that it met all elements of the doctrine in this case and no evidence to the contrary was offered.

Dallas County, the City of Garland, and Garland Independent School District complained to the Court that equitable subrogation is not available under Section 34.04 of the Texas Tax Code, even though Texas caselaw overwhelmingly establishes that (a) the Tax Code does not abrogate common law subrogation,[11] and (b) subrogation is available under Tax Code Section 32.06,[12] a far more specific and detailed section, making the idea that subrogation is not allowed under Section 34.04 highly implausible, especially given that "Texas courts are particularly hospitable to the doctrine of equitable subrogation."[13]

Why the taxing authorities oppose the petition of 2012 Properties, LLC remains a mystery because the taxing authorities have been paid in full. Their only loss is that they are not accruing additional fees and penalties, which they can collect out of the remaining proceeds. Assumedly, the taxing authorities seek to

---

[11] *Lyda Swinerton Builder, Inc. v. Cathay Bank*, 409 S.W.3d 221, 243 (Tex. App.—Houston 14th Dist. 2013).
[12] *Id.*
[13] *Bank of Am. v. Babu*, 340 S.W.3d 917, 925 (Tex. App. Dallas 2011).

preserve their ability to maximize the amount of penalties and interest that they can collect when proceeds are available in the Court's registry to cover all penalties and interest that accrue.

The opposition of the former owners of the property makes more sense. By preventing 2012 Properties, LLC from recovering out of the excess proceeds, the former owners can take all of the excess proceeds for themselves and simply allow 2012 Properties, LLC to pay their taxes for them, which eliminates their personal liability on the taxes and allows them to both have their cake and eat it (no personal liability and they get all the money). Thus, the former owners seek to become unjustly enriched at 2012 Properties, LLC's expense.

# STANDARD OF REVIEW

The legal conclusions of the trial court are reviewed *de novo*.[14] Entitlement to equitable subrogation is a matter of law that appellate courts will review de novo.[15] The issue of whether equitable subrogation is available under Section 34.04 of the Texas Tax Code is also a legal question for which the standard of review is *de novo*.[16]

---

[14] *Bank of Am. v. Babu*, 340 S.W.3d 917, 922 (Tex. App. Dallas 2011).
[15] *Id.* at 929.
[16] *Lyda Swinerton Builders, Inc. v. Cathay Bank*, 409 S.W.3d 221, 229 (Tex. App. Houston 14th Dist. 2013).

# ARGUMENT AND AUTHORITIES

2012 Properties, LLC offers caselaw almost directly on point to support its position, while the taxing authorities and former owners have, to date, cited no authority for their position. Moreover, the position taken by the former owners and the taxing authorities leads to a blatantly unjust result that cannot have been intended by the Texas legislature and should not be tolerated by Texas Courts.

## I. THE TAX CODE GENERALLY DOES NOT ELIMINATE EQUITABLE SUBROGATION DOCTRINE

Equitable subrogation is a common law right that the Texas Supreme Court has been loath to deny even in the face of highly detailed tax statutes that appear to comprehensively legislate the exact subject matter of lien subrogation.[17] Generally, Texas Courts should not abrogate common law claims.[18] Statutes that may be read to abrogate common law claims are not to be extended beyond their plain meaning.[19]

---

[17] *Lyda Swinerton Builders, Inc. v. Cathay Bank*, 409 S.W.3d 221, 245 (Tex. App. Houston 14th Dist. 2013), Appx. F.

[18] *Cash Am. Int'l, Inc. v. Bennett*, 35 S.W.3d 12, 16 (Tex. 2000) ("A statute that deprives a person of a common-law right will not be extended beyond its plain meaning or applied to cases not clearly within its purview. Abrogating common-law claims is disfavored and requires a clear repugnance between the common law and statutory causes of action." (internal quotations and citation omitted)).

[19] *Satterfield v. Satterfield*, 448 S.W.2d 456, 459 (Tex. 1969) ("While Texas follows the rule that statutes in derogation of the common law are not to be strictly construed, it is recognized that if a statute creates a liability unknown to the common law, or deprives a person of a common law right, the statute will be strictly construed in the sense that it will not be extended beyond its plain meaning or applied to cases not clearly within its purview.").

Property tax lenders in Texas must follow a detailed procedure outlined in Texas Tax Code § 32.06 in order to obtain a transfer of the tax lien. This procedure governs the exact subject matter of subrogation to a tax lien, but the Texas Courts have found that it is supplemental to, not exclusive of equitable subrogation doctrine.[20]

For example, under Section 32.06 of the Texas Tax Code, to obtain subrogation a person must file a sworn document containing the exact information specified, follow the special rules governing taxed owed by persons over sixty-five (65) years of age, make sure that all form and content of the request complies with rules promulgated by the Finance Commission of Texas, cover only delinquent taxes, follow the release rules, send by certified mail copies of documents to first lien holders, *etcetera*.[21] If anything is not done according to the rules, then the taxing authorities can and will refuse to issue a tax lien transfer certificate. Regardless, Texas caselaw is abundantly clear that even if you fail to follow the rules, you can still be equitably subrogated to the tax lien. Granted, the *Swinerton Builders* Court held that a lienholder who does not follow all of the rules may not be entitled to "all special privileges accompanying the taxing authority's

---

[20] *Lyda Swinerton Builders, Inc. v. Cathay Bank*, 409 S.W.3d 221, 243 (Tex. App. Houston 14th Dist. 2013), Appx. F.
[21] Texas Tax Code § 32.06.

constitutional and statutory lien,"[22] but the Court was clear that, based on existing

Texas Supreme Court precedent, equitable subrogation doctrine is available.

In the *Swinerton Builders* case, the Court looked at the tax lien transfer

statutes and held that "nothing in the text of the statute addresses what happens if

the lien is not transferred or suggests a legislative intent to prohibit common law

subrogation if a party pays a tax lien without transferring it."[23] Similarly in this

case, nothing in the text of Section 34.04(c) of the Texas Tax Code suggests that

subrogated lienholders are barred from filing an excess proceeds claim under

34.04(a). In fact, 34.04(a) broadly states that a "person" may file a petition . . .

setting forth a claim to the excess proceeds. Section 34.04(c) sets out the payment

priorities for claimants, but does not state that only claimants with priority can

make a claim. Regardless, under 34.04(c)(3) "any other lienholder, consensual or

otherwise . . ." can make a claim. Nowhere does the Tax Code state that subrogated

lienholders are not lienholders.

"The Texas Supreme Court has endorsed the view that prior versions of the

tax lien transfer statutes did not abrogate common law subrogation."[24] "Even in the

---

[22] *Lyda Swinerton Builders, Inc. v. Cathay Bank*, 409 S.W.3d 221, 247 (Tex. App. Houston 14th Dist. 2013), Appx. F.
[23] *Id.* at 244, Appx. F.
[24] *Id.* at 245, Appx. F (citing *Chicago Title Ins. Co. v. Lawrence Invs., Inc.*, 782 S.W.2d 332 (Tex. App.—Fort Worth 1989, writ ref'd) (holding lender was equitably subrogated to tax liens, but not discussing transfer statutes); *McDermott v. Steck Co.*, 138 S.W.2d 1106, 1109 (Tex. Civ. App.—Austin 1940, writ ref'd) ("It is not material whether the bank acquired a lien upon the property under [the tax lien transfer statute]. . . . [A party asserting the bank's interest] was in

absence of statutory or contractual authorization, a limited right to equitable subrogation may arise in accordance with certain well-established rules of law."[25]

The Texas Supreme Court has said that "Equitable subrogation applies in 'every instance in which one person . . . has paid a debt for which another was primarily liable.'"[26] Moreover, "Texas courts are particularly hospitable to the doctrine of equitable subrogation."[27]

Texas courts have given the doctrine "a liberal application . . . broad enough to include every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity and good conscience should have been discharged by the latter."[28] Moreover, "Texas courts favor equitable subrogation."[29]

In light of the foregoing authorities, it seems quite obvious that 2012 Properties, LLC is legally entitled to assert an equitable subrogation claim. Section

---

equity entitled to subrogation to that lien as against a junior incumbrancer . . . ."); *see also Yancy v. United Surgical Partners Int'l, Inc.*, 236 S.W.3d 778, 786 n.6 (Tex. 2007) ("writ refused" cases have same precedential value as Texas Supreme Court opinions).

[25] *Smart v. Tower Land & Inv. Co.*, 597 S.W.2d 333, 338 (Tex. 1980), Appx. E.

[26] *Frymire Eng'g Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 144 (Tex. 2008) (quoting *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 774 (Tex. 2007) (emphasis added).

[27] *Bank of Am. v. Babu*, 340 S.W.3d 917, 925 (Tex. App. Dallas 2011) (quoting *Murray v. Cadle Co.*, 257 S.W.3d 291, 299 (Tex. App. Dallas 2008) (emphasis added).

[28] *Murray v. Cadle Co.*, 257 S.W.3d 291, 299 (Tex. App. Dallas 2008) (emphasis added) (quoting *Forney v. Jorrie*, 511 S.W.2d 379, 386 (Tex. Civ. App.—San Antonio 1974, writ ref'd n.r.e.).

[29] *Crowder v. Benchmark Bank*, 889 S.W.2d 525, 528 (Tex. App. Dallas 1994) (citing *Diversified Mortg. Investors v. Lloyd D. Blaylock General Contractor*, 576 S.W.2d 794, 807 (Tex. 1978)), Appx. G.

34.04 of the Texas Tax Code governing claims for excess proceeds is nowhere near as detailed or specific as Section 32.06 governing tax lien transfers. Instead, Section 34.04 of the Tax Code simply sets out a basic five-item list of priorities among excess proceeds claimants. If the highly detailed and specific Section 32.06 did not exclude the doctrine of equitable subrogation from consideration, then *a fortiori* the simple list of priorities in Section 34.04 of the Tax Code does not exclude equitable subrogation doctrine. In addition, Texas Courts have a long history of generally favoring equitable subrogation. Consequently, in cases where the availability of the doctrine is in doubt, the Courts should generally err on the side of allowing equitable subrogation claims.

## II. THIS CASE PRESENTS THE KIND OF EQUITABLE SITUATION REFERRED TO IN THE *SMART V. TOWER LAND* CASE, WHEREIN EQUITABLE SUBROGATION TO A TAX LIEN IS APPROPRIATE

Allowing equitable subrogation in this case is not only correct as a matter of law based on precedent, but is necessary to prevent unjust enrichment. As a matter of public policy, the former owners should not be able to so easily skirt their tax obligations and the taxing authorities should certainly not be entitled to unnecessarily maximize and inflate the amount of interest and penalties that they can charge.

In *Smart v. Tower Land*, Texas Supreme Court held that "The mortgagee who purchases the property with delinquent taxes owed by the mortgagor, may

account for the delinquent taxes in determining his bid." [30] Consequently, the Court found that based on a totality of the circumstances, subrogation was not equitable for a lender who paid the borrower's taxes after foreclosure.

The situation in *Smart v. Tower Land*, however, is entirely different from the situation in this case. The Court in *Smart v. Tower Land* first acknowledged that equitable subrogation to a tax lien for payment of taxes is available under the right circumstances.[31] Then, the Court denied equitable subrogation for two primary reasons. First, the contract between the lender and the borrower already provided remedies for non-payment of taxes, which made the Court reticent to judicially add additional remedies to the contract.[32] Second, the Court noted that because the unpaid taxes were already being added to the mortgage debt, it made little sense for the lender to also have them as a separate personal liability claim against the debtor. [33]

None of the considerations made by the *Smart v. Tower Land* Court are present in this case. First, 2012 Properties, LLC did not have a contract with the former owners. Consequently, there is no need to avoid judicially modifying the contract by adding an additional judicial remedy to an agreement entered into

---

[30] *Smart v. Tower Land & Inv. Co*., 597 S.W.2d 333, 339 (Tex. 1980), Appx. E.
[31] *Id.* at 338, Appx. E.
[32] *Id.*, Appx. E ("The parties having fixed their rights by contract, additional rights, such as are incidental to the sovereign's taxing power, will not be created by judicial intervention.").
[33] *Id.*, Appx. E ("Taxes not paid by the mortgagor are considered to be part of the mortgage debt").

voluntarily by contracting individuals. Second, 2012 Properties, LLC does not have the ability to add the tax liability onto an existing mortgage debt. In other words, 2012 Properties, LLC does not have other contractual remedies available to it that would lessen the need for equitable subrogation. Third, 2012 Properties cannot simply account for the delinquent taxes in determining the bid on the property for the reasons explained below.

When there are excess proceeds, the taxing authorities are supposed to simply take those proceeds out of the Court's registry pursuant to Texas Tax Code § 34.04, but the taxing authorities sometimes fail to do so at all or fail to do so in a timely manner. Meanwhile, 2012 Properties, LLC must, pursuant to Section 34.015 of the Texas Tax Code, sign a statement every ninety (90) days verifying that 2012 Properties, LLC owns no properties that have delinquent property taxes. Otherwise, 2012 Properties, LLC is barred from purchasing properties at the monthly tax sales. Mr. Blackburn testified that personally or through his companies, he purchased approximately thirty properties at tax auction in the past two years.[34] Consequently, he cannot afford to wait an indeterminate time to find out if the taxing authorities will, in fact, petition for excess proceeds pursuant to the statute. He must keep taxes current on all properties at all times regardless of

---

[34] 2 RR 12, Appx. C.

how fast or slow the taxing authorities are in petitioning for excess proceeds or whether the taxing authorities will choose to petition at all.

Consequently, even though everyone agrees that the taxes should be promptly paid out of the Court's registry to the taxing authorities, 2012 Properties, LLC often has no choice but to either pay the taxes while waiting on the taxing authorities to facilitate the transfer of funds from the Court's registry to the taxing authorities coffers or lose the right to purchase properties at the next month's auction. The tax office also runs a search to determine the veracity of 2012 Properties, LLC's statement, and the statement is a pre-made form document. Consequently, 2012 Properties, LLC is not able to skirt the statement requirement by alleging that the taxing authorities are supposed to collect the taxes from the funds in the Court's registry on some of the properties and that more than ample funds exist to cover the payments. It is an unfair Catch 22 situation for 2012 Properties, LLC to be put into, particularly when the simplest possible solution is to just pay the taxes and seek reimbursement out of the Court proceeds.

With this result, the taxes are paid, which prevents additional penalties and interest from being taken out of the remaining funds due to the former owners. Consequently, the former owners benefit from the action taken by 2012 Properties, LLC. By paying the taxes promptly upon purchase, 2012 Properties, LLC actually saves the former owners money from interest, attorney's fees, and penalties such

that more of the funds in the court's registry will be paid to the former owners. Meanwhile, the taxing authorities can hardly complain about whatever loss in additional penalties and interest was caused by the timely payment of taxes. The biggest loss is the loss of legal work to the law firms representing the taxing authorities, which is not an equitable consideration to the parties to the case.

The uncertainty regarding whether and when the taxing authorities will petition for the proceeds to be paid makes it impossible to simply account for the taxes in determining the bid, as was possible in *Smart v. Tower Land*. Anecdotally, 2012 Properties, LLC could tell many stories of situations where the taxing authorities allowed the former owners to take all of the proceeds, missing taxes that were owed, or failed to petition for the proceeds to be paid in a timely manner, or failed to petition at all. Consequently, 2012 Properties, LLC is unable to simply assume that the taxes will be timely paid out of the excess proceeds even though the law is clear that payment of the taxes out of the excess proceeds is the intended result of Section 34.04 of the Texas Tax Code.

### III.   THE TEXAS LEGISLATURE KNEW, AT THE TIME THAT 34.04 WAS LAST MODIFIED, THAT THE TAX CODE DID NOT ELIMINATE EQUITABLE SUBROGATION DOCTRINE

The Texas Legislature's latest modification to Section 34.04 of the Texas Tax Code came in 2011 when the 82nd Legislature, with HB 1674, added Title IV-D agencies as parties that can request excess proceeds so that child support owed

would be easier to collect.[35] The Texas Supreme Court has endorsed the view, in multiple cases dating back to 1980, that the Texas Tax Code does not abrogate common law subrogation.[36] Since at least 1996, in *Benchmark Bank v. Crowder*,[37] it has been established that payment of taxes can give rise to equitable subrogation to the tax liens. Thus, the Texas Legislature has amended Section 34.04 of the Texas Tax Code nine times over the past thirty-five years without bothering to eliminate common law subrogation. Clearly, if the Texas Legislature wanted to prevent this issue from being heard by the Courts on excess proceeds petitions, then the Legislature could have so provided, but knowing of existing precedent, failed to do so.

The law has been clear for the past thirty-five years that common law subrogation is not eliminated by the Texas Tax Code. For example, the *Smart v. Tower Land* case tells us that "Even in the absence of statutory or contractual

---

[35] Act of June 17, 2011, 82nd Leg., R.S., ch. 508, 2011 Tex. ALS 508, 2011 Tex. Gen. Laws 508, 2011 Tex. Ch 508, 2011 Tex. HB 1674 (to be codified in various parts of the Family, Tax, and Criminal Procedure Codes).

[36] *Smart v. Tower Land & Inv. Co.*, 597 S.W.2d 333, 338 (Tex. 1980) ("Even in the absence of statutory or contractual authorization, a limited right to equitable subrogation may arise in accordance with certain well-established rules of law"), Appx. E; *Chicago Title Ins. Co. v. Lawrence Invs., Inc.*, 782 S.W.2d 332 (Tex. App.—Fort Worth 1989, writ ref'd) (holding lender was equitably subrogated to tax liens, but not discussing transfer statutes); *Yancy v. United Surgical Partners Int'l, Inc.*, 236 S.W.3d 778, 786 n.6 (Tex. 2007) ("writ refused" cases have same precedential value as Texas Supreme Court opinions); *Lyda Swinerton Builders, Inc. v. Cathay Bank*, 409 S.W.3d 221, 245 (Tex. App. Houston 14th Dist. 2013), Appx. F.

[37] *Benchmark Bank v. Crowder*, 919 S.W.2d 657, 662 (Tex. 1996), Appx. G.

authorization, a limited right to equitable subrogation may arise in accordance with certain well-established rules of law."[38] The courts have explained that

> "equitable subrogation is only available 'to the extent necessary [for the subrogee's] equitable protection.' *Smart*, 597 S.W.2d at 338. 'When not compelled by the equities of the situation, full subrogation to all special privileges accompanying the taxing authoritiy's constitutional and statutory lien will be denied.' *Id.* This rule limits the extent of subrogated rights."[39]

In this case, no explicit authorization for equitable subrogation under Section 34.04 of the Texas Tax Code exists, but no explicit authorization is necessary. Instead, equitable subrogation is available "in accordance with well-established rules of law" as it always has been.

## IV. 2012 PROPERTIES, LLC PROVED ITS ENTITLEMENT TO EQUITABLE SUBROGATION AND NO EVIDENCE TO THE CONTRARY WAS OFFERED

The taxing authorities and the former owners had an opportunity to offer evidence contradicting the evidence offered by 2012 Properties, LLC, but did not do so. Instead, they relied solely on legal arguments. To prevail, 2012 Properties, LLC needed to offer evidence of the elements of its equitable subrogation claim. 2012 Properties, LLC offered evidence of each element. No evidence to the

---

[38] *Smart*, 597 S.W.2d at 338, Appx. E.
[39] *Lyda Swinerton Builders, Inc. v. Cathay Bank*, 409 S.W.3d 221, 247 (Tex. App. Houston 14th Dist. 2013), Appx. F.

contrary was offered. Thus, the Court should have ruled in 2012 Properties, LLC's favor on its equitable subrogation claim. No evidence existed that the Court could have considered to hold that 2012 Properties, LLC did not meet any of the elements of equitable subrogation.

### a. FIRST ELEMENT: THE PERSON WHOSE DEBT WAS PAID WAS PRIMARILY LIABLE ON THE DEBT AND HAS BEEN UNJUSTLY ENRICHED

Mr. Blackburn testified that he paid taxes for which the former owners were personally liable and introduced into evidence records of such payments.[40] In this case, the former owners are obviously primarily liable on the debt. Section 32.07 of the Texas Tax Code states clearly that the owner is personally liable for payment of the taxes. The taxing authorities routinely take money judgments against property owners whose properties do not bring in enough money at constable's sale to cover payment of all of the taxes due because those owners are personally liable for payment of the taxes.

The caselaw on equitable subrogation is full of examples where a person whose property was encumbered by a lien that was secured by a debt that another person was personally liable for paid off the debt in order to protect the property. In every case, it was held that the person who was personally liable for the debt

---

[40] 2 RR 15–19, 3 RR 3-14, Appx. C.

had primary liability for repayment of the debt. Any arguments to the contrary in this case can only be a product of not reading the caselaw.

For example, in *Swinerton Builders*,[41] the bank paid taxes that were due by the owner of the property. It was undisputed that the owner was primarily liable for payment of the taxes.

In *Bank of Am. v. Babu*,[42] a bank paid off a note and deed of trust. It was undisputed that the debtor was primarily liable on the debt. While the Court held that the foreclosure sale buyer (Babu et. al.) bought the property subject to an equitable subrogation lien in favor of the bank, the fact that the foreclosure sale buyer bought the property subject to the lien did not make the foreclosure sale buyer primarily liable for the debt. The former owner was still primarily liable for the debt, just as in the present case, the former owners are still primarily as well as personally liable for the debt.

2012 Properties, LLC bought the property subject to the encumbrance, but that does not make 2012 Properties, LLC primarily liable for the debt just as Babu et. al. did not somehow become primarily liable for the equitable subrogation lien just because they bought the property at foreclosure sale without a warranty.

---

[41] *Swinerton*, 409 S.W.3d 221, Appx. F.
[42] *Bank of Am. v. Babu,* 340 S.W.3d 917, 919 (Tex. App. Dallas 2011).

2012 Properties, LLC could go on to cite numerous cases where the subrogee paid off an encumbrance to protect the subrogee's interest in the property and the fact that the subrogee bought encumbered property without a warranty did not somehow make the subrogee primarily liable for the debt. In this case, Section 32.07 clearly makes the former owners primarily liable on the debt.

### b. SECOND ELEMENT: THE CLAIMAINT PAID THE DEBT INVOLUNTARILY

"Texas courts are liberal in their determinations that payments were made involuntarily." *Frymire Eng'g Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140 (Tex. 2008) (quoting *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 20 S.W.3d 692, 702 (Tex. 2000) (quoting *Argonaut Ins. Co. v. Allstate Ins. Co.*, 869 S.W.2d 537, 542 (Tex. App. Corpus Christi 1993). A payment made to protect the payor's interest is considered involuntary.[43]

Mr. Bellevue did elicit testimony by Daniel Blackburn, manager of 2012 Properties, LLC, that Mr. Blackburn knew that the purchase was without warranty and that the property was encumbered by the taxes.[44] But, knowledge of the outstanding taxes is irrelevant to the equities of the case. The caselaw on equitable subrogation does not suggest that the person who pays the debt of another must be surprised to find out that the debt exists, only that the debt is not paid voluntarily.

---

[43] *Frymire Eng'g Co. v. Jomar Int'l, Ltd*., 259 S.W.3d 140, 145 n. 26 (Tex. 2008).
[44] 2 RR 12, Appx. C.

For example, in *Benchmark Bank v. Crowder*, the bank's knowledge of the outstanding tax lien did not somehow turn the payment of the taxes into a voluntary payment.[45] A payment is voluntary when the payor acts "without any assignment or agreement for subrogation, without being under any legal obligation to make payment, and without being compelled to do so for the preservation of any rights or property."[46] In this case, 2012 Properties, LLC obviously made the payment to preserve 2012 Properties, LLC's rights in the property. Mr. Blackburn testified that the payment was not intended as a gift to the former owners[47] and no evidence to the contrary was offered.

### c. THIRD ELEMENT: NO PREJUDICE TO INTERVENING LIENHOLDERS

Mr. Blackburn testified that no intervening lienholders exist that could be prejudiced.[48] No one has contested this allegation. It should be undisupted that no prejudice occurred to intervening lienholders.

---

[45] *Benchmark Bank v. Crowder*, 919 S.W.2d 657, 661 (Tex. 1996), Appx. G.
[46] *Frymire*, 259 S.W.3d at 145 (quoting *First Nat'l Bank of Kerrville v. O'Dell*, 856 S.W.2d 410, 415 (Tex. 1993)).
[47] 2 RR 18–19, Appx. C.
[48] 2 RR 18, Appx. C.

### d. FOURTH ELEMENT: BALANCING OF THE EQUITIES UNDER A TOTALITY OF THE CIRCUMSTANCES TEST

The taxing authorities and former owners did not offer evidence tending to show that subrogation would not be equitable. Consequently, all of the evidence favors equitable subrogation, making a balancing of the equities very easy to perform.

The only sensible point made by the taxing authorities and former owners regarding the equities of the case seems to be that 2012 Properties, LLC knew that the taxes were due and the time of the sale and purchased the property without a warranty. However, all comparisons to the *Smart v. Tower Land*[49] case have been debunked in Section II of this Argument. Unlike the debtor in *Smart v. Tower Land*, there is no contractual liability on a note from the former owners to 2012 Properties, LLC. The former owners have alleged that 2012 Properties, LLC should sue them in a separate lawsuit and take a personal liability money judgment against them.[50]

Obviously, they are well-aware that if they abscond with the proceeds from the tax sale, then the chances of 2012 Properties, LLC serving them and prosecuting a lawsuit with no idea whether the former owners have non-exempt

---

[49] *Smart v. Tower Land & Inv. Co.,* 597 S.W.2d 333 (Tex. 1980).
[50] 1 CR 205.

assets adequate to satisfy a money judgment for a couple thousand dollars are unlikely. Instead, they seek to take money that rightfully belongs to the taxing authorities, and consequently to 2012 Properties, LLC who paid the taxes, and force 2012 Properties, LLC to file a completely impractical and unnecessary lawsuit that will pointlessly clog up the court system when the money to pay the debt is sitting in the Court's registry and has been designated by the tax code for this exact purpose (to pay the taxes due).

That is not equitable. Equitable means fair and that is blatantly unfair. It is akin to unnecessarily driving up litigation costs in an attempt to force the other side into a settlement that is not based on the merits of the case. It can be done, and it is done often, but it is an abuse of the legal system and it is not equitable.

There is no question here as to who owes the money. There is no question as to how the priorities in Section 34.04 of the tax code are supposed to work. The taxes are supposed to be paid out of the former owner's share. The former owners are supposed to get the remainder after the taxes and other lienholders are paid. The former owners are not supposed to get the residual funds and the taxes. That is having your cake and eating it. The taxing authorities are not supposed to get additional penalties and interest. The taxing authorities have no standing to complain once they have been paid in full as they have been in this case. Preservation of the taxing authorities' (and their law firms') monopoly on excess

proceeds petitions is not an appropriate equitable consideration. They are simply

supposed to get paid what they are owed and that payment burden is placed on the

former owners.

# CONCLUSION AND PRAYER

Based on the foregoing, 2012 Properties, LLC asserts that the record requires the following relief from this Court:

- That the trial court's order denying the relief requested in 2012 Properties, LLC's petition be reversed

- That this court hold that 2012 Properties, LLC has established its equitable subrogation claim.

- Remand to the trial court for proceedings consistent with the foregoing.

- The parties have entered into a Rule 11 Agreement, which is attached to this brief as Exhibit A.[51] The parties have agreed "that the issue of how much taxes have been paid by 2012 Properties, LLC can be resolved on remand such that it is unnecessary for either appellants or appellees to brief this issue to the Court of Appeals."

2012 Properties, LLC prays this Court grant the relief requested herein, and for such other and further relief as the Court deems proper.

---

[51] Appx. Ex. A.

Respectfully submitted,

Ian Ghrist
State Bar No. 24073449
ian@ghristlaw.com

Ghrist Law Firm
1210 Hall Johnson Road, Suite 100C
Colleyville, Texas 76034
Telephone: (817) 778-4136
Fax:        (817) 485-1117

ATTORNEY FOR APPELLANT

**CERTIFICATE OF COMPLIANCE**

Pursuant to Texas Rules of Appellate Procedure 9.4, I hereby certify that, absent the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendices, the computer program used to prepare this document prior to its conversion to portable document format calculates the number of words in the foregoing brief as 6,817.

_____
Ian Ghrist

**CERTIFICATE OF SERVICE**

I certify that on December 10, 2015, I provided a true and correct copy of the foregoing to the following attorneys for the parties via electronic filing:

Evelyn Conner Hicks
State Bar No. 09575900
Linebarger, Goggan, Blair & Sampson
2777 Stemmons Freeway, Suite 1000
Dallas, Texas 75207
Phone: (214) 880-0089
Fax (469) 221-5171
dallas.litigation@lgbs.com

Dustin L. Banks
State Bar No. 24064344
Perdue, Brandon, Fielder, Collins & Mott, LLP
1919 S. Shiloh Road, Suite 310, LB 40
Garland, Texas 75042
Phone: (972) 278-8282
Fax    (972) 278-8222
dbanks@pbfcm.com

G. Walter McCool
McCool Law Firm, P.C.
9090 Skillman, Suite 182-A-256
Dallas, Texas 75243-8262
Phone:         (214) 256-3673
Fax    (214) 206-1081
walt@mccoollaw.com

James Bellevue
Law Office of James Bellevue
6705 W Hwy 290, Suite 502-295
Austin, Texas 78735
Phone : (512) 288-0317
Fax    (512) 288-0317
jim@landlawtexas.com

Michael Savage
Ackerman and Savage, LLC
8226 Douglas Ave, Suite 330
Dallas, Texas 75225
Phone: (214) 346-4201
Fax  (214) 346-4201
mtsavage@ackermansavage.com

Lisa Greunke
1452 Oak Tree Drive
Athens, Texas 75751
Via mail

Crow's Nest Inc.
5724 Marina Drive
Garland, Texas 75043
Via mail

_____

Ian Ghrist

# INDEX OF APPENDIX

| Tab | Description | Record Cites |
|---|---|---|
| A | Order Appealed From | 1 CR 179 |
| B | Findings of Fact and Conclusions of Law | 1 CR 213–17 |
| C | Excerpts from Testimony of Daniel Blackburn | 2 RR 10–20 |
| D | Exhibits From Hearing, Payment Records | 3 RR 3–14 |
| E | *Smart v. Tower Land & Inv. Co.,* 597 S.W.2d 333 (Tex. 1980) | |
| F | *Lyda Swinerton Builders, Inc. v. Cathay Bank*, 409 S.W.3d 221, 226 (Tex. App. Houston 14th Dist. 2013) | |
| G | *Benchmark Bank v. Crowder,* 919 S.W.2d 657, 659 (Tex. 1996) | |
| Appellant's Exhibit A | Rule 11 Agreement Regarding Taxes Paid | |

# Appendix A

## CAUSE NO. TX12-40136

| GARLAND INDEPENDENT SCHOOL DISTRICT | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| VS. | § | 134th JUDICIAL DISTRICT |
| | § | |
| HEIRS AND UNKNOWN HEIRS OF LENA M. HOBBS | § | DALLAS COUNTY, TEXAS |

### ORDER DENYING 2012 PROPERTIES, LLC'S PETITION TO WITHDRAW EXCESS PROCEEDS

On this date, came on for consideration the 2012 Properties, LLC's Petition to Withdraw Excess Proceeds. The Court, after reading the pleadings, and hearing the evidence, finds:

Upon argument of counsel and for good cause shown, that 2012 Properties, LLC's Petition to Withdraw Excess Proceeds should be denied.

IT IS HEREBY ORDERED that 2012 Properties, LLC's Petition to Withdraw Excess Proceeds is DENIED.

Signed on this the _____ day of _____, 2015

_____
Judge Presiding

M. Kent Sims, Judge Presiding
Retired Judge of the 31st Judicial District Court
Sitting for Judge 34th Judicial District Court
Dallas County, Texas

*Order Denying 2012 Properties. LLC's Petition to Withdraw Excess Proceeds*
*Garland ISD v. Heirs of Lena Hobbs; Cause No. TX-12-40136, In The 134th Judicial District, Dallas County, Texas*
*Page 1 of 1*

# Appendix B

**CAUSE NO. TX-12-40136**

| | | |
|---|---|---|
| GARLAND INDEPENDENT SCHOOL DISTRICT, ET AL., | § § § | IN THE DISTRICT COURT |
| VS. | § § § § | 134th JUDICIAL DISTRICT |
| HEIRS AND UNKNOWN HEIRS OF LENA M. HOBBS, ET AL. | § § | DALLAS COUNTY, TEXAS |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On August 13, 2015, the Court held a hearing on the following: (1) Petition to Withdraw Excess Proceeds filed by Tonya Broyles, (2) Third Amended Petition for Excess Proceeds and Response to Garland ISD's Special Exceptions and Objection, filed by 2012 Properties, LLC, which the Court heard by agreement of the parties; (3) Garland ISD's Objection to and Special Exception to 2012 Properties LLC's Petition to Release Funds; and (4) Objections to 2012 Properties, LLC's Petition to Withdraw Excess Proceeds, filed by Charles Hobbs and the Heirs and Unknown Heirs of Lena M. Hobbs. By agreement of the parties, the Court heard the Third Amended Petition by 2012 Properties, LLC in lieu of that party's initial petition, although the amendment was not otherwise timely, and applied the other parties' objections and special exceptions to the Third Amended Petition. Following the hearing, on August 13, 2015, the Court signed an agreed order granting Tonya Broyles' Petition, and signed its Order Denying 2012 Properties, LLC's Petition to Withdraw Excess Proceeds.

On August 19, 2015, 2012 Properties, LLC filed a timely request for findings of fact and conclusions of law under TEX. R. CIV. P. 297. In response, the Court makes these findings and fact and conclusions of law.

*Findings of Fact and Conclusions of Law*
*Garland ISD v. Heirs of Lena M. Hobbs; Cause No. TX12-40136, In The 134th Judicial District, Dallas County, Texas*
*Page 1 of 5*

213

# FINDINGS OF FACT

1. The City of Garland, Garland Independent School District, County of Dallas, Dallas School Equalization Fund, Dallas County Community College District, and Parkland Hospital District ("Taxing Units") are authorized to levy and assess *ad valorem* taxes on the value of property located within its taxing jurisdictions as of January 1 of each tax year. The real property that is the subject of this cause ("Property") is located in the taxing jurisdiction of the Taxing Units.

2. This Court signed its Judgment in favor of the Taxing Units on June 12, 2013 ("Judgment") naming as Defendants: Heirs and Unknown Heirs of Lena M. Hobbs, Charles Randall Hobbs, Tonya Broyles, Lisa Greunke (collectively "Former Property Owners"), and Crow's Nest, Inc. The Judgment included property taxes for tax years 2010-2012.

3. On October 7, 2014, the Property was sold at a tax foreclosure sale.

4. The Property was sold for an amount greater than the amount due under the Judgment, resulting in surplus funds ("Excess Proceeds") which were deposited into the registry of this Court.

5. The Property was originally owned by Lena M. Hobbs who died intestate on April 28, 2005 while single and with issue. Lena M. Hobbs' children are: Charles Hobbs, Tonya Broyles, and Lisa Greunke.

6. 2012 Properties, LLC ("Tax Purchaser") was the successful bidder at the tax foreclosure sale of the Property.

7. The Tax Purchaser was not a party to the Judgment.

8. At the time the Tax Purchaser purchased the Property at the tax foreclosure sale, there were post-judgment taxes due on the Property for the tax years 2013 and 2014 ("Post-Judgment Taxes"). The Post-Judgment Taxes were not included in the Judgment.

*Findings of Fact and Conclusions of Law*
*Garland ISD v. Heirs of Lena M. Hobbs; Cause No. TX12-40136, In The 134th Judicial District, Dallas County, Texas*
*Page 2 of 5*

214

9. At the time the Tax Purchaser bid on the Property at the tax foreclosure sale, the Tax Purchaser knew the Post-Judgment Taxes were due on the Property, and the Tax Purchaser knew the Post-Judgment Taxes would continue to be a lien on the Property after the tax foreclosure sale.

10. The Tax Purchaser is an experienced tax foreclosure purchaser, having purchased about thirty properties at tax foreclosure during the previous approximate two years.

11. At the time the Tax Purchaser bid on the Property at the tax foreclosure sale, the Tax Purchaser knew that the tax foreclosure deed is a deed without warranty.

12. After the tax foreclosure sale, the Tax Purchaser paid all or a portion of the Post-Judgment Taxes. Based on the evidence, the Court cannot determine the amount of the Post-Judgment Taxes the Tax Purchaser paid, nor the amount that was due at the time of the Tax Purchaser's payment.

13. At the time the Tax Purchaser paid the Post-Judgment Taxes, there was no pending tax foreclosure lawsuit, nor was there an imminent threat of foreclosure of the tax lien for the Post-Judgment Taxes.

14. Intervenors County of Dallas, Dallas County School Equalization Fund, Dallas County Community College District, and Parkland Hospital District filed a petition for the release of a portion of the Excess Proceeds under TEX. TAX CODE §34.04. This Court signed its Order Disbursing Excess Proceeds on January 28, 2015, ordering the release of $532.75 for the benefit of Intervenors as payment for the Intervenors' portion of the 2013 Post-Judgment Taxes.

15. Charles Hobbs filed a petition for the release of a portion of the Excess Proceeds under TEX. TAX CODE §34.04. This Court signed its Order to Release Excess Proceeds from the Registry of the Court on January 8, 2015, ordering the release of $8,436.29 for the benefit of Charles Hobbs.

*Findings of Fact and Conclusions of Law*
*Garland ISD v. Heirs of Lena M. Hobbs; Cause No. TX12-40136, In The 134th Judicial District, Dallas County, Texas*
*Page 3 of 5*

215

16. Tonya Broyles filed a petition for the release of a portion of the Excess Proceeds under TEX. TAX CODE §34.04. This Court signed its Order to Release Excess Proceeds from the Registry of the Court on August 13, 2015, ordering the release of $8,436.29 for the benefit of Tonya Broyles.

17. As of this date, Lisa Greunke has not filed a petition claiming a portion of the Excess Proceeds, however, the statutory period for her to do so has not expired

18. The tax foreclosure sale of the Property to the Tax Purchaser has not been adjudged void.

## CONCLUSIONS OF LAW

1. TEX. TAX CODE §34.04 enumerates the proper claimants, and the priorities between different types of claimants, to excess proceeds from a tax foreclosure sale.

2. TEX. TAX CODE §34.04(c)(1) does provide that a tax sale buyer is the highest priority claimant to excess proceeds, but only in the event the tax sale has been adjudged void, which is not the case here.

3. TEX. TAX CODE §34.04 does not permit a claim by the Tax Purchaser for reimbursement of the Post-Judgment Taxes paid by the Tax Purchaser.

4. Generally, tax courts do not sit in equity, unless there is no adequate remedy at law, and a clear case establishing equitable jurisdiction has been made.

5. The Tax Purchaser had an adequate remedy at law, in that the Tax Purchaser could have filed a separate civil suit against the Former Property Owners seeking reimbursement for the Tax Purchaser's payment of the Post-Judgment Taxes. The Court draws no conclusion as to the merits of such a claim.

6. The Tax Purchaser has not made a clear case establishing the equitable jurisdiction of this Court.

*Findings of Fact and Conclusions of Law*
*Garland ISD v. Heirs of Lena M. Hobbs; Cause No. TX12-40136, In The 134th Judicial District, Dallas County, Texas*
*Page 4 of 5*

216

7. A tax lien attached to the Property securing the payment of the Post-Judgment Taxes on January 1 of each year 2013 and 2014. The Tax Purchaser purchased the Property at the tax foreclosure sale subject to the 2013 and 2014 tax liens.

8. After the Tax Purchaser purchased the Property at the tax foreclosure sale, the Tax Purchaser had liability for payment of the Post-Judgment Taxes because the tax lien for the Post-Judgment Taxes attached to the Property which the Tax Purchaser then owned.

9. The doctrine of equitable subrogation applies when one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity the other should have paid.

10. The Tax Purchaser fails the test of equitable subrogation because the Former Property Owners were not primarily liable for payment of the Post-Judgment Taxes.

11. The Tax Purchaser fails the test of equitable subrogation because the Tax Purchaser was either primarily or jointly liable for payment of the post-judgment taxes.

12. Based upon the facts of this case, this Court is not compelled by the equities of the situation to grant equitable relief to the Tax Purchaser.

SIGNED this ___9th___ day of ___September___, 2015.

_____
JUDGE PRESIDING

M. Kent Sims, Judge Presiding
Retired Judge of the 31st Judicial District Court
Sitting for Judge [illegible] Judicial District Court
Dallas County, Texas

*Findings of Fact and Conclusions of Law*
*Garland ISD v. Heirs of Lena M. Hobbs; Cause No. TX12-40136, In The 134th Judicial District, Dallas County, Texas*
*Page 5 of 5*

217

# Appendix C

MR. BELLEVUE:  I would like to ask some questions for the record.

THE COURT:  What is your client's name?

MR. GHRIST:  Dan Blackburn, Your Honor.

THE COURT:  Mr. Blackburn.

THE WITNESS:  Yeah.

THE COURT:  Please raise your right hand.

(Witness sworn)

THE WITNESS:  Yes.

THE COURT:  If this gets to be too burdensome, court reporter, let me know and we'll get everybody back and put him on the stand.

Yes, sir, Mr. Bellevue.

**DANIEL BLACKBURN**,

having been first duly sworn, testified as follows:

**VOIR DIRE EXAMINATION**

**BY MR. BELLEVUE:**

Q.  Mr. Blackburn, would you state your full name for the record?

A.  Daniel Blackburn.

Q.  And what is your relationship to 2012 Properties, LLC?

A.  I'm the business manager.

Q.  And so LLCs have managers that have authority to operate for them, so you're a manager of the LLC; is

that correct?

A. Correct.

Q. Okay. And 2012 Properties, LLC, purchased the subject property at tax foreclosure sale, correct?

A. Yes.

Q. Okay. And when you bid -- and you -- were you the one that bid on the property on behalf of the LLC?

A. Which property? Is there an address on this one? I don't recall if it was me or my -- or the other manager.

Q. Were you involved in the decision-making process of the LLC to bid on the property?

A. Yes.

Q. And so would your approval have been required for somebody to bid on behalf of the LLC for the property?

A. Yes.

Q. Okay. And at the time that you -- and I'm assuming you gave that approval; is that correct?

A. Yes.

Q. At the time that you gave that approval, were you aware that there were post-judgment taxes that were due on the property that would not be included in the minimum bid at tax sale?

A. Yes.

Q.   And were you aware that those post-judgment taxes were a lien on the property?

A.   Yes.

Q.   Okay.  And so you were aware that when you purchased the property, those taxes would be a lien on the property even after you purchased them at tax sale, correct?

A.   Yes.

Q.   And about how many properties, tax foreclosure properties have you been involved with the purchase of?

A.   Approximately 30, probably.

Q.   Approximately 30 over what time period?

A.   Two years.

Q.   Two years, okay.

And are you aware that a tax -- the tax deed that one receives from a tax foreclosure sale is without a warranty?

A.   Yes.

Q.   Okay.

MR. BELLEVUE:  I have no further questions at this time, Your Honor.

MR. McCOOL:  I have -- excuse me.  I have one other question, Your Honor.

THE COURT:  Okay.

**VOIR DIRE EXAMINATION**

**BY MR. McCOOL:**

Q. At the time of the tax sale purchase, were you aware that the -- that the debt for the taxes as to the prior owners was unsecured?

A. No.

MR. GHRIST: I'm going to object. I think there's a conclusion in there that hasn't been established.

THE COURT: It will be sustained.

Q. (By Mr. McCool) Well, did you know that after the tax sale purchase, after your -- after you purchased the property at tax sale, there would no longer be security for the debt as to the prior owners?

A. No.

MR. GHRIST: Object again. Same reason.

THE COURT: I'm unsure what the question is entirely, so I'll sustain the objection. Re- -- restate it, please, counsel.

Q. (By Mr. McCool) The question is: At the time as of your purchase of the tax -- of the tax sale property, there was no longer security for the debt for the post-judgment taxes as to the prior owners, is that your understanding?

MR. GHRIST: I'm going to object again on the grounds that the answer will be a legal conclusion.

THE COURT: I'll let him answer since he's indicated that he's very familiar with this procedure.

A. No.

MR. McCOOL: No more questions.

THE COURT: Either --

MR. BELLEVUE: So --

THE COURT: Any of you have other questions of this witness?

MR. GHRIST: I do, but we -- we're prepared to present our case, if this is the time.

MR. BANKS: I have no questions for the witness, Your Honor.

THE COURT: All right.

MR. BELLEVUE: I can present my objections before or after he presents his case.

THE COURT: Well, I'm not sure what -- tell me what your objections are.

MR. BELLEVUE: Well, Mr. McCool and I have jointly filed objections that cover nine separate objections to the claim of -- of 2012 Properties, LLC. But to highlight the most important ones, number one, as the taxing authorities have mentioned, the Legislature has not provided for a right for tax sale buyers that pay post-judgment taxes to make a claim against excess

proceeds, which is what's being attempted in this case.

In addition, as Your Honor is aware, tax courts do not sit in equity, but even if you could consider the equitable factors in this particular case, under the petitioner's claim of equitable subrogation, the facts of this case do not justify the court in equity allowing this subrogation. And the --

THE COURT: So I'll let counsel present what evidence you might have, please.

This will just help complete the record. I've heard some of these before, so I'm pretty familiar with what the result may need to be as far as what I've seen so far.

**DANIEL BLACKBURN,**

having been previously duly sworn, continued to testify as follows:

**DIRECT EXAMINATION**

**BY MR. GHRIST:**

Q. After the purchase, did 2012 Properties pay the taxes on the property that were due at that time?

A. Yes.

MR. GHRIST: I'd like to ask the other attorneys if they're opposed to admitting the tax records.

MR. BELLEVUE: Are those the same records

that were attached to your petition?

MR. GHRIST: Yes.

MR. BELLEVUE: No objection.

MR. McCOOL: No objection.

MR. BANKS: I don't have an objection either, Your Honor.

MS. HICKS: No objections from intervenors.

THE COURT: So what are they marked as?

MR. GHRIST: The Dallas --

THE COURT: Or are you just wanting me to take notice as they're attached?

MR. GHRIST: If you -- if you would take notice of the attachments to the third amended petition, Your Honor, that would --

THE COURT: Is that all that was attached?

MR. GHRIST: Yes, Your Honor.

MR. BANKS: Your -- Judge, considering the fact that you haven't made a ruling with respect to whether that amended petition is ripe, I would -- I would not be kosher with you taking notice of that amended petition. So I would ask that it be admitted the way he's trying to admit it.

THE COURT: Okay. That might be a safer

way. So mark your Exhibit 1.

MR. GHRIST: Petitioner would offer Exhibits A --

THE COURT: All right.

MR. GHRIST: -- B and C. Exhibit A being the taxes from the Dallas County Tax Office, Exhibit B being the taxes from the City of Garland Tax Office, and Exhibit C being the taxes from Garland Independent School District.

MR. BANKS: No objection.

MS. HICKS: No objections to the tax evidence.

MR. McCOOL: No objection.

MR. BELLEVUE: No objection, Your Honor.

THE COURT: Admitted.

Q. (By Mr. Ghrist) Now, Mr. Blackburn, when you paid the taxes -- you've testified previously that you understood there was a lien attached to the property -- did you make that payment in order to prevent foreclosure of that lien?

A. Yes.

Q. And did you also make the payment to avoid further accrual of taxes, penalties, fines or interest on amounts due?

A. Yes.

Q.   Were those amounts due by the former owner of the property?

MR. McCOOL:  Objection, it calls for a legal conclusion.

MR. GHRIST:  Your Honor, I -- I think the answer would be helpful to an understanding of the facts as a lay opinion.

THE COURT:  I'll sustain the objection. You can show me what you're getting at I assume by the dates of the taxes owed and date of sale and so forth.

Q.   (By Mr. Ghrist)  Did the former owner pay the taxes that were due at the time of the sale?

A.   The former owner, no.

Q.   And if you're equitably subrogated to the tax lien that was satisfied by your paying it, would there be any intervening lien holders that would be prejudiced?

MR. McCOOL:  Objection, calls for a legal conclusion.

THE COURT:  Sustained.

Q.   (By Mr. Ghrist)  Would there be any intervening lien holders that you're aware of in existence at this time?

A.   No.

Q.   Did you intend for that payment to be a gift

to the former owners?

A. No.

Q. So you paid the -- you made the payment solely to protect your interest in the property?

A. Yes.

Q. And have the former owners been enriched by the tax payment that you made?

MR. McCOOL: Objection --

MS. HICKS: Objection.

MR. McCOOL: -- calls for a legal conclusion.

THE COURT: Sustained.

Q. (By Mr. Ghrist) If you had not paid those taxes, would the taxes still be due?

A. Yes.

MR. GHRIST: We rest, Your Honor.

THE COURT: Any other questions of this witness?

MR. BELLEVUE: Yes, Your Honor, I have one question.

**CROSS-EXAMINATION**

**BY MR. BELLEVUE:**

Q. Mr. Blackburn, when you stated that you paid the taxes to prevent foreclosure of the property, was there an imminent foreclosure in process, had a new tax

foreclosure lawsuit been filed against you or the property at that time?

A. No.

MR. BELLEVUE: No further questions.

MR. McCOOL: I have no other questions.

THE COURT: Thanks, y'all.

So you have evidence on yours, counsel?

MR. SAVAGE: I do. Your Honor, we ask the Court to take judicial notice of the heir -- affidavit of heirship that was attached to the pleading. We also have proof of notice to the parties.

THE COURT: I assume everyone's here that needed notice maybe, right?

MR. SAVAGE: There's -- there's one un- --

THE COURT: Wait, let me look at the docket sheet.

MR. SAVAGE: One -- one, that was Ms Greun- --

MR. McCOOL: There's one defendant who is not present --

MR. SAVAGE: One defendant who is not -- not present.

MR. McCOOL: -- Your Honor.

THE COURT: And that is?

# Appendix D

# Exhibit A

AUG 1 3 2015



DALLAS COUNTY TAX OFFICE

*John R. Ames, CTA | Tax Assessor/Collector*

500 Elm Street, Dallas, TX 75202 | Phone 214-653-7811 | Fax 214-653-7887

*Se habla Español*

| Owner Search | Address Search | Account Search | Fiduciary Search |
|---|---|---|---|

## Property Tax Balance

> All tax information refers to the 2014 Tax Year, unless otherwise noted, i.e. "Prior Year Amount Due". Amounts due include penalty, interest, and collection fees if applicable.

**Account Number: 26126750010320000**

**Address:**
2012 PPTIES LLC
PO BOX 191088
DALLAS, TX 75219-8088

**Property Site Address:**
5618 MARINA DR, CG

**Legal Description:**
CAPTAINS QUARTERS 2/CROWS NEST
CROWS NEST
BLDG F UNIT 32 CE 2.5%
INT201400270598 DD10072014 CO-DC
1267500103200 32612675001

**Current Tax Levy:** $363.54

**Current Amount Due:** $0.00

**Prior Year Amount Due:** $0.00

**Total Amount Due:** $0.00

### eStatement Enrollment

**Enroll in eStatements to receive your 2015 Current Tax Statement by email in October, 2015.**

**Market Value:** $54,760

**Land Value:** $6,850

**Improvement Value:** $47,910

**Capped Value:** $0

**Agricultural Value:** $0

**Exemptions:** None

Current Tax Statement

Summary Tax Statement

Taxes Due Detail by Year and Jurisdiction

Payment Information

Account History Report

Payment History Report by Year

Payment History Report

Request an Address Correction

Click Here to see your estimated amount due for a future date. You can see this information by year and by both year and jurisdiction.

*Make your check or money order payable to:*
**JOHN R. AMES, CTA, TAX ASSESSOR/COLLECTOR**
**Dallas County Tax Office**
**P O BOX 139066**
**DALLAS, TEXAS 75313-9066**

| Go to Your Portfolio | Tax Office Home Page |
|---|---|

**Terms of Use**

**Disclaimer:** The Dallas County Tax Office provides this World Wide Web (WWW) site information and services "as is" without warranty of any kind, either expressed or implied. The Dallas County Tax Office does not warrant the accuracy, authority, completeness, usefulness, timeliness, or fitness for a particular purpose of its information or services. The Dallas County Tax Office, its officials and employees shall not be liable for any loss or injury caused in whole or part by its negligence, contingencies beyond its control, loss of data, or errors or omissions in the WWW site information or services.

DALLAS COUNTY TAX OFFICE
500 ELM STREET
DALLAS, TEXAS 75202-3304
214-653-7811

©Appraisal & Collection Technologies.
All rights reserved.

| Account No: | 261-267-500-10320000 | | Run Date: | 07/01/2015 |
|---|---|---|---|---|
| Certified Owner: | 2012 PPTIES LLC | | Run Time: | 16:49:53 |

**Year: 1996**

| Deposit No. | Rec Type | Remit Seq. | Validation No. | Deposit Date | Receipt Date | Paid Levy | Discount | Penalty | Interest | Collection Fees | Refund | Variance | Total Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 000008016411 | TL | 12434103 | 0000000012434103 | 12/27/96 | 12/27/96 | 118.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 118.13 |

**Year: 1997**

| Deposit No. | Rec Type | Remit Seq. | Validation No. | Deposit Date | Receipt Date | Paid Levy | Discount | Penalty | Interest | Collection Fees | Refund | Variance | Total Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PR991005MOR | TL | 13490098 | 0000000013490102 | 10/05/99 | 10/05/99 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -22.63 | 0.00 | -22.63 |
| RD991005MOR | TL | 13490098 | 0000000013490104 | 10/05/99 | 10/05/99 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 22.63 | 0.00 | 22.63 |
| RD991005MOR | TL | 13490098 | 0000000013490103 | 10/05/99 | 10/05/99 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -22.63 | 0.00 | -22.63 |
| 000008020851 | TL | 13490098 | 0000000013490101 | 12/31/97 | 12/31/97 | 90.54 | 0.00 | 0.00 | 0.00 | 0.00 | 22.63 | 0.00 | 113.17 |
| 000008020851 | TL | 13490098 | 0000000013490099 | 12/31/97 | 12/31/97 | -113.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -113.17 |
| 000008020851 | TL | 13490098 | 0000000013490098 | 12/31/97 | 12/31/97 | 113.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 113.17 |
| | | | Totals for Year 1997 : | | | 90.54 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 90.54 |

**Year: 1998**

| Deposit No. | Rec Type | Remit Seq. | Validation No. | Deposit Date | Receipt Date | Paid Levy | Discount | Penalty | Interest | Collection Fees | Refund | Variance | Total Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 000008025111 | TL | 14300847 | 0000000014300847 | 12/23/98 | 12/23/98 | 88.49 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 88.49 |

**Year: 1999**

| Deposit No. | Rec Type | Remit Seq. | Validation No. | Deposit Date | Receipt Date | Paid Levy | Discount | Penalty | Interest | Collection Fees | Refund | Variance | Total Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 000008029948 | TL | 15362715 | 0000000015362715 | 12/22/99 | 12/22/99 | 91.48 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 91.48 |

**Year: 2000**

| Deposit No. | Rec Type | Remit Seq. | Validation No. | Deposit Date | Receipt Date | Paid Levy | Discount | Penalty | Interest | Collection Fees | Refund | Variance | Total Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 000008034620 | TL | 16262883 | 0000000016262883 | 12/28/00 | 12/27/00 | 123.99 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 123.99 |

**Year: 2001**

| Deposit No. | Rec Type | Remit Seq. | Validation No. | Deposit Date | Receipt Date | Paid Levy | Discount | Penalty | Interest | Collection Fees | Refund | Variance | Total Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 000200004320 | TL | 2000611531 | 0000002000611531 | 01/03/02 | 12/31/01 | 139.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 139.03 |

**Year: 2002**

| Deposit No. | Rec Type | Remit Seq. | Validation No. | Deposit Date | Receipt Date | Paid Levy | Discount | Penalty | Interest | Collection Fees | Refund | Variance | Total Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 000200010612 | TL | 2001523975 | 0000002001523975 | 12/20/02 | 12/20/02 | 152.93 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 152.93 |

**Year: 2006**

| Deposit No. | Rec Type | Remit Seq. | Validation No. | Deposit Date | Receipt Date | Paid Levy | Discount | Penalty | Interest | Collection Fees | Refund | Variance | Total Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| K10070834863 | TL | 2010334127 | 900002011288895 | 07/08/10 | 07/08/10 | 377.83 | 0.00 | 45.34 | 158.70 | 116.38 | 0.00 | 0.00 | 698.25 |

**Year: 2007**

| Deposit No. | Rec Type | Remit Seq. | Validation No. | Deposit Date | Receipt Date | Paid Levy | Discount | Penalty | Interest | Collection Fees | Refund | Variance | Total Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Account No: 261-267-500-10320000

Certified Owner: 2012 PPTIES LLC

| Deposit No. | Rec Type | Remit Seq. | Validation No. | Deposit Date | Receipt Date | Paid Levy | Discount | Penalty | Interest | Collection Fees | Refund | Variance | Total Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| K10070834863 | TL | 2010334127 | 900002011288895 | 07/08/10 | 07/08/10 | 386.90 | 0.00 | 46.43 | 116.07 | 109.87 | 0.00 | 0.00 | 659.27 |

**Year: 2008**

| Deposit No. | Rec Type | Remit Seq. | Validation No. | Deposit Date | Receipt Date | Paid Levy | Discount | Penalty | Interest | Collection Fees | Refund | Variance | Total Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| K10070834863 | TL | 2010334127 | 900002011288895 | 07/08/10 | 07/08/10 | 336.58 | 0.00 | 40.39 | 60.58 | 87.51 | 0.00 | 0.00 | 525.06 |

**Year: 2009**

| Deposit No. | Rec Type | Remit Seq. | Validation No. | Deposit Date | Receipt Date | Paid Levy | Discount | Penalty | Interest | Collection Fees | Refund | Variance | Total Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| K10070834863 | TL | 2010334127 | 900002011288895 | 07/08/10 | 07/08/10 | 351.63 | 0.00 | 42.19 | 21.10 | 82.99 | 0.00 | 0.00 | 497.91 |

**Year: 2010**

| Deposit No. | Rec Type | Remit Seq. | Validation No. | Deposit Date | Receipt Date | Paid Levy | Discount | Penalty | Interest | Collection Fees | Refund | Variance | Total Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| K11032238761 | TL | 2011199646 | 900002015381453 | 03/22/11 | 03/22/11 | 363.97 | 0.00 | 25.49 | 7.27 | 0.00 | 0.00 | 0.00 | 396.73 |

**Year: 2011**

| Deposit No. | Rec Type | Remit Seq. | Validation No. | Deposit Date | Receipt Date | Paid Levy | Discount | Penalty | Interest | Collection Fees | Refund | Variance | Total Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| K12020237881 | TL | 2012041749 | 900002017839144 | 02/02/12 | 02/01/12 | 344.89 | 0.00 | 20.69 | 3.46 | 0.00 | 0.00 | 0.00 | 369.04 |

**Year: 2012**

| Deposit No. | Rec Type | Remit Seq. | Validation No. | Deposit Date | Receipt Date | Paid Levy | Discount | Penalty | Interest | Collection Fees | Refund | Variance | Total Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S0082085 | TL | 2014094491 | 900002021866172 | 11/11/14 | 11/11/14 | 329.71 | 0.00 | 39.56 | 72.55 | 88.37 | 0.00 | 0.00 | 530.19 |

**Year: 2013**

| Deposit No. | Rec Type | Remit Seq. | Validation No. | Deposit Date | Receipt Date | Paid Levy | Discount | Penalty | Interest | Collection Fees | Refund | Variance | Total Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RD0000378624 | TL | 2014430040 | 900002023305885 | 06/30/15 | 06/30/15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -532.75 | 0.00 | -532.75 |
| RA150629 | TL | 2014430040 | 900002023304776 | 06/29/15 | 03/25/15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| S0088073 | TL | 2014747850 | 900002022923800 | 03/25/15 | 03/25/15 | 358.03 | 0.00 | 42.96 | 42.97 | 88.79 | 0.00 | 0.00 | 532.75 |
| T0088072 | TL | 2014430040 | 900002022923791 | 03/25/15 | 03/25/15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 532.75 | 0.00 | 532.75 |
| T0088072 | TL | 2014430040 | 900002022923790 | 03/25/15 | 03/25/15 | -358.03 | 0.00 | -42.96 | -42.97 | -88.79 | 0.00 | 0.00 | -532.75 |
| P0085004 | TL | 2014430040 | 900002022293080 | 01/20/15 | 01/20/15 | 358.03 | 0.00 | 42.96 | 42.97 | 88.79 | 0.00 | 0.00 | 532.75 |
| Totals for Year 2013 : | | | | | | 358.03 | 0.00 | 42.96 | 42.97 | 88.79 | 0.00 | 0.00 | 532.75 |

**Year: 2014**

| Deposit No. | Rec Type | Remit Seq. | Validation No. | Deposit Date | Receipt Date | Paid Levy | Discount | Penalty | Interest | Collection Fees | Refund | Variance | Total Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| P0085004 | TL | 2014430040 | 900002022293080 | 01/20/15 | 01/20/15 | 363.54 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 363.54 |
| Grand Totals : | | | | | | 4,017.67 | 0.00 | 303.05 | 482.70 | 573.91 | 0.00 | 0.00 | 5,377.33 |

| Account No: | 261-267-500-10320000 | | Run Date: | 07/01/2015 |
| Certified Owner: | 2012 PPTIES LLC | | Run Time: | 16:49:53 |

### PAYMENT HISTORY BY DEPOSIT

| Deposit No. | Payer | Paid Levy | Discount | Penalty | Interest | Coll Fees | Refund | Variance | Total Paid |
|---|---|---|---|---|---|---|---|---|---|
| 000008016411 | HOMESIDE LENDING INC #008384<br>14528 S OUTER FORTY DR<br>CHESTERFIELD , MO 63017 | 118.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 118.13 |
| PR991005MORT | UNKNOWN<br>UNKNOWN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -22.63 | 0.00 | -22.63 |
| RD991005MORT | UNKNOWN<br>UNKNOWN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 000008020851 | HOMESIDE LENDING INC #008384<br>14528 S OUTER FORTY DR<br>CHESTERFIELD , MO 63017 | 113.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 113.17 |
| 000008020851 | UNKNOWN<br>UNKNOWN | -22.63 | 0.00 | 0.00 | 0.00 | 0.00 | 22.63 | 0.00 | 0.00 |
| 000008025111 | HOMESIDE LENDING INC #008384<br>14528 S OUTER FORTY DR<br>CHESTERFIELD , MO 63017 | 88.49 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 88.49 |
| 000008029948 | HOMESIDE LENDING INC #008384<br>14528 S OUTER FORTY DR<br>CHESTERFIELD , MO 63017 | 91.48 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 91.48 |
| 000008034620 | HOMESIDE LENDING INC #008384<br>14528 S OUTER FORTY DR<br>CHESTERFIELD , MO 63017 | 123.99 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 123.99 |
| 000200004320 | HOMESIDE LENDING INC #008384<br>14528 S OUTER FORTY DR<br>CHESTERFIELD , MO 63017 | 139.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 139.03 |
| 000200010612 | HOMESIDE LENDING INC #008384<br>14528 S OUTER FORTY DR<br>CHESTERFIELD , MO 63017 | 152.93 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 152.93 |

# PAYMENT HISTOR )EPORT BY YEAR

| | | | | | | | | Run Date: | 07/01/2015 |
|---|---|---|---|---|---|---|---|---|---|

Account No: 261-267-500-10320000

Certified Owner: 2012 PPTIES LLC

Run Time: 16:49:53

| Account | Name/Address | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| K10070834863 | HOBBS LENA M ESTATE OF<br>C/O LISA GREUNKE<br>1452 OAK TREE DRIVE<br>ATHENS , TX 75751-0000 | 377.83 | 0.00 | 45.34 | 158.70 | 116.38 | 0.00 | 0.00 | 698.25 |
| K10070834863 | HOBBS LENA M ESTATE OF<br>C/O LISA GREUNKE<br>1452 OAK TREE DRIVE<br>ATHENS , TX 75751-0000 | 386.90 | 0.00 | 46.43 | 116.07 | 109.87 | 0.00 | 0.00 | 659.27 |
| K10070834863 | HOBBS LENA M ESTATE OF<br>C/O LISA GREUNKE<br>1452 OAK TREE DRIVE<br>ATHENS , TX 75751-0000 | 336.58 | 0.00 | 40.39 | 60.58 | 87.51 | 0.00 | 0.00 | 525.06 |
| K10070834863 | HOBBS LENA M ESTATE OF<br>C/O LISA GREUNKE<br>1452 OAK TREE DRIVE<br>ATHENS , TX 75751-0000 | 351.63 | 0.00 | 42.19 | 21.10 | 82.99 | 0.00 | 0.00 | 497.91 |
| K11032238761 | HOBBS LENA M ESTATE OF<br>C/O LISA GREUNKE<br>1452 OAK TREE DR<br>ATHENS , TX 75751-9013 | 363.97 | 0.00 | 25.49 | 7.27 | 0.00 | 0.00 | 0.00 | 396.73 |
| K12020237881 | HOBBS LENA M ESTATE OF<br>C/O LISA GREUNKE<br>1452 OAK TREE DR<br>ATHENS , TX 75751-9013 | 344.89 | 0.00 | 20.69 | 3.46 | 0.00 | 0.00 | 0.00 | 369.04 |
| S0082085 | DISTRICT CLERK PYMT<br>TAX SUIT<br>DALLAS , TX 75202 | 329.71 | 0.00 | 39.56 | 72.55 | 88.37 | 0.00 | 0.00 | 530.19 |
| RD0000378624 | 2012 PROPERTIES, LLC<br>PO BOX 191088<br>DALLAS , TX 75219 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -532.75 | 0.00 | -532.75 |
| RA150629 | 2012 PROPERTIES, LLC<br>PO BOX 191088<br>DALLAS , TX 75219 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -532.75 | 0.00 | -532.75 |
| RA150629 | 2012 PROPERTIES, LLC<br>PO BOX 191088<br>DALLAS , TX 75219 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 532.75 | 0.00 | 532.75 |
| S0088073 | DISTRICT CLERK<br>EXCESS FUNDS ON TAX SUIT<br>DALLAS , TX 75202 | 358.03 | 0.00 | 42.96 | 42.97 | 88.79 | 0.00 | 0.00 | 532.75 |

| Account No: | 261-267-500-10320000 | | | | | | Run Date: | 07/01/2015 |
|---|---|---|---|---|---|---|---|---|

| Certified Owner: | 2012 PPTIES LLC | | | | | | Run Time: | 16:49:53 |
|---|---|---|---|---|---|---|---|---|

| T0088072 | 2012 PROPERTIES, LLC<br>PO BOX 191088<br>DALLAS , TX  75219 | -358.03 | 0.00 | -42.96 | -42.97 | -88.79 | 0.00 | 0.00 | -532.75 |
|---|---|---|---|---|---|---|---|---|---|
| T0088072 | 2012 PROPERTIES, LLC<br>PO BOX 191088<br>DALLAS , TX  75219 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 532.75 | 0.00 | 532.75 |
| P0085004 | 2012 PROPERTIES, LLC<br>PO BOX 191088<br>DALLAS , TX  75219 | 358.03 | 0.00 | 42.96 | 42.97 | 88.79 | 0.00 | 0.00 | 532.75 |
| P0085004 | 2012 PROPERTIES, LLC<br>PO BOX 191088<br>DALLAS , TX  75219 | 363.54 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 363.54 |
| | Grand Totals for Deposit : | 4,017.67 | 0.00 | 303.05 | 482.70 | 573.91 | 0.00 | 0.00 | 5,377.33 |

# Exhibit B

AUG 1 3 2015

City of Garland Tax Office



# GARLAND
### TEXAS MADE HERE

**Phone: (972)205-2410**

Sunday, June 28, 2015

**Fax: (972)205-2820**

## PAYMENT HISTORY

| Account Number: | 0000052833 | | | | | CAD Number: | 26126750010320000 |
|---|---|---|---|---|---|---|---|
| Owner Name: | 2012 PPTIES LLC | | | | | Property Address: | S618 MARINA DR |
| Address: | | | | | | Legal 1: | CAPTAINS QUARTERS 2/CROWS NEST |
| | PO BOX 191088 | | | | | Legal 2: | CROWS NEST |
| | DALLAS TX 75219-8088 | | | | | Legal 3: | BLDG F UNIT 32 CE 2.5% |
| | | | | | | Legal 4: | INT201400270598 DD10072014 CO- |
| | | | | | | Acres: | 0 |
| Mortgage Company: | | | | | | Property Type: | R |

| Year | Amount Paid | Penalty | Interest | Attorney | Total | Date | Check No | Payor Name |
|---|---|---|---|---|---|---|---|---|
| 2014 | $385.84 | $0.00 | $0.00 | $0.00 | $385.84 | 01/26/2015 808 | | 2012 PPTIES LLC |
| 2013 | $385.84 | $46.30 | $46.30 | $95.69 | $574.13 | 01/26/2015 808 | | 2012 PPTIES LLC |
| 2012 | $385.84 | $46.30 | $54.02 | $94.42 | $580.58 | 11/21/2014 503044343 | | COUNTY TREASURER |
| 2011 | $389.57 | $0.00 | $0.00 | $0.00 | $389.57 | 01/31/2012 CREDIT CARD | | LISA GREUNKE |
| 2010 | $411.42 | $28.80 | $8.23 | $0.00 | $448.45 | 03/22/2011 CREDIT | | GREUNKE, LISA D |
| 2009 | $411.42 | $41.14 | $20.57 | $70.97 | $544.10 | 06/08/2010 CREDIT | | LISA D GREUNKE |
| **Total** | **$2,369.93** | **$162.54** | **$129.12** | **$261.08** | **$2,922.67** | | | |

## Click on a blue individual year above to view/print a duplicate receipt.

Tax receipt data is current as of our last business day. Website updated daily to reflect current payment activity. Receipt invalid if payment not honored by financial institution.

### If you have questions about your taxes please call your tax office.
### Otherwise call Governmental Data Services at 800-431-6176 if you experience any issues using this website.

About Us                    Legal Notices                    Contact Us

Copyright © 2015 GDS Inc./TexasPayments.com All Rights Reserved

# Exhibit C

AUG 1 3 2015



Phone: (972)494-8570                              Fax: (972)494-8631

# PAYMENT HISTORY

| | | |
|---|---|---|
| **Account Number:** | 0000034911 | **CAD Number:** 26126750010320000 |
| **Owner Name:** | 2012 PPTIES LLC | **Property Address:** 5618 MARINA DR |
| **Address:** | | **Legal 1:** CAPTAINS QUARTERS 2/CROWS NEST |
| | PO BOX 191088 | **Legal 2:** CROWS NEST |
| | DALLAS TX 75219-8088 | **Legal 3:** BLDG F UNIT 32 CE 2.5% |
| | | **Legal 4:** INT201400270598 DD10072014 CO- |
| | | **Acres:** 0 |
| **Mortgage Company:** | | **Property Type:** R |

| Year | Amount Paid | Penalty | Interest | Attorney | Total | Date | Check No | Payor Name |
|---|---|---|---|---|---|---|---|---|
| 2014 | $686.31 | $0.00 | $0.00 | $0.00 | $686.31 | 01/27/2015 | 811 | 2012 PROPERTIES LLC |
| 2013 | $686.31 | $82.38 | $82.38 | $127.65 | $978.68 | 01/27/2015 | 811 | 2012 PPTIES LLC |
| 2012 | $686.31 | $82.38 | $220.87 | $137.95 | $1,127.49 | 11/21/2014 | 503044344 | COUNTY OF DALLAS |
| 2011 | $692.95 | $0.00 | $0.00 | $0.00 | $692.95 | 01/31/2012 | CC | LISA GREUNKE |
| 2010 | $723.08 | $86.77 | $419.42 | $171.37 | $1,400.62 | 11/21/2014 | 503044344 | COUNTY OF DALLAS |
| 2010 | $8.74 | $1.05 | $0.87 | $1.60 | $12.26 | 11/30/2011 | 503026547 | COUNTY OF DALLAS |
| 2009 | $731.80 | $87.82 | $161.00 | $147.09 | $1,127.71 | 11/30/2011 | 503026547 | COUNTY OF DALLAS |
| **Total:** | **$4,215.48** | **$340.38** | **$884.52** | **$585.66** | **$6,026.02** | | | |

## Click on a blue individual year above to view/print a duplicate receipt.

Tax receipt data is current as of our last business day. Website updated daily to reflect current payment activity. Receipt invalid if payment not honored by financial institution.

**If you have questions about your taxes please call your tax office.**
**Otherwise call Governmental Data Services at 800-431-6176 if you experience any issues using this website.**

About Us                          Legal Notices                          Contact Us

Copyright © 2015 GDS Inc./TexasPayments.com All Rights Reserved

# Appendix E

# Smart v. Tower Land & Inv. Co.

The Supreme Court of Texas

Mar. 12, 1980

No. B-8664

## Reporter

597 S.W.2d 333; 1980 Tex. LEXIS 328; 23 Tex. Sup. J. 241

Don M. Smart, Petitioner vs. Tower Land and Investment Company, Respondent

**Subsequent History:** **[**1]** Rehearing Denied May 7, 1980

**Prior History:** From Dallas County, Fifth District

## Core Terms

taxes, foreclosure, reimbursement, mortgagee, mortgage, usurious, trust deed, mortgagor, subrogated, acceleration, unearned, personal liability, ref'd, personal judgment, default, per annum, parties, terms, maturity, refund, equitable subrogation, mortgage debt, prepaid, rights, pays, purchase the property, motion for rehearing, personal debt, no writ, delinquent

## Case Summary

### Procedural Posture

Petitioner mortgagor challenged the decision of the court of civil appeals, Dallas County, Fifth District (Texas), which affirmed the trial court's judgment that granted respondent mortgagee's claim for reimbursement of taxes and denied petitioner's usury claim.

### Overview

Petitioner mortgagor purchased real estate from respondent mortgagee and paid part of the purchase price with a promissory note secured by a deed of trust which contained a no personal liability clause. When petitioner defaulted on the note, respondent repurchased the property at foreclosure sale, paid the delinquent taxes and sought reimbursement from petitioner. Petitioner counterclaimed stating the note was usurious. The lower court granted respondent's claim and denied petitioner's claim. The court reversed both findings. It determined that the mortgage contract did not give rise to a personal debt for taxes owed because both the purchase money debt and the tax debt comprised a single mortgage debt to be enforced at foreclosure without personal liability. The court also found that the note was usurious on its face because the documents required prepayment of three years of interest, affirmatively provided for the retention of unearned interest, and did not contain a usury savings clause.

### Outcome

The court reversed the judgments of the lower courts and rendered judgment that respondent mortgagee take nothing on its claim for reimbursement because there was no basis for imposing personal liability against petitioner mortgagor for taxes paid after foreclosure. It also reversed the judgments of the lower courts that held the note was not usurious and remanded the matter for determination of damages because the note was usurious on its face.

## LexisNexis® Headnotes

Real Property Law > Financing > Foreclosures > General Overview

Tax Law > State & Local Taxes > Administration & Procedure > Failure to Pay

*HN1* If a mortgagor fails to pay taxes he has promised to pay, the mortgagee may treat the amount owed for taxes as part of the mortgage debt. In the usual mortgage agreement the rights and obligations of the mortgagor and mortgagee for expenses such as property taxes are set out in the deed of trust, and the duty to pay taxes is ordinarily the mortgagor's. If the mortgagor fails to pay the taxes, the mortgagee may pay them and the amount paid for taxes is considered to be a part of the mortgage debt. Both the mortgagor's obligation to pay the amount due on the purchase price and his obligation to pay taxes are secured by the mortgage.

Contracts Law > Contract Interpretation > General Overview

*HN2* It is the duty of the court to construe the contract as an entire instrument, and to consider each part with every other part so that the effect and meaning of one part on any other part may be determined.

Contracts Law > Standards of Performance > Creditors & Debtors

Contracts Law > Remedies > Equitable Relief > General Overview

Contracts Law > ... > Secured Transactions > Default > Creditor Obligations

Contracts Law > Third Parties > Subrogation

Contracts Law > Types of Contracts > Quasi Contracts

*HN3* Equitable subrogation may be invoked to prevent unjust enrichment when one person confers upon another a benefit that is not required by legal duty or contract. A right to subrogation is often asserted by one who pays a debt owed by another. If entitled to full subrogation, the payor is allowed to enforce the rights available to the creditor, such as rights against the debt's security.

Subrogation to the creditor's rights is available, however, only when the debtor was enriched unjustly; thus, the payor who confers a benefit as a mere volunteer is not entitled to this remedy.

Real Property Law > ... > Liens > Nonmortgage Liens > Tax Liens

Tax Law > State & Local Taxes > Administration & Procedure > Tax Liens

Tax Law > State & Local Taxes > Real Property Taxes > General Overview

*HN4* One who pays real property taxes assessed while the property was owned by another asserts a right to be subrogated to the taxing authority's constitutional and statutory lien. Under this lien, liability for taxes is secured by the property and may be enforced by foreclosure. Other special rights and privileges have been held to inure to the taxing authority in addition to its lien, such as the right to enforce tax liability as a personal debt.

Contracts Law > Third Parties > Subrogation

Contracts Law > Types of Contracts > Express Contracts

Real Property Law > ... > Liens > Nonmortgage Liens > Tax Liens

Tax Law > State & Local Taxes > Administration & Procedure > Tax Liens

*HN5* The taxpayer's right to subrogation may arise by statute or by express agreement. Furthermore, the taxing authority's lien may be transferred. Tex. Rev. Civ. Stat. Ann. art. 7345a (1979).

Contracts Law > Third Parties > Subrogation

Insurance Law > Claim, Contract & Practice Issues > Subrogation > Voluntary Payments

Real Property Law > Financing > Foreclosures > General Overview

Real Property Law > ... > Mortgages & Other Security Instruments > Satisfaction & Termination > General Overview

*HN6* The mortgagee's interest in the security of his mortgage makes him more than a mere volunteer when he pays taxes owed by the mortgagor. Because the relationship between the mortgagor and mortgagee is contractual, the extent to which the mortgagee is subrogated to the taxing authority's rights may be addressed in the documents representing their agreement, particularly in the deed of trust. Unless provided otherwise, the mortgagee is subrogated to the security of the tax debt. Taxes not paid by the mortgagor are considered to be part of the mortgage debt. Upon foreclosure, the proceeds from the sale of the property may be applied in satisfaction of the amount paid for taxes.

Real Property Law > Financing > Foreclosures > General Overview

*HN7* The mortgagee who purchases the property with delinquent taxes owed by the mortgagor, may account for the delinquent taxes in determining his bid. The purchasing mortgagee who fails to pursue this course of action and purchases the property with taxes remaining unpaid will be considered to have purchased with reference to the tax liability.

Contracts Law > Defenses > Usury

Real Property Law > ... > Mortgages & Other Security Instruments > Transfers > Due on Sale Clauses

*HN8* Upon acceleration of maturity, the failure to properly refund or credit excess unearned interest may result in usury. Whether the inclusion of an acceleration clause, and the attendant contingency that excess unearned interest may be collected or retained, makes a contract usurious is a question of construction.

Contracts Law > Defenses > Usury

*HN9* While courts have no right to depart from the terms in which the contract is expressed to make legal what the parties have made unlawful, nevertheless when the contract by its terms, construed as a whole, is doubtful, or even susceptible of more than one reasonable construction, the court will adopt the construction which comports with legality. It is presumed that in contracting parties intend to observe and obey the law. For this reason the court will not hold a contract to be in violation of the usury laws unless, upon a fair and reasonable interpretation of all its terms, it is manifest that the intention was to exact more interest than allowed by law.

Contracts Law > Defenses > Usury

*HN10* Unless the contract by its express and positive terms evidences an intention which requires a construction that unearned interest was to be collected in all events, the court will give it the construction that the parties intended that the unearned interest should not be collected.

Contracts Law > Defenses > Usury

*HN11* The contract under construction will not be found usurious on its face unless it expressly entitles the lender, upon the happening of a contingency or otherwise, to exact interest at a rate greater than that allowed by law.

**Counsel:** For Petitioner: Timothy E. Keeley - Dallas, TX

For Respondent: H. Dee Johnson, Jr. - Dallas, TX

**Opinion by:** McGEE

## Opinion

[*335] Sears McGee, Justice
This is a suit for reimbursement of real property taxes that accrued while the property was held under a deed of trust. The taxes were paid by the mortgagee, Tower Land and Investment Company (Tower), after Tower foreclosed on the mortgage. Tower sought reimbursement from the mortgagor, Don M. Smart. Smart filed a counterclaim for

usury. The trial court entered judgment for Tower for reimbursement for taxes and denied Smart's usury claim. The court of civil appeals affirmed. *582 S.W.2d 543*. On Tower's claim for reimbursement we reverse the judgments of the lower courts and render judgment that Tower take nothing. We also reverse the lower courts' judgments that Smart's counterclaim for usury be denied.

In 1968 Tower sold approximately 35 acres of land to Smart. Smart paid part of the purchase price with a promissory note secured by a deed of trust. The note and deed of trust represented a "no personal liability" obligation.

Smart defaulted [**2] on his note in December 1975. Three months later Tower repurchased the property at the foreclosure sale. After the sale, Tower paid delinquent ad valorem taxes in the amount of $18,736.53, which had been assessed on the property during the time Smart owned the property. Tower then brought suit against Smart for reimbursement for the amount paid for taxes. Smart counterclaimed, alleging that the note was usurious.

 [*336] REIMBURSEMENT TO TOWER FOR TAXES

Neither Smart nor Tower disputes that under the deed of trust Smart was obligated to pay taxes assessed on the property during the mortgage; the parties disagree, however, on how Smart's liability to Tower for failure to pay taxes may be enforced. Both the trial court and the court of civil appeals held Tower could pay the delinquent taxes after having purchased the property at the mortgage foreclosure sale and subsequently obtain a personal judgment against Smart for reimbursement. We will consider first whether the contractual relationship between Tower as mortgagee and Smart as mortgagor gives rise to a personal debt for taxes, and second, whether principles of equitable subrogation entitle Tower to obtain a personal [**3] judgment for reimbursement.

We first find that the mortgage contract did not give rise to a personal debt for taxes owed by Smart to Tower. Many Texas cases have held that *HN1* if a mortgagor fails to pay taxes he has promised to pay, the mortgagee may treat the amount owed for taxes as part of the mortgage debt. In the usual mortgage agreement the rights and obligations of the mortgagor and mortgagee for expenses such as property taxes are set out in the deed of trust, and the duty to pay taxes is ordinarily the mortgagor's. If the mortgagor fails to pay the taxes, the mortgagee may pay them and the amount paid for taxes is considered to be a part of the mortgage debt. Both the mortgagor's obligation to pay the amount due on the purchase price and his obligation to pay taxes are secured by the mortgage. *See Stone v. Tilley, 100 Tex. 487, 101 S.W. 201, 201-02 (1907)*; *Peurifoy v. Wiebusch, 174 S.W.2d 619, 623* (Tex. Civ. App.--El Paso 1943, no writ); *Bryan v. Dallas Nat'l Bank, 135 S.W.2d 249, 253* (Tex. Civ. App. Dallas 1939, writ dism'd judgmt cor.); *Young v. Harbin Citrus Groves, 130 S.W.2d 896, 901* (Tex. Civ. App.--San Antonio 1939, writ ref'd); *Yates* [**4] *v. Home Building & Loan Co., 103 S.W.2d 1081, 1087* (Tex. Civ. App.--Beaumont 1937, no writ); *Jefferson Standard Life Ins. Co. v. Lindsey, 94 S.W.2d 549, 551-52* (Tex. Civ. App.--Eastland 1936, writ dism'd); *The Praetorians v. State, 53 S.W.2d 334, 335* (Tex. Civ. App.--Waco 1932, writ ref'd); *Wood v. Scott, 48 S.W.2d 1024, 1025* (Tex. Civ. App.--Waco 1932, writ ref'd).

Four documents represent the mortgage transaction between Smart and Tower; a contract of sale, an installment note, a deed of trust, and an extension agreement. Smart and Tower had agreed that these documents comprise their entire agreement. The installment note, containing Smart's promise to pay the purchase price and interest, also contains the following nonpersonal liability provision: "[the] maker hereof is not now or shall he ever be personally liable on this note...."

The deed of trust form contains the following paragraph, quoted in pertinent part, which sets out

the rights and duties of the parties with respect to property taxes:

"It is agreed and stipulated that [Smart] shall and will at [his] own proper cost and expense, keep the property and premises herein described, and **[**5]** upon which a lien is hereby given and created, in good repair and condition, and to pay and discharge as they are or may become payable, all and every taxes and assessmemts that are or may become payable thereon under any law, ordinance or regulation, whether made by Federal, State, or Municipal authority, and shall keep said property fully insured…. And in case of default made by [Smart] in performance of any of the foregoing stipulations, the same may be performed by the holder of said indebtedness, for account and at the expense of [Smart], and any and all expenses incurred and paid in so doing shall be payable by [Smart] to [Tower] with interest at the rate of ten per cent per annum from the date when the same was so incurred or paid, and shall stand secured and payable by and under this deed in like manner with the other indebtedness herein mentioned…."

According to Tower's interpretation of this paragraph, Smart's promise to reimburse **[*337]** Tower for taxes is to exist as a personal debt independent of the mortgage debt. Tower emphasizes the following phrase from the paragraph: "and any and all expenses incurred and paid in so doing shall be payable by [Smart] **[**6]** to [Tower]…."

Although the words, "shall be payable," standing alone may lend some support to the interpretation urged by Tower, we adhere to the rule that *HN2* "[it] is the duty of the Court to construe the contract as an entire instrument, and to consider each part with every other part so that the effect and meaning of one part on any other part may be determined." *Steeger v. Beard Drilling, Inc., 371 S.W.2d 684, 688 (Tex. 1963)*. Immediately following the "shall be payable" phrase is the

phrase "and shall stand secured and payable by and under this deed in like manner with the other indebtedness herein mentioned…." The "other indebtedness" is Smart's promissory note for the purchase price and interest, which is described in the deed of trust form as follows: "Said note provides that the maker has no personal liability thereunder…." The tax payment provision in the deed of trust provides that Smart's liability to Tower for tax reimbursement was to be secured and payable in "like manner" as his note. Under these provisions, Tower was entitled to pursue his right to reimbursement for taxes at foreclosure, when he pursued his right to receive the balance due on Smart's **[**7]** note. Both the purchase money debt and the tax debt comprised a single mortgage debt to be enforced at foreclosure without personal liability.

Wo do not find that the words "shall be payable by [Smart]" give rise to an additional remedy for tax reimbursement, enforceable apart from foreclosure. By the terms of the installment note and the deed of trust Smart and Tower limited the purchase money debt to a nonpersonal liability, enforceable only by foreclosure proceedings against the property. Under the deed of trust, Smart's liability for tax reimbursement is made part of the mortgage debt. There is no contractual authority created whereby Tower is also entitled to enforce his right to reimbursement as a personal debt. Regardless whether Tower paid taxes before or after foreclosure, he did not acquire the right to a personal judgment against Smart.

The "Extension of Lien" agreement executed in 1974 supplies an additional reason for holding that Smart and Tower intended all of Smart's obligations under the mortgage to be nonpersonal. It contains the following provision:

"And [Smart and Tower] also agree… that the lien given and retained to secure the payment of said **[**8]** Note *and all the agreements and covenants therein*, shall remain in full force and effect. This extension lien is without personal liability."

(Emphasis added). We conclude that the parties did not contract for personal liability for taxes. [1]

Tower contends that notwithstanding the terms of the mortgage contract, under principles of equitable subrogation, it is entitled to a personal judgment against Smart for tax reimbursement. *HN3* Equitable subrogation may be invoked to prevent unjust enrichment when one person confers upon another a benefit that is not required by legal duty or contract. A right to subrogation is often asserted by one who [**9] pays a debt owed by another. If entitled to full subrogation, the payor is allowed to enforce the rights available to the creditor, such as rights against the debt's security. Subrogation to the creditor's rights is available, however, only when the debtor was enriched unjustly; thus, the payor who confers a benefit as a "mere volunteer" is not entitled to this remedy. *Oury v. Saunders, 77 Tex. 278, 13 S.W. 1030, 1031 (1890)*.

Often *HN4* one who pays real property taxes assessed while the property was owned by [*338] another asserts a right to be subrogated to the taxing authority's constitutional and statutory lien. Under this lien, liability for taxes is secured by the property and may be enforced by foreclosure. *See TEX. CONST. art. VIII, § 15*; *TEX. REV. CIV. STAT. ANN. art. 7172* (Vernon Supp. 1979). Other special rights and privileges have been held to inure to the taxing authority in addition to its lien, such as the right to enforce tax liability as a personal debt. *See Texas Vegetable Union v. Zavala-Dimmitt Counties Water Imp. Dist. No. 1, 57 S.W.2d 883* (Tex. Civ. App. San Antonio 1933, writ ref'd); *Humble Oil & Refining Co. v. State, 3 S.W.2d* [**10] *559* (Tex. Civ. App.--Waco 1927, writ ref'd).

Whether one who pays property taxes assessed on property owned by another is entitled to subrogation to the taxing authority's lien, and if so, the extent to which he is subrogated, equitably or otherwise, to the special privileges accompanying the lien, has been the source of much litigation. *HN5* The taxpayer's right to subrogation may arise by statute, *see McDonald v. Doyschen, 28 S.W.2d 243, 246* (Tex. Civ. App.--Fort Worth 1930, no writ), or by express agreement, *see Dotson v. Pahl, 206 S.W.2d 272, 273* (Tex. Civ. App. Austin 1947, no writ); *Kauffmann v. Hahn, 59 S.W.2d 435, 436* (Tex. Civ. App.--San Antonio 1933, no writ); *Texas Bank & Trust Co. v. Bankers' Life Co.,* 43 S.W.2d, 631, 631 (Tex. Civ. App.--Waco 1931, writ ref'd). Furthermore, there is a statutory procedure whereby the taxing authority's lien may be transferred. *See* TEX. REV. CIV. STAT. ANN. art. 7345a (Vernon Supp. 1979). Even in the absence of statutory or contractual authorization, a limited right to equitable subrogation may arise in accordance with certain well-established rules of law.

The rule set out in *Stone v. Tilley,* [**11] *supra at 202*, with respect to a mortgagee who pays taxes that his mortgagor is under a duty to pay is consistent with general principles of subrogation. *HN6* The mortgagee's interest in the security of his mortgage makes him more than a "mere volunteer" when he pays taxes owed by the mortgagor. *Burkhardt v. Lieberman, 138 Tex. 409, 159 S.W.2d 847, 853 (1942)*. Because the relationship between the mortgagor and mortgagee is contractual, the extent to which the mortgagee is subrogated to the taxing authority's rights may be addressed in the documents representing their agreement, particularly in the deed of trust. Unless provided otherwise, the mortgagee is subrogated to the security of the tax debt. Taxes not paid by the mortgagor are considered to be part of the mortgage debt. Upon foreclosure, the proceeds from the sale of the property may be applied in

---

[1]    We do not suggest that if Smart's mortgage note were a personal liability obligation and the deed of trust and lien extension had not contained the "no personal liability" language, there would be no personal liability for taxes paid by the mortgagee prior to foreclosure in the event the net proceeds of foreclosure were insufficient to pay them.

satisfaction of the amount paid for taxes. *Stone v. Tilley, supra at 202*; *Wood v. Scott, 48 S.W.2d 1024, 1025* (Tex. Civ. App.--Waco 1932, writ ref'd). As discussed above, the mortgage contract between Smart and Tower comports with this right to equitable subrogation to the taxing authority's lien and expressly **[**12]** precludes personal liability. The parties having fixed their rights by contract, additional rights, such as are incidental to the sovereign's taxing power, will not be created by judicial intervention.

After foreclosure, the relationship between the mortgagor and mortgagee in those capacities ends. If the mortgagee purchases the mortgaged property, as Tower did in this case, his interest in the property becomes an ownership interest. If taxes on the property owed by the mortgagor are delinquent, the purchaser, whether the mortgagee or a disinterested party, may desire to pay them to prevent foreclosure by the taxing authorities. Because of his interest in protecting his title, the purchaser is not a "mere volunteer," when he discharges an outstanding tax lien. Under various circumstances he may be subrogated to the taxing authority's lien to the extent necessary for his own equitable protection. *See* *McDermott v. Steck Co., 138 S.W.2d 1106, 1109* (Tex. Civ. App.--Austin 1940, writ ref'd). When not compelled by the equities of the situation, full subrogation to all special privileges accompanying the taxing authority's constitutional and statutory lien will be denied.

**[**13]** **[*339]** Tower urges that this court should adopt the rule followed in Pennsylvania cases that hold that a mortgagee who, after foreclosing and purchasing the property at the foreclosure sale, pays taxes assessed against the former owner, is subrogated to the taxing authority's right to maintain a personal action against the former owner for the amount of the taxes. *Pennsylvania Co. for Insurances on Lives and Granting Annuities v. Bergson, 307 Pa. 44, 159 A. 32, 35 (1932)*; *Preston Retreat v. Potter, 120 Pa. Super. 82, 182*

*A. 64, 64 (1935)*. We decline to follow this rule. In *The Praetorians v. State, 53 S.W.2d 334* (Tex. Civ. App.--Waco 1932, writ ref'd), The Praetorians, assignee of a mortgagee, purchased the mortgaged property at foreclosure. Later, the State sought to enforce its lien for taxes that had accrued during the mortgage. The Praetorians, although compelled to pay the tax lien to protect its title, was not entitled to a personal judgment for reimbursement against the mortgagor's grantee, who had taken subject to the mortgage and owned the property when the taxes accrued. The court held:

"[Had] the Praetorians, prior to the foreclosure of its **[**14]** deed of trust, paid the amount of taxes due the state and county, it would not have been entitled to a personal judgment against the lumber company for the taxes so paid, but would have been limited in its recovery to a foreclosure of a lien on the property for the amount of such taxes. The fact that it has foreclosed its lien and is now the owner of the property and may now be compelled to pay such taxes in order to protect its title, does not give it any greater right. It is, therefore, not entitled to a personal judgment against the lumber company for the amount of taxes which it may be required to pay in order to redeem the property from the judgment in favor of the state."

*Id. at 335*. **HN7** The mortgagee who purchases the property with delinquent taxes owed by the mortgagor, may account for the delinquent taxes in determining his bid. The purchasing mortgagee who fails to pursue this course of action and purchases the property with taxes remaining unpaid will be considered to have purchased with reference to the tax liability. Assuming that the taxing authority would have been entitled to a personal judgment against Smart for taxes assessed during the mortgage, we do not **[**15]** believe that the equities of this suit entitle Tower to be subrogated to that right.

Because we find that no basis for imposing personal liability against Smart for taxes paid

after foreclosure arises from the mortgage contract or by equitable subrogation, we hold that Tower may not enforce his reimbursement claim as a personal judgment against Smart.

## SMART'S COUNTERCLAIM FOR USURY

Smart's promissory note to Tower contained the following provision for interest payments prior to maturity:

"[With] interest thereon from date until three years from date at the rate of six percent (6%) per annum (such portion of the interest being paid for the first three years in advance on the date hereof) and thereafter at the rate of seven percent (7%) per annum…."

Only interest was payable until 1974, when payments of the principal amount of $517,549.80 were to begin. Pursuant to these terms, Smart prepaid the first three years' interest at 6%, an amount of $93,159,00, at the inception of the note in 1968.

The note also gave Tower the option upon default to accelerate and mature the note:

"Default in the payment of any part of the principal or interest when due, or failure to **[**16]** comply with any of the agreements and conditions in the instrument given to secure this note shall, at the option of the holder hereof, mature this note and it shall at once become due and payable… however, holder shall give marker or enforsers thirty (30) days' notice of default before this note can be matured."

Another provision ensured that Tower was not required to refund payments:

 **[*340]** "The maker hereof is not know nor shall he ever he personally liable on this note, but the payees or other holders of this note shall never be obligated to refund any payment of interest or principal after such payment has been made."

The note was extended in 1974 and Smart defaulted in 1975. Tower foreclosed on the property and purchased the property at foreclosure. Smart does not contend that Tower received usurious interest; Smart's usury claim is based on his contention that the note is usurious on its face because under hypothetical circumstances it allows the holder to receive more than the lawful rate of interest. The statute providing penalties for usury applies in the distinctive to either a contract for, a charge of, or receipt of usurious interest, and any one of **[**17]** these triggers the penalty provisions. *Tanner Development Co. v. Ferguson,* 561 S.W.2d 777, 788 (Tex. 1977) (on motion for rehearing).

According to Smart, the interest in advance terms, in conjunction with the acceleration clause and no refund provision, results in a potentially usurious contract. Smart argues that if he had defaulted during the first twenty-two months of the loan, Tower could have accelerated maturity of the entire principal and would not have been required to refund the three years' prepaid interest. If Tower did not credit part of this prepaid interest to principal, the rate of interest received by Tower would exceed 10% per annum.*HN8*

Upon acceleration of maturity, the failure to properly refund or credit excess unearned interest may result in usury. *Tanner Development Co. v. Ferguson, supra* at 788-89 (on motion for rehearing). *See* St. Clair, *The "Spreading of Interest" Under the Actuarial Method,* 10 ST. MARY'S 753, 757 (1979). Whether the inclusion of an acceleration clause, and the attendant contingency that excess unearned interest may be collected or retained, makes a contract usurious is a question of construction. The contention **[**18]** that the lender's right to exercise an acceleration clause resulted in a usurious contract was discussed in *Shropshire v. Commerce Farm Credit Co.,* 120 Tex. 400, 30 S.W.2d 282 (1930), *on motion for rehearing, 120 Tex. 412, 39 S.W.2d 11 (1931), cert. denied, 284 U.S. 675 (1931).* Holding that the particular contract under construction gave the

lender the right to recover usurious interest, the court stated:

"In obedience to the behest of the Constitution to provide appropriate penalties to prevent contracts for a greater rate of interest than 10 percent per annum, the Legislature has declared that all written contracts whatsoever which may in any way, directly or indirectly, provide for a greater rate of interest than 10 percent per annum, shall be usurious…. The illegality is the same whether the contract for usury takes the form of a stipulation for lawful interest, becoming a stipulation for usurious interest through reduction of the original term of the loan and increase in that which may be exacted of the debtor, at the creditor's option, on no other contingency than the debtor's default; or whether the contract is in the form of a stipulation for interest **[\*\*19]** in excess of 10 percent per annum for a specific term. Both contracts provide for usury."

*Id. at 14* (on motion for rehearing). Significantly, the court had recognized a duty to give a legal construction to the contract, but because the "clear and positive language" of the contract provided for the collection of unearned interest in addition to the principal balance due, the contract was usurious.

Several cases decided after *Shropshire* have given nonusurious constructions to contracts alleged to be usurious because of acceleration clauses. In *Walker v. Temple Trust Co., 124 Tex. 575, 80 S.W.2d 935 (1935)*, this court stated:

**HN9** "While of course courts have no right to depart from the terms in which the contract is expressed to make legal what the parties have made unlawful, nevertheless when the contract by its terms, construed as a whole, is doubtful, or even susceptible of more than one reasonable **[\*341]** construction, the court will adopt the construction which comports with legality. It is presumed that in contracting parties intend to observe and obey the law. For this reason the court will not hold a contract to be in violation of the usury laws unless, **[\*\*20]** upon a fair and reasonable interpretation of all its terms, it is manifest that the intention was to exact more interest than allowed by law.

. . .

"[The] rule should be, as clearly recognized in motion for rehearing in the Shropshire Case [*Shropshire v. Commerce Farm Credit Co., 120 Tex. 400, 30 S.W.2d 282, 39 S.W.2d 11, 84 A.L.R. 1269]*, that **HN10** unless the contract by its express and positive terms evidences an intention which requires a construction that unearned interest was to be collected in all events, the court will give it the construction that the parties intended that the unearned interest should not be collected."

*Id. at 936-37*; *see Marble Sav. Bank v. Davis, 124 Tex. 560, 80 S.W.2d 298, 299 (1935)*; *Sinclair v. Mack Trucks, Inc., 355 S.W.2d 563, 564* (Tex. Civ. App.--Fort Worth 1962, writ ref'd n.r.e.). These cases indicate that it will be presumed that the parties intended a nonusurious contract. **HN11** The contract under construction will not be found usurious on its face unless it expressly entitles the lender, upon the happening of a contingency or otherwise, to exact interest at a rate greater than that allowed by law. *W.E. Grace Manufacturing* **[\*\*21]** *Co. v. Levin, 506 S.W.2d 580, 584 (Tex. 1974)*.

Nevertheless, under the rule in *Shropshire* applied to facts of this case, we are unable to presume Tower intended a nonusurious contract. This is not a situation in which the contract is silent on whether the lender will collect unearned interest upon default and acceleration of maturity. To the contrary, three years' interest was prepaid and the note expresses an intent to retain it in the event of acceleration as excess unearned interest. The note is not merely silent whether prepaid interest will be credited or refunded upon acceleration. It provides that interest will not be refunded. If

acceleration had occurred early in the loan period, the transaction would be usurious. Acceleration upon the first anniversary of the note with the retention of the $93,159.00 prepaid interest for the use of $517,549.80 principal would have resulted in a rate of approximately 18% per annum, an amount in excess of the legal rate.

Tower argues that the transaction would be saved from usury if some of the retained interest were credited to principal. Although we recognize that this course of action may prevent usury, there is nothing **[**22]** in the note to indicate that Tower would pursue any course of action other than to keep unearned interest. The note attempts to give Tower the right to keep unearned interest in addition to the right to recover the balance on the note by foreclosure.

Having affirmatively provided for the retention of unearned interest, Tower was obliged to make further provisions ensuring that the retention of this interest would not result in a usurious transaction. Neither the note nor the deed of trust, nor any of the other documents contains any kind of usury savings clause whatever. *Cf. Nevels v. Harris, 129 Tex. 190, 102 S.W.2d 1046, 1049-50 (1937)*. In the absence of a savings clause, we find that Tower's expressed authorization to retain excess unearned interest overcomes the presumption of legality accorded to allegedly usurious contract. [2] Because the installment note is usurious on its face, we remand this case to the trial court for determination of the proper remedy to be imposed.

**[**23]** CONCLUSION

For the reasons stated above, the judgments of the trial court and court of civil **[*342]** appeals are reversed and judgment is rendered that Tower take nothing on its claim for tax reimbursement. The judgments of the lower courts are also reversed insofar as they hold that Smart's note to Tower is not usurious, and that portion of this suit is remanded for determination of damages.

---

[2] The effective date of Tex. Laws 1975, ch. 26, § 1, at 47, which added article 5069-1.07(a) to the Revised Civil Statutes of Texas, was September 1, 1975, subsequent to all the instruments under consideration here. Neither party contends that this case is governed by section 1.07(b), and we express no opinion on its application to facts such as are presented here.

# Appendix F

◆ Positive

# *Lyda Swinerton Builders, Inc. v. Cathay Bank*

Court of Appeals of Texas, Fourteenth District, Houston

August 13, 2013, Opinion Filed

NO. 14-12-00163-CV

## Reporter

409 S.W.3d 221; 2013 Tex. App. LEXIS 10081; 2013 WL 4080743

LYDA SWINERTON BUILDERS, INC, Appellant v. CATHAY BANK, Appellee

**Subsequent History:** Petition for review denied by *Cathay Bank v. Lyda Swinerton Builders, Inc., 2014 Tex. LEXIS 885 (Tex., July 25, 2014)*

**Prior History:** [**1] On Appeal from the 113th District Court, Harris County, Texas. Trial Court Cause No. 2008-64001A.

## Core Terms

subrogation, tax lien, summary judgment, developer, parties, liens, tracts, statutes, Parcel, post-release, expenses, mechanic's lien, Mechanic's, foreclosure, amend, amended affidavit, abandoned, requirements, pre-release, transferred, argues, notice, common law, trust deed, release's, unpaid portion, pet, equitable, contends, indebtedness

## Case Summary

### Overview

HOLDINGS: [1]-A release under *Tex. Prop. Code Ann. § 53.152* of a previous mechanic's lien on one tract of land, following a payment made by a bank in order to gain priority, prevented a builder from re-filing a lien against the same property for the remaining pre-release debt but did not affect the builder's entitlement to the unpaid portion of its debt or its ability to file new liens on other tracts for the unpaid debt or liens on any tracts for post-release expenses because the release did not mention the underlying debt or the filing of future liens; [2]-Although the bank's failure to comply with the tax lien transfer statutes, *Tex. Tax Code Ann. §§ 32.06*, *32.065* (2008), did not prevent its subrogation to the tax lien, there were fact questions regarding whether equity required subrogation, and the fact questions precluded summary judgment.

### Outcome

Summary judgment affirmed in part and reversed in part. Case remanded.

## LexisNexis® Headnotes

Contracts Law > Third Parties > Subrogation

Real Property Law > ... > Liens > Nonmortgage Liens > Lien Priorities

*HN1* Subrogation gives someone who pays a debt the lien priority of the creditor paid. Normally, subrogation is permissible because it does not alter the rights of junior lienholders; it merely alters the party to whom they are junior. When a party satisfies a tax lien, however, allowing subrogation to the taxing authority's priority position may inequitably circumvent notice and foreclosure requirements that would otherwise apply.

Real Property Law > ... > Liens > Nonmortgage Liens > Tax Liens

*HN2* By statute, tax liens are automatically senior to most other real property liens. *Tex. Tax Code Ann. § 32.05(b)*.

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

*HN3* The court reviews a trial court's order granting traditional summary judgment de novo.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

*HN4* To be entitled to summary judgment, the movant must demonstrate that no genuine issues of material fact exist and that he is entitled to judgment as a matter of law. *Tex. R. Civ. P. 166a(c)*. If the movant does so, the burden shifts to the non-movant to produce evidence sufficient to raise a fact issue. When reviewing a summary judgment motion, the court cannot read between the lines or infer from the pleadings or evidence any grounds for summary judgment other than those expressly set forth before the trial court.

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

*HN5* When both sides move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both sides' summary judgment evidence and determine all questions presented. When the trial court's order granting summary judgment does not specify the grounds on which it relied, the summary judgment will be affirmed if any of the theories advanced are meritorious.

Civil Procedure > Settlements > Releases From Liability > Interpretation of Releases

*HN6* A release is a writing that provides that a duty or obligation owed to one party to the release is discharged, either immediately or upon the occurrence of a condition. Releases are subject to the usual rules of contract construction. As in other instances of contract construction, the court's primary concern is to ascertain the intent of the parties at the time of the execution of the alleged release as expressed in the release. To construe the release, the court may examine evidence of the circumstances surrounding its negotiation and execution. The court may also consider the title of the document, but it is not dispositive.

Civil Procedure > Settlements > Releases From Liability > General Overview

Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

*HN7* Although *Tex. Prop. Code Ann. § 53.152* delineates the minimal obligation of a contractor to release a lien upon receiving payment, nothing in the statute suggests that broader releases may not be executed.

Contracts Law > Contract Interpretation > General Overview

*HN8* If, in the light of surrounding circumstances, the language of a contract appears to be capable of only a single meaning, the court can then confine itself to the writing.

Real Property Law > ... > Liens > Nonmortgage Liens > General Overview

*HN9* Lien waivers, as their name implies, pertain to lien rights and not to the more general right to payment.

Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

*HN10* A subcontractor's lien rights are totally dependent on its compliance with the statutes authorizing the lien.

Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

*HN11* Substantial compliance with the statutes is sufficient to perfect a mechanic's lien.

Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

*HN12* Nothing in the language of the statutes suggests that a mechanic's lien's effectiveness hinges upon whether affidavits filed after a release describe themselves as "amending" or "replacing" the pre-release affidavit.

Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

*HN13* The mechanic's and materialman's lien statutes are to be liberally construed for the purpose of protecting laborers and materialmen. And courts have been more willing to excuse a mistake or omission in cases where no party is prejudiced by the defect. Indeed, the Legislature did not intend that the materialman should lose his lien through the technicalities of a warning, where the owner was not misled to his prejudice.

Contracts Law > Contract Interpretation > Intent

*HN14* A contract shall be construed in light of the purposes and objects for which it was made.

Civil Procedure > Appeals > Appellate Briefs

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > General Overview

*HN15* Appellate briefs are to be construed reasonably, yet liberally, so that the right to appellate review is not lost by waiver.

Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

*HN16* Mechanic's liens first attach at the commencement of construction or delivery of materials, that is visible from inspection of the land. *Tex. Prop. Code Ann. § 53.124*. Mechanic's lien statutes require mechanics to file their affidavits within a fixed period after their presence on the property ceases. *Tex. Prop. Code Ann. § 53.052*. After work concludes, a party can avoid mechanic's liens by waiting for the lien-filing

period to expire. The clock on the filing period starts ticking when indebtedness accrues. Several events can trigger the accrual of indebtedness, but each stands in for the cessation of work. For example, indebtedness to an original contractor accrues on the last day of a month during which either the contractor or the property owner receives a written declaration from the other party terminating the contract. *Tex. Prop. Code Ann. § 53.053(b)(1)*. Absent termination, indebtedness accrues on the last day of the month in which the original contract has been completed, finally settled, or abandoned. *§ 53.053(b)(2)*.

Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

*HN17* See *Tex. Prop. Code Ann. § 53.052*.

Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

*HN18* "Abandon," as applied to mechanic's liens, means to turn from or relinquish.

Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

*HN19* For purposes of a statutory mechanic's lien, a contract terminates when one party receives a written notice of termination from the other. *Tex. Prop. Code Ann. § 53.053(b)(1)*.

Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

*HN20* To obtain a valid lien, a mechanic must file an affidavit within the statutory period. *Tex. Prop. Code Ann. § 53.052*. This affidavit must contain substantially a sworn statement of the amount of the claim. *Tex. Prop. Code Ann. § 53.054(a)*.

Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

*HN21* Mechanic's liens secure payment for, among other things, the labor done or material

furnished for the construction or repair. *Tex. Prop. Code Ann. § 53.023*.

Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

*HN22* See *Tex. Prop. Code Ann. § 53.001(4)*.

Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

*HN23* The definition of materials does not always require actual use or consumption in the direct prosecution of the work. Instead, mechanic's liens are also available when items are delivered for use or consumption. In this way, the availability of a mechanic's lien becomes a question of how the parties intended to use equipment and services delivered to the project, which is generally a question of fact. Intent is a fact question uniquely within the realm of the trier of fact.

Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

*HN24* To obtain a mechanic's lien for rental expenses, the equipment must be not only delivered for use, but also reasonably required for use in the direct prosecution of the work. *Tex. Prop. Code Ann. § 53.001(4)(B)*. Reasonableness is ordinarily a question of fact.

Real Property Law > ... > Liens > Nonmortgage Liens > Tax Liens

*HN25* Tax liens are senior to other liens. *Tex. Tax Code Ann. § 32.05(b)*.

Real Property Law > ... > Liens > Nonmortgage Liens > General Overview

Real Property Law > ... > Liens > Nonmortgage Liens > Tax Liens

*HN26* Subrogation is liberally applied and is broad enough to include every instance where one person, not acting voluntarily, pays another's debt. Subrogation essentially allows a subsequent lienholder to take the lien-priority status of a prior lienholder by satisfying the prior lien's associated debt. One who pays another's real property taxes often asserts a right to be subrogated to the taxing authority's lien.

Real Property Law > ... > Liens > Nonmortgage Liens > Tax Liens

*HN27* The doctrine of subrogation applies to tax liens.

Governments > Courts > Common Law

Governments > Legislation > Interpretation

*HN28* Statutes can modify common law rules, but before the court construes one to do so, the court must look carefully to be sure that was what the Legislature intended. ″Common law″ in this context means the body of law derived from judicial decisions, rather than from statutes or constitutions. When evaluating an argument that a statute deprives a person of a common law right, the court will not extend the statute beyond its plain meaning or apply it to cases not clearly within its purview.

Real Property Law > ... > Liens > Nonmortgage Liens > Tax Liens

*HN29* *Tex. Tax Code Ann. §§ 32.06*, *32.065* (2008) do not abrogate common law subrogation doctrines.

Real Property Law > ... > Liens > Nonmortgage Liens > Tax Liens

*HN30* The requirements of *Tex. Tax Code Ann. § 32.065* (2008) are specifically limited to contracts between a transferee and the property owner under *Tex. Tax Code Ann. § 32.06* (2008). *§ 32.065(b)*. Thus, *§ 32.065* only applies to contracts involving statutory lien transfers. Moreover, *§ 32.065* specifically notes that *§ 32.06* does not abridge the right of an owner of real property to enter into a contract for the payment of taxes. *§ 32.065(a)*.

Real Property Law > ... > Liens > Nonmortgage Liens > Tax Liens

*HN31* The tax lien statutes supplement, rather than eliminate, common law subrogation.

Real Property Law > ... > Liens > Nonmortgage Liens > Tax Liens

*HN32* Even in the absence of statutory or contractual authorization, a limited right to equitable subrogation may arise in accordance with certain well-established rules of law. Thus, under various circumstances a non-volunteer who satisfies a tax lien may be subrogated to the taxing authority's lien to the extent necessary for his own equitable protection. Statutory transfer procedures do not abrogate common law subrogation.

Real Property Law > ... > Liens > Nonmortgage Liens > Tax Liens

*HN33* A party can obtain the taxing authority's lien priority through equitable subrogation.

Real Property Law > ... > Liens > Nonmortgage Liens > Tax Liens

*HN34* The tax lien transfer statutes do not abrogate common law subrogation doctrines. However, parties who rely exclusively upon equity to obtain the taxing authority's priority may face additional obstacles not present under the statutes. For example, equitable subrogation is only available to the extent necessary for the subrogee's equitable protection. When not compelled by the equities of the situation, full subrogation to all special privileges accompanying the taxing authority's constitutional and statutory lien will be denied. This rule limits the extent of subrogated rights.

Real Property Law > ... > Liens > Nonmortgage Liens > Tax Liens

*HN35* Subrogation to a tax lien can materially alter the lien's terms and thereby prejudice intervening lienholders. This prejudice may trigger a factual inquiry to resolve the equities.

Contracts Law > Third Parties > Subrogation

Real Property Law > ... > Liens > Nonmortgage Liens > Tax Liens

*HN36* When two parties have a subrogation contract, equitable considerations that might control in the absence of an agreement cannot invalidate it. This rule works between the parties because the parties have fixed their rights by contract and additional rights will not be created by judicial intervention. This reasoning's force diminishes in cases where enforcing a subrogation contract would alter a nonparty's rights. In these cases, the right of subrogation is not wholly dependent on the application of a contract. Instead, as to the nonparty, subrogation depends partially on equitable principles. Thus, such cases fall into a third, hybrid category. The cornerstone of this equitable analysis, in context of a tax lien, is prejudice to the intervening lienholder that is not a party to the subrogation contract. For example, merely changing the identity of the senior lienholder does not affect the intervening lienholder's rights and therefore is not prejudicial. Although subrogation may alter who holds the senior lien, the junior lienholder is still junior and still in the same amount. Whether subrogation prejudices intervening interests is determined as of the time of the transaction supporting subrogation. The consequences of subsequent transactions or events are not relevant to this inquiry.

Real Property Law > ... > Liens > Nonmortgage Liens > General Overview

*HN37* In many cases, subrogation to a lien changes only the intervening lienholder's identity. This change creates no prejudice, so subrogating the intervening lienholder is appropriate as a matter of law. One court has stated that there is no prejudice to intervening interest holders absent a showing that subrogation results in (1) additional debt having priority over or parity with the intervening interest, (2) a material change in the terms of the superior interest, or (3) other

pecuniary loss resulting from the subrogation. In the absence of prejudice, subrogation must be allowed, but the mere presence of prejudice does not necessarily prevent subrogation. Rather, when prejudice exists, the trial court should, in exercising its equitable discretion, consider the totality of the circumstances, of which the existence of prejudice to one or more parties is a part. Factors to consider include the extent of prejudice, its foreseeability, and whether the party claiming prejudice could have avoided it.

Real Property Law > ... > Liens > Nonmortgage Liens > Tax Liens

**HN38** Eliminating protections that existed prior to subrogation constitutes a material change in the terms of a superior tax lien, triggering an equitable inquiry.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Real Property Law > ... > Liens > Nonmortgage Liens > General Overview

**HN39** Although summary judgment is available in equitable actions, certain factors counsel against summary dispositions in cases of equitable subrogation to a lien. For example, the material facts in these cases are difficult to define precisely. The main guiding principle is the prevention of an unfair or unjust result. Trial courts have a measure of discretion in weighing the circumstances and adjusting the remedy to accomplish this main goal. But a trial court does not have unfettered discretion to determine the equities of subrogation. Rather, the right to subrogation must be determined in light of its purpose: preventing unjust enrichment.

Real Property Law > ... > Liens > Nonmortgage Liens > General Overview

**HN40** The equitable balance necessary to determine whether prejudice to an intervening lienholder prevents subrogation focuses upon the would-be subrogee and an intervening lienholder.

Civil Procedure > Preliminary Considerations > Equity > General Overview

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

**HN42** Although a litigant has the right to a trial by jury in an equitable action, only ultimate issues of fact are submitted for jury determination. The jury does not determine the expediency, necessity, or propriety of equitable relief.

Civil Procedure > Appeals > Remands

**HN41** As long as there is a probability that a case has for any reason not been fully developed, a reviewing court has the discretion to remand rather than render a decision.

**Counsel:** For APPELLANT: Anthony Todd Golz, HOUSTON, TX.

For APPELLEE: Paul J. McConnell, III, Ben A. Baring, Jr., Vijay Arthur D'Cruz, HOUSTON, TX; Barbara M. Ellis, AUSTIN, TX.

**Judges:** Panel consists of Chief Justice Hedges and Justices Brown and Busby (Hedges, C.J., dissenting).

**Opinion by:** J. Brett Busby

## Opinion

**[*226] MAJORITY OPINION**

This lien priority case comes to us on appeal from the trial court's rulings on cross-motions for final summary judgment. The appeal presents two issues involving two special types of real property liens.

We first address the scope of a builder's release of its mechanic's lien. *See generally* Tex. Prop. Code Ann. Ch. 53 (West 2007 & Supp. 2012). We conclude that the release at issue here did exactly what it purported to do: it released a previous

mechanic's lien on one of the tracts of land at issue. The release did not mention the underlying debt or the filing of future liens, so we conclude that with one exception, it did not affect the builder's entitlement to the unpaid portion of its debt or its ability to file new liens. Nonetheless, there are fact questions regarding whether the liens that the builder filed after releasing its initial lien comply with the applicable statutes. These fact questions largely preclude summary judgment on the validity of the post-release **[**2]** liens.

Next, we apply subrogation doctrines to a tax lien. *HN1* Subrogation gives someone who pays a debt the lien priority of the creditor paid. Normally, subrogation is permissible because it does not alter the rights of junior lienholders; it merely alters the party to whom they are junior. When a party satisfies a tax lien, however, allowing subrogation to the taxing authority's priority position may inequitably circumvent notice and foreclosure requirements that would otherwise apply. Fact issues preclude us from resolving the equities on this record. Therefore, with one exception described below, we reverse the trial court's summary judgment and remand the case for further proceedings.

**BACKGROUND**

Lyda Swinerton Builders, Inc. (the builder) agreed to improve real property owned by Park 8 Place, L.P. (the developer), but the improvements never progressed very far. This case began when the builder sued the developer, but the developer filed for bankruptcy protection and is no longer a party. The only parties remaining are two of the developer's unpaid creditors: the builder and Cathay Bank. Both claim a priority interest in portions of the property that the developer planned to develop. **[**3]** We refer to these disputed tracts as "Parcel A" and "Parcel B."[1] Our task is **[*227]** to determine priority as between the builder (which claims priority based upon its mechanic's liens) and the bank (which claims priority based upon deeds of trust and a tax lien that it satisfied).

The builder began work on the project in February 2007.[2] Over the next several months, the builder completed "dirt," utility, and foundation work. During the same period, the bank lent the developer approximately $800,000 secured by a deed of trust on Parcel B and approximately $500,000 secured by a deed of trust encumbering the entire property.[3]

In October 2007, work ceased due to "payment issues" and never resumed. That month, the builder filed its first mechanic's lien affidavit. The affidavit reflected a lien of approximately $3.2 million and only encumbered Parcel A. Generally, mechanic's liens like this one relate back to the start of work for priority purposes, regardless of when the mechanic files its lien affidavit. *See Diversified Mortg. Investors v. Lloyd D. Blaylock Gen. Contractor, Inc., 576 S.W.2d 794, 800 (Tex. 1978)*. Thus, although the builder filed its affidavit after the bank had obtained its deed of trust liens, the builder's lien nonetheless had priority because it related back to the start of work in February 2007.

On October 31, 2007, shortly after the builder filed its first lien affidavit, the bank lent the developer approximately $1.9 million. A deed of trust encumbering both Parcels A and B secured

---

[1] This case involves six contiguous tracts of land, which Exhibit B to the builder's summary judgment motion designates as tracts I-VI. The builder concedes the bank's superior interest in tracts II, IV, and VI, so this opinion only addresses tracts I, III, and V. We omit details relating to the parcels that are not in dispute. Moreover, for our purposes, it is unnecessary to distinguish between tracts III and V, so we refer to those tracts collectively as "Parcel A." We refer to tract I as "Parcel B."

[2] "'Work' means any part of construction or repair performed under an original **[**4]** contract." Tex. Prop. Code Ann. § 53.001(14). For purposes of this appeal, the parties do not dispute when the builder began work.

[3] The exact lien amounts are not relevant to our analysis, so we state them as round numbers throughout.

the bank's loan. The builder was paid $1.5 million of the loan proceeds against [**5] the developer's outstanding debt.[4] The builder then filed a lien release. We will discuss the release in detail later, but for now it suffices to say that the document recited the receipt of $1.5 million and purported to release the builder's $3.2 million lien.

On the same day that the builder signed its release, the bank used a portion of the loan to satisfy outstanding tax liens against the property. *HN2* By statute, these tax liens are automatically senior to most other real property liens. *See Tex. Tax Code Ann. § 32.05(b)*. The bank later claimed that the principle of subrogation entitled it to the taxing authority's lien position for the portion of the loan used to pay taxes. *See generally Smart v. Tower Land & Inv. Co., 597 S.W.2d 333 (Tex. 1980)*.

On [**6] November 13, 2007, soon after filing its release, the builder filed an "[a]mended" lien affidavit reciting a debt of approximately $2.9 million. This sum included both the unpaid portion of the developer's pre-release debt (approximately $1.7 million) and amounts for post-release expenses that the builder had since incurred. [*228] Like the builder's first lien affidavit, this one covered only Parcel A.

The builder contends this post-release affidavit, as a mechanic's lien, related back to the start of work in February 2007. As a result, according to the builder, it now had a $2.9 million lien that was senior to the bank's deeds of trust, notwithstanding the lien release it had just filed.

Although the builder stated in its lien affidavit that it had incurred post-release expenses, no post-release work had occurred on the property. The builder contends that even though it had stopped working, it remained on the site at the developer's request. The post-release expenses reflected in the affidavit were "administrative and equipment rental costs related to maintaining the site at an estimated $200,000 per month."

Over the ensuing months, the developer made at least one partial payment, but the [**7] developer's payment did not keep pace with the builder's continually accruing expenses. In May 2008, the builder sent the developer a letter stating that if the developer failed to cure its debt, the builder would leave the project site and terminate the contract. The developer did not cure its debt, but the builder nonetheless remained on the site.

Indeed, after sending this termination letter, the builder "continued to maintain its office facilities at the Project, continued to store materials and equipment at the Project, and maintained water, sewer, power, phones and data connections at the office complex." It also continued to bill the developer for these expenses and to file lien affidavits to secure payment. Each new amended affidavit reflected the current total owed and each encumbered both Parcel A and Parcel B.

While still on the property accruing expenses (allegedly still at the developer's request), the builder sued the developer in October 2008. The bank intervened shortly thereafter, claiming a superior interest in the property. The trial court eventually severed this lien priority dispute from the builder's action against the developer.

With all this litigation pending, [**8] the builder filed its final lien affidavit in January 2009. This was over a year after the builder's last work on the project, six months after its termination letter, and three months after filing its lawsuit. The final amended affidavit reflected a lien on Parcels A and B in the amount of $6.75 million, representing the builder's total expenses. As a mechanic's lien,

---

[4] Approximately $400,000 of this payment went to a subcontractor that is not a party to this appeal. In its brief, the builder appears to concede that this payment to the subcontractor also reduced its claim against the developer, so our analysis assumes this is the case. If we misapprehend the transaction, nothing in this opinion prevents a party from asserting on remand that the payment to the subcontractor did not reduce the builder's claim against the developer.

the builder contends this lien related back to the start of work—almost two years earlier—and was therefore senior to the bank's deed of trust liens on Parcels A and B. After filing this final lien, the builder remained on the property for another thirteen months.

Shortly after the builder finally decamped from the property in March 2010, the bank foreclosed on its October 31, 2007 deed of trust. The builder received notice of the trustee's sale, but contends it was unaware that the bank intended to foreclose on a senior tax lien. The builder contends that, "had [it] known that [the bank] was foreclosing . . . transferred tax liens, [it] could have . . . bid on the property at the foreclosure sale to preserve its interest."

But the builder did not bid at the foreclosure sale. Instead, the bank purchased the property for **[\*\*9]** $10,000. Because this amount was less than the bank's alleged senior tax lien, the bank contends its foreclosure extinguished all junior liens—including the builder's. *See I-10 Colony, Inc. v. Chao Kuan Lee, 393 S.W.3d 467, 472 (Tex. App.—Houston [14th Dist.] 2012, pet. filed)* ("It is well settled in Texas that a valid foreclosure on a senior lien . . . extinguishes a junior lien . . . if there are **[\*229]** not sufficient excess proceeds from the foreclosure sale to satisfy the junior lien."). The bank thus argues that, as a result of this sale, it owned the property outright.

In the severed lien priority litigation, the parties filed cross-motions for final summary judgment. The builder argued that because its lien related back to February 2007, it was senior to the bank's. Thus, the builder argued that the bank's purchase of the property at its own foreclosure sale was subject to the builder's senior lien.

The bank contended that it was entitled to the property for two reasons. First, the bank argued that the builder's release fully terminated any interest it had in the property and prevented it from filing new liens. Second, the bank contended that its foreclosure of a senior tax lien extinguished **[\*\*10]** the builder's interest in the property.

The trial court granted the bank's motion and denied the builder's. It held that the bank owned the property "free and clear" of the builder's claims. This appeal followed.

## ANALYSIS

### I. STANDARD OF REVIEW

*HN3* We review a trial court's order granting traditional summary judgment de novo. *Olmstead v. Napoli, 383 S.W.3d 650, 652 (Tex. App.—Houston [14th Dist.] 2012, no pet.)*. *HN4* To be entitled to summary judgment, the movant must demonstrate that no genuine issues of material fact exist and that he is entitled to judgment as a matter of law. *Tex. R. Civ. P. 166a(c)*. If the movant does so, the burden shifts to the non-movant to produce evidence sufficient to raise a fact issue. *Olmstead, 383 S.W.3d at 652*. When reviewing a summary judgment motion, we cannot read between the lines or infer from the pleadings or evidence any grounds for summary judgment other than those expressly set forth before the trial court. *Id*.

The builder presents two issues on appeal, which we address together: whether the trial court erred in granting the bank's motion for summary judgment, and whether it erred in denying the builder's motion. *HN5* When both sides move for summary judgment **[\*\*11]** and the trial court grants one motion and denies the other, the reviewing court should review both sides' summary judgment evidence and determine all questions presented. *Id*. When, as here, the trial court's order granting summary judgment does not specify the grounds on which it relied, the summary judgment will be affirmed if any of the theories advanced are meritorious. *Id*. Here, the two grounds advanced for summary judgment in the bank's favor are (1) the builder's release and

(2) the bank's alleged foreclosure of tax liens. We address these grounds in turn.

**II. Although the builder fully released its initial lien on Parcel A, it did not waive its right to file new liens covering other property or securing payment for post-release expenses, and there are fact questions concerning the validity of those new liens**.

One of the parties' principal disputes concerns the builder's mechanic's lien. Specifically, the parties dispute (1) the effect of the builder's release upon its initial lien and upon its ability to file subsequent liens, and (2) the validity of the builder's post-release liens. We begin with some undisputed general principles.

"As a general rule, a properly perfected mechanic's **[**12]** lien 'relates back' to a time referred to as the inception of the lien for the purpose of determining lien priorities." *Diversified Mortg. Investors, 576 S.W.2d at 800*. In most cases, "the time of inception of a mechanic's lien is the commencement **[*230]** of construction of improvements or delivery of materials to the land on which the improvements are to be located and on which the materials are to be used." *Tex. Prop. Code Ann. § 53.124(a)*.

Here, neither party disputes that the relevant date for inception of the builder's liens is February 2007. Thus, if the builder's lien affidavits are effective, they all relate back to February 2007, and the bank's relevant deeds of trust are junior to them. The bank argues these liens are ineffective, however, because of (1) the builder's release and (2) flaws in the post-release liens themselves. As explained below, we hold that with one exception, the bank is incorrect regarding the release and that fact issues regarding the validity of the post-release liens preclude summary judgment for either party.

**A. The release did exactly what it said: it released the builder's initial lien and nothing more**.

Omitting the formal parts, the builder's October 2007 **[**13]** release reads as follows:

RELEASE OF LIEN

The [builder] is a holder of a lien ("the lien") in the amount of $3,228,444.50 ("the indebtedness") filed originally on or about October 10, 2007 [in the] Real Property Records of Harris County, Texas regarding the real property and improvements thereon ("the property") generally described as Park 8, Tower B, [the property's address] and more particularly described as follows:

[Description of Parcel A].

FOR AND IN CONSIDERATION of $1,500,000.00 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the [builder] does hereby release and discharge the property from this lien.

*HN6* A release is a writing that provides that a duty or obligation owed to one party to the release is discharged, either immediately or upon the occurrence of a condition. *See Port of Houston Auth. of Harris Cnty. v. Zachry Const. Corp., 377 S.W.3d 841, 854 (Tex. App.—Houston [14th Dist.] 2012, pet. filed)*. Releases are subject to the usual rules of contract construction. *Id*. As in other instances of contract construction, our primary concern is to ascertain the intent of the parties at the time of the execution of the alleged release **[**14]** as expressed in the release. *Id*. To construe the release, we may examine evidence of the circumstances surrounding its negotiation and execution. *Id*. We may also consider the title of the document, but it is not dispositive. *Id*.

Here, the parties present multiple alternative interpretations of the two-sentence release. They dispute the release's effect on the builder's initial October 2007 lien, on the underlying debt, and on the builder's ability to file subsequent liens. Below, we discuss in detail what the release does

and why it does not do all of the work that the parties assign to it.

The short answer is that the release only says that the builder is releasing the full amount of its initial lien against Parcel A. The builder argues that notwithstanding the release, it could "re-file" a lien for the unpaid portion of the same debt against the same parcel of land. We disagree because allowing the builder to do so would render the release meaningless. Thus, the release extinguished the builder's initial lien and prevented it from reasserting the same lien against Parcel A for the unpaid portion of the pre-release debt.

The bank argues that the release also did other things, but the [**15] document in front of us does not mention them. For example, the bank argues that the release not only released the lien, but also forgave the unpaid portion of the initial debt. The [*231] release does not say that. The bank also argues that the release prevented the builder from filing liens for subsequent expenses. The release does not say that either. Finally, the bank contends that the release prevented the builder from securing the unpaid portion of its initial debt with a lien on Parcel B. The release also does not say that—it only mentions Parcel A. Accordingly, the release does not entitle the bank to the final summary judgment it received below.

**1. The release unambiguously released the full amount of the initial lien, but it did not forgive or cancel the unpaid portion of the pre-release debt**.

To explain these conclusions, we begin with the release's effect on the builder's pre-release lien and debt. The builder argues that it only released its initial October 2007 lien to the extent of the payment it received. More specifically, because it only received $1.5 million of the $3.2 million it was owed, the builder contends it only released $1.5 million of the initial lien. We disagree.

The [**16] release contains just two sentences. The first describes the lien and the property, stating that the lien secures a debt of $3.2 million. The second "release[s] and discharge[s] the property from *this lien*" "for and in consideration of $1,500,000.00" (emphasis added and capitalization omitted). This language does precisely what it says: it releases the whole lien. The builder's contrary interpretation is inconsistent with the unambiguous language of the release and therefore unreasonable.

Notwithstanding this plain language, the builder argues that *section 53.152(a) of the Property Code* required it to release its lien "to the extent of the indebtedness paid," so we should construe its release to have only this effect. **HN7** Although "*[s]ection 53.152* delineates the minimal obligation of a contractor to release a lien upon receiving payment, . . . nothing in the statute suggests that broader releases may not be executed." *Addicks Servs., Inc. v. GGP-Bridgeland, LP, 596 F.3d 286, 297 (5th Cir. 2010)*. Here, in exchange for immediate payment, the builder executed a broader release and thereby fully released its initial lien.

But the release itself does not forgive the unpaid portion of the developer's [**17] underlying debt.[5] Thus, although the release extinguished the lien, nothing in the document suggests the builder intended to forgive the remaining $1.7 million debt that had not been paid. To the contrary, the release distinguishes the "indebtedness" from the "lien" and releases only the lien.

The document's first sentence is definitional: it defines "the lien," "the indebtedness," and "the

---

[5]  The builder asks us to take judicial notice of a judgment it obtained against the developer, which was based on an agreed arbitration award and included the unpaid portion of the pre-release debt. The bank urges us not to take judicial notice. We need not address the issue because the judgment against the developer does not affect our decision. As discussed above, the release alone does not establish that the developer's entire pre-release debt has been satisfied, and we reject the bank's argument that it does. Judicial notice that the debt has been reduced to judgment is unnecessary to reach this conclusion.

property." The use of separate terms to describe "the lien" and "the indebtedness" demonstrates a desire to distinguish one from the other. The release's second sentence is operative: it "release[s] [**18] and discharge[s] the property from this lien." The second sentence does not mention the indebtedness. In this way, the builder unambiguously demonstrated its intent to release only "the lien" [*232] without forgiving the unpaid portion of the separately defined "indebtedness."

Moreover, the circumstances of the transaction support this construction of the release. *Sun Oil Co. (Del.) v. Madeley, 626 S.W.2d 726, 731 (Tex. 1981)* (**HN8** "If, in the light of surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing."). To the extent the release evidences a contract (*see* n.6, *infra*), the parties to that contract are the bank and the builder. The bank sought a priority interest in the property, while the builder sought partial payment.

There is no evidence, however, that either party sought to reduce the developer's debt. As for the builder, it had no reason to forgive the developer's debt because it wanted payment for its work. In any event, there is no evidence that the builder agreed to—or was even asked to—forgive the unpaid portion of the underlying debt. As for the bank, nothing in the record suggests that [**19] the bank had any interest in reducing the developer's indebtedness to the builder. The bank wanted to get the builder's previously filed lien out of the priority line, not to protect the developer.

We must also "keep in mind that **HN9** lien waivers, as their name implies, pertain to lien rights and not to the more general right to

payment." 3 Philip L. Bruner & Patrick J. O'Connor, Jr., Construction Law § 8:151 (2002). Here, neither the release's text nor the context of the transaction establishes that the parties intended to forgive the developer's underlying debt. We therefore reject the bank's contention that the release had this effect.[6]

Thus, following [**20] the release of its initial October 2007 lien, the builder held no lien against Parcel A or any other tracts. The developer remained indebted to the builder, however, for the $1.7 million unpaid portion of the pre-release debt.

## 2. The release prohibited the builder from re-filing a lien against the same property for the remaining pre-release debt.

The builder next argues the release did not prohibit it from re-filing a lien against the same property for the unpaid portion of the same debt. This construction is unreasonable because it would essentially render the release meaningless.

The release's plain language and the context of the transaction demonstrate that the parties intended for the builder to release its previously filed lien, thereby ensuring the bank's priority position on Parcel A. For this reason, the bank paid the builder $1.5 million, and in exchange the builder fully released its lien. Once released, the lien could not be revived. *See Apex Fin. Corp. v. Brown, 7 S.W.3d 820, 830 (Tex. App.—Texarkana 1999, no pet.)*. Although a release may be rescinded for failure of consideration, *see Murray v. Crest Const., Inc., 900 S.W.2d 342, 344 (Tex. 1995)*, in this case the consideration [**21] was paid, the release was filed, and the builder presents no argument that would permit it to rescind the release in part.

---

6  This opinion does not foreclose the parties' ability on remand to introduce evidence of agreements supplementing the release's plain meaning. Although we conclude the release is unambiguous, the parties have not argued that the release is a fully integrated expression of their agreement, and we express no opinion on that issue. *See generally Garner v. Redeaux, 678 S.W.2d 124, 128-29 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.)*. The parties' arguments thus far rely solely upon the release, and we limit our analysis accordingly.

[*233] Allowing the builder to re-file a lien for a portion of the same debt against the same property, however, would effectively allow a rescission. Nothing in the record suggests that the parties intended for the builder to retain such unilateral authority. To the contrary, for the bank to obtain the security it bargained for, the pre-release lien had to stay fully released. We therefore reject the builder's argument that the release permitted it to re-file liens against Parcel A to secure the unpaid portion of the pre-release debt.

***3. The release did not prohibit the builder from filing new liens on other tracts for the unpaid debt or liens on any tracts for post-release expenses***.

Having determined the release's effect on the builder's October 2007 lien and the developer's pre-release debt, we turn to the release's effect on the builder's post-release liens.

After filing the release, the builder filed four amended lien affidavits to secure payment for the unpaid portion of the pre-release debt and for expenses that the builder continued to incur. The first of these documents, [**22] filed shortly after the release in November 2007, asserted a lien only against Parcel A. The builder filed a second amended affidavit in June 2008, a third in October, and a fourth in January 2009. These three subsequent affidavits placed liens on the entire property, including Parcels A and B. Each affidavit updates the total amount owed by the developer at the time of filing. The final affidavit states that approximately $6.75 million is owed.

The bank argues that summary judgment in its favor was proper because the builder's release prevented it from filing any further liens on any tracts to secure any of the developer's debt. As discussed above, the bank is right insofar as the release prohibited the builder from re-filing a lien on Parcel A for the unpaid portion of the pre-release debt, and it is entitled to partial summary judgment to that extent.[7] As to the bank's other contentions, we disagree.

Neither the release itself nor any summary judgment evidence suggests that [**23] the builder agreed to refrain from filing new liens if it incurred additional expenses. By its terms, the release affected only the builder's pre-release lien. It said nothing about the builder's ability to file future liens for post-release expenses.

In this way, the release differs from that in *Apex Financial Corporation v. Brown*, upon which the bank relies. In that case, the waiver released lien rights based not only upon "labor or materials furnished," but also upon labor and materials "*to be furnished* in the future." [7 S.W.3d at 830](). The court held that this language allowed the party challenging the subsequently filed liens to "rely on the fact that the . . . property would not be burdened by a statutory mechanic's lien." *Id*.

The release here, by contrast, does not purport to waive the builder's right to file new liens. Instead, it refers only to the lien already filed and the indebtedness already incurred. We therefore do not construe the release as barring liens for post-release expenses.

Similarly, neither the release itself nor any summary judgment evidence suggests the builder agreed to refrain from filing a lien against tracts other than Parcel A to [*234] secure the unpaid portion [**24] of the pre-release debt. The builder's initial October 2007 lien only encumbered Parcel A, and its release purported to release only this lien. The release did not mention Parcel B or the property's other tracts, so we do not construe it to prevent the filing of liens against those tracts to secure the unpaid portion of the developer's pre-release debt.

---

[7] *See* [Tex. R. App. P. 43.2(a)](); *[PAS, Inc. v. Engel](), 350 S.W.3d 602, 617 (Tex. App.—Houston [14th Dist.] 2011, no pet.)* (affirming summary judgment on fraud claim to extent based upon a certain misrepresentation).

This construction is consistent with the release's plain meaning and the context of the transaction. The builder released Parcel A from its initial lien, and it cannot avoid this consequence by simply re-filing. But there is no evidence that the parties intended the release to prevent the builder from securing the remaining pre-release debt—or any other debt for that matter—with a lien on Parcel B. Nor is there any contention that Parcel B is outside the "[p]roperty to [w]hich [the] [l]ien [e]xtends" under *Texas Property Code section 53.022*. Thus, on the record before us, nothing prevented the builder from filing a lien against Parcel B to secure the unpaid portion of the developer's pre-release debt.

The bank makes additional arguments to avoid this result, but they do not change our conclusion that the release does not entitle the bank **[**25]** to final summary judgment. The bank contends that we must construe the release to waive additional rights because the release's language differs from language in other "partial releases" that the builder filed. Although the relevant release does differ from others in the record, its language still does not waive the builder's right to file future liens for post-release expenses or forgive the developer's unpaid debt.

The bank also contends that the builder could not "amend" its October 2007 lien because it fully released this lien and therefore had nothing to amend. This contention must be evaluated under the mechanic's lien statute because the liens at issue here are creatures of statute. Indeed, *HN10* "'[a] subcontractor's lien rights are totally dependent on its compliance with the statutes authorizing the lien.'" *K & N Builder Sales, Inc. v. Baldwin, No. 14-12-00012-CV, 2013 Tex. App. LEXIS 4027, 2013 WL 1279292, at *3 (Tex. App.—Houston [14th Dist.] Mar. 28, 2013, no pet.)* (mem. op.) (quoting *First Nat'l Bank in*

*Graham v. Sledge, 653 S.W.2d 283, 285 (Tex. 1983))*. Although a general contractor may have common law, contractual, and constitutional lien rights as well, the builder has not relied upon such rights in **[**26]** this appeal. Thus, to determine whether the builder has a statutory lien based upon its amended affidavits, we need only "compare the steps the [builder] took to perfect [its] liens with the statutory requirements." *First Nat'l Bank in Graham, 653 S.W.2d at 286*.

The required contents of a lien affidavit are prescribed in *section 53.054(a) of the Texas Property Code*. We conclude that each post-release affidavit complies with these requirements, and the bank does not argue otherwise. Nothing in the statute suggests that the builder sacrificed its entitlement to a lien in its November 2007 affidavit by adding a statement that this affidavit "amends" the original October 2007 affidavit, which perfected a lien that had been released in the interim.[8] To the contrary, the supreme court has made clear that *HN11* "substantial compliance with the statutes is sufficient to perfect a lien." *Id. at 285*.

Our dissenting colleague disagrees with this conclusion, relying on the affidavits' **[*235]** form rather than their substance. In her view, the first post-release affidavit in November 2007 is ineffectual because it purports to amend the October 2007 affidavit, but there was nothing to amend because the lien perfected by that affidavit had been released. Moreover, because the post-release affidavits amend one another, she contends those affidavits are ineffectual as well.

We disagree with this analysis because it is contrary to the language, established interpretation, and purpose of the mechanic's lien statutes. *HN12* Nothing in the language of the statutes suggests that a lien's effectiveness hinges upon whether

---

[8] All of the lien affidavits are substantively identical with the exception of: (1) the amended affidavits' references to amendment in the caption and in one numbered sentence; (2) differences in the amount of the claim; and (3) beginning with the second amended affidavit in June 2008, an expansion of the **[**27]** property subject to the lien.

Ian Ghrist

affidavits filed after a release describe themselves as "amending" or "replacing" the pre-release affidavit. This omission is telling because the statutes not only contemplate, but require, releases whenever payment is received. *See Tex. Prop. Code Ann. § 53.152(a)*. Release documents are "an intended and customary part of the payment process" in construction transactions. 3 BRUNER & O'CONNOR, *supra*.

Given the prevalence and necessity of releases, one would expect **[**28]** that if the Legislature intended "amended" post-release affidavits to be entirely ineffective, it would have expressed that intent. Certainly some statutory warning would be appropriate if, as the dissent argues, a mechanic who proceeds by amendment loses all security for expenses incurred after filing a statutorily required release. Because there is no such warning or expression of legislative intent, we adhere to the requirements the Legislature did establish in *section 53.054(a)*, which are met here as explained above.

Cases interpreting the mechanic's lien statutes also counsel against invalidating a lien on a purely technical basis. For example, "[i]t is well settled that *HN13* the mechanic's and materialman's lien statutes are to be liberally construed for the purpose of protecting laborers and materialmen." *Ready Cable, Inc. v. RJP S. Comfort Homes, Inc., 295 S.W.3d 763, 765 (Tex. App.—Austin 2009, no pet.)*. And courts have been more willing to excuse a mistake or omission in cases where no party is prejudiced by the defect. *Id.* (citing cases). Indeed, "[t]he Legislature did not intend that the materialman should lose his lien through the technicalities of a warning, where the owner **[**29]** was not misled to his prejudice." *Hunt Developers, Inc. v. W. Steel Co., 409 S.W.2d 443, 449 (Tex. Civ. App.—Corpus Christi 1966, no writ)*.

Here, there is no contention that the bank, the developer, or anyone else relied upon or was misled by the references to amendment in the post-release affidavits. Each affidavit was properly filed in the real property records, each clearly identifies the encumbered property, and each states the amount of the lien.[9]

Moreover, the purpose of these affidavits was to give notice of the builder's interest in the property. *See Arias v. Brookstone, L.P., 265 S.W.3d 459, 464-65 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)* (purpose of serving lien affidavits on property owner is to give notice). If anything, filing the post-release affidavits as amendments furthered this purpose. The use of the amendment format ensured that all of the amendments were filed together, thus clarifying that each affidavit superseded the previous one and that the most recent stated the full **[**30]** extent of the builder's interest.

At bottom, the dissent rests on the rule that "[i]f there is nothing for an amended **[*236]** instrument to amend, then such an amended instrument is itself ineffectual nullity." *Post*, at 8. The dissent cites no authority for applying this rule to mechanic's lien affidavits, but would apparently apply it to instruments of every kind. Of course, we agree that this rule may apply in some situations. *See, e.g., Lazo v. RSI Int'l, Inc., No. 14-06-00432-CV, 2007 Tex. App. LEXIS 7077, 2007 WL 2447299, at *4 (Tex. App.—Houston [14th Dist.] Aug. 30, 2007, no pet.)* (mem. op.) (endorsement to cancelled insurance policy ineffective). But it does not apply to amended pleadings, for example. Because an amended pleading replaces the original pleading, *see Tex. R. Civ. P. 65*, no one would argue that a fatal defect in the original pleading that is absent from the amended pleading vitiates the latter simply because it states that it amends the original pleading. We decline to apply the dissent's rule to

---

[9]   Although the lien perfected by the original October 2007 affidavit was released, the affidavit itself did not cease to exist, *cf. post*, at 8-9, and it is in the record before this Court.

defeat otherwise valid instruments that effectively serve the purpose for which they were created.[10]

Here, the amended affidavits gave notice of the builder's interest in the property in compliance with the applicable statutes. Accordingly, they perfected the builder's lien.[11]

## B. Whether the builder timely filed its post-release lien affidavits and whether its post-release expenses were for "materials" as defined in the mechanic's lien statute involve fact questions that preclude final summary judgment for either party.

The bank next contends that even if the builder's release allowed it to file subsequent lien affidavits, its post-release affidavits were nonetheless ineffective because (1) they were untimely and (2) the expenses referenced in the affidavits could not give rise to mechanic's liens because they were not for "materials furnished for construction" as required by the mechanic's lien statute.[12] We address each argument in turn. Because there are fact questions regarding both arguments, neither party is entitled to final summary judgment regarding the validity of the post-release mechanic's liens.

### 1. The timeliness of the builder's post-release liens presents questions of fact.

Because mechanic's liens attach on the day work begins, but need not be recorded **[*237]** until after work concludes, there can be notice problems. That is, a party relying solely upon the real property records will be unaware of a mechanic's senior lien until after the mechanic files its affidavit. *See Diversified Mortg. Investors, 576 S.W.2d at 801*.

The mechanic's visible construction activity on the property fills this potential notice gap. *Id. at 801-02*. Thus, *HN16* mechanic's liens first attach at "the commencement of construction . . . or delivery of materials," that is "visible from inspection of the land." *Tex. Prop. Code Ann. § 53.124*. Mechanic's lien statutes also protect third parties by requiring mechanics to file their affidavits within a fixed period after their presence on the property ceases. *See id. § 53.052*. In this way, when work is ongoing, third parties can observe the mechanic's presence and assume that liens may be forthcoming. **[**34]** *See Diversified Mortg. Investors, 576 S.W.2d at 801*. After work concludes, a party can avoid mechanic's liens by waiting for the lien-filing period to expire. *See id*.

The clock on the filing period starts ticking when "indebtedness accrues." Here, the builder had to file its lien affidavit *HN17* "not later than the 15th day of the fourth calendar month after the day on which the indebtedness accrue[d]." *Tex. Prop. Code Ann. § 53.052*.

Several events can trigger the accrual of indebtedness, but each stands in for the cessation

---

[10] *Cf. Rogers v. Ricane Enters., Inc.*, 884 S.W.2d 763, 770 (Tex. 1994) (principle that *HN14* "a contract shall **[**31]** be construed . . . in light of the purposes and objects for which it was made" is "well-settled"); *Union Pac. Res. Grp. v. Neinast*, 67 S.W.3d 275, 282 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (lease covenants will be implied to, among other things, "give effect to the actual intention of the parties . . . and the purposes sought to be accomplished [by their contract or conveyance]"); *Hicks v. Loveless*, 714 S.W.2d 30, 34 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) (deed restrictions construed "in light of the obvious purpose and intent of the restrictions").

[11] The dissent's "Supplemental Background" section discusses the correspondence between the builder and the bank, perhaps suggesting that this correspondence influences its interpretation of the post-release affidavits. As far as we can tell, however, it does not. The dissent's rule would apply with equal force if the only parties were a property owner and a mechanic who received payment and filed the statutorily required release. If the mechanic filed lien **[**32]** affidavits as amendments after filing a release, then the dissent would hold that nothing secures the mechanic's post-release expenses. As discussed above, we see no reason why this should be the case.

[12] The bank's brief conflates timeliness with whether the builder's expenses entitle it to a mechanic's lien, but we construe the brief to raise both issues. **[**33]** *See Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008) (*HN15* "Appellate briefs are to be construed reasonably, yet liberally, so that the right to appellate review is not lost by waiver.").

of work. For example, indebtedness to an original contractor[13] accrues on the last day of a month during which either the contractor or the property owner receives a written declaration from the other party terminating the contract. *Id*. *§ 53.053(b)(1)*. Absent termination, indebtedness accrues "on the last day of the month in which the original contract has been completed, finally settled, or abandoned." *Id*. *§ 53.053(b)(2)*.

For our purposes, the only relevant accrual triggers are abandonment and termination. The builder argues it never abandoned or terminated the project [**35] until it left the site in March 2010, so its post-release lien affidavits filed between November 2007 and January 2009 were all timely. For its part, the bank argues that the builder abandoned the project when it stopped working in October 2007, and thus all but the first of the builder's post-release lien affidavits were untimely because they were filed after February 15, 2008. We cannot agree with either party because the summary judgment evidence fails to conclusively establish when the builder abandoned or terminated the contract.

***Fact questions regarding abandonment***. Chapter 53 of the Property Code does not define "abandoned." *See Tex. Prop. Code Ann. § 53.001*. Moreover, neither party has cited, and our research has not revealed, a Texas authority exploring the meaning of "abandoned" as applied to mechanic's liens. We therefore use the word's ordinary meaning. *See TGS-NOPEC Geophysical Co. v. Combs, 340 S.W.3d 432, 439 (Tex. 2011)*. *HN18* "Abandon," as used in this context, means "to turn from or relinquish." Webster's Third New International Dictionary 2 (1993).

Courts across the country disagree about whether the objective appearance of abandonment triggers a mechanic's filing obligation [**36] or whether the parties must actually intend to abandon the project. *See Superior Constr. Servs., Inc. v. Belton,*

*749 N.W.2d 388, 391 (Minn. Ct. App. 2008)* (discussing the two approaches). The courts [*238] that focus upon the notice-giving purpose of ongoing work believe that the parties' "secret purposes" have no place in the analysis. *Allison v. Schuler, 1934- NMSC 072, 38 N.M. 506, 36 P.2d 519, 522 (N.M. 1934)*. These courts consider only the objective appearance of abandonment. *See id*. Other courts emphasize the mechanic's need for certainty in order to safeguard its rights and therefore include in their analysis the parties' subjective intent regarding abandonment. *See Superior Constr. Servs., 749 N.W.2d at 391*.

The parties here have not asked us to adopt one side of this split over the other, and we conclude that it is unnecessary to do so. Based upon the summary judgment evidence, both approaches raise fact questions. Accordingly, neither party is entitled to summary judgment under either approach.

Regarding the parties' subjective intent, the builder argues that a single fact conclusively establishes that it did not abandon the project until March 2010: the developer's request that it remain on the site until that [**37] time. Given the unique facts of this case, we disagree.

The project began deteriorating long before the builder's March 2010 departure, and there is evidence that one or both of the parties may have abandoned the project prior to that time. Indeed, two and a half years passed between the day the builder stopped working and the day it left the project site. During that time, the builder did no work, received little payment, sent notice of its intent to terminate the contract, and sued the developer. The builder is correct that its continuing presence on the property supports an inference that it did not abandon the project, but these other developments support a contrary inference. This evidentiary conflict raises a fact question that cannot be resolved on summary judgment.

---

[13]   The parties agree that the builder is an "original contractor" and this was an "original contract."

We also reject the builder's argument that its summary judgment evidence conclusively established that the parties actually intended to complete the project. The builder relies upon affidavits from its operations manager and a letter that it sent to the developer in May 2008. One affidavit says that "[the developer] repeatedly promised that it was in the process of securing additional financing, and that [the builder] [**38] should not demobilize." The other states that the builder "did not terminate the contract, abandon the contract or demobilize the Project" when it stopped working in October 2007 "[b]ecause of [the developer's] repeated promises that it was in the process of securing additional financing."

Neither affidavit reflects exactly when the developer made these promises or exactly what promises it made. Without this information, the mere existence of promises as early as October 2007 fails to establish conclusively the non-abandonment of the project prior to March 2010.

The builder's letter to the developer falls short for similar reasons. The May 2008 letter states that "[the builder] at the request of [the developer] has remained mobilized at the site." Even if the developer made this request prior to May 2008, however, such a request would not conclusively establish that the intent to complete the project survived until March 2010. The summary judgment evidence fails to establish conclusively when the parties intended to abandon the project, so neither party is entitled to summary judgment based upon abandonment.

Turning to the objective appearance of abandonment, the builder argues that its [**39] equipment remained on the property, signaling to third parties that it was working and that its liens could come at any time. The bank focuses upon the long period [*239] during which no work occurred, arguing that a third party would surmise the work was over.

The parties' arguments are both correct, as far as they go, and demonstrate the existence of a fact question on abandonment. Maintaining equipment on the property certainly suggests work may be ongoing. But the builder's extended period of inactivity suggests that, at some point, the builder and the developer may have given up the project. Deciding if and when the parties abandoned the contract is therefore a fact question that cannot be resolved on summary judgment.

*Fact questions regarding termination*. **HN19** For purposes of a statutory mechanic's lien, a contract terminates when one party receives a written notice of termination from the other. *Tex. Prop. Code Ann. § 53.053(b)(1)*. The builder contends that "[i]t is undisputed" that it "*never received* any notice the Contract was terminated" (emphasis added). This appears to be correct. But the builder alleged in its original petition below that it "*served* notice of intent to terminate the [**40] Contract" "[b]y late May, 2008" (emphasis added). At this point, the builder contended it had "bec[o]me apparent that [the developer] was incapable of obtaining the financing necessary to complete the Project." The builder's termination letter stated that, if the developer failed to cure its default, the contract would terminate on May 27, 2008.[14]

Although this letter appears in the record, we [**41] do not believe it conclusively proves that the contract terminated in May or June of 2008. First, there is no evidence that the developer

---

[14] The letter is dated May 20, 2008, and states that the developer's failure to cure its default within seven days will "terminate the Contract." The letter also states, however, that it is a "Notice of Intent to Terminate" and "[p]ursuant to" "Article 14.1.1" of the parties' construction agreement. This provision appears to provide for a fifteen-business-day cure period. In any event, even if the contract terminated in June 2008, a lien affidavit would have been due by the fifteenth day of the fourth month thereafter, i.e., October 15, 2008. *See* Tex. Prop. Code Ann. § 53.052(a). Thus, if the letter terminated the contract in May or June of 2008 (a matter upon which we express no opinion), then the builder's affidavits filed on October 23, 2008, and January 16, 2009, would appear to be untimely.

received this written notice, and *section 53.053(b)(1)* provides that receipt triggers the accrual of indebtedness, not dispatch. Moreover, neither party's brief thoroughly addresses the termination letter's effect. Thus, the issue of termination also cannot be resolved on summary judgment.

**2. The builder's filing of a single timely mechanic's lien does not render its amended liens timely under the statute**.

The builder argues, however, that issues of termination and abandonment do not prevent final summary judgment in its favor. The builder points out that even if its later post-release affidavits were untimely, its first amended lien affidavit filed in November 2007 was still timely. The builder then contends that any late affidavits "relat[e] back" to this timely one. Under this theory, the builder's single timely affidavit enabled it to more than double its lien on the property at any time regardless of when the statutory filing period expired. We disagree with this construction of the filing requirements.

The builder's construction disregards the **[**42]** language of the relevant statutes. *HN20* To obtain a valid lien, a mechanic "must file an affidavit" within the statutory period. *Tex. Prop. Code Ann. § 53.052*. This affidavit **[*240]** "must contain substantially . . . a sworn statement of the amount of the claim." *Id*. *§ 53.054(a)*. Here, the first amended affidavit, assuming it was timely, did not contain a substantially correct statement of the amount the builder ultimately claimed. The first amended affidavit stated a claim for approximately $2.9 million, and the builder ultimately claimed approximately $6.75 million.

Thus, the builder's first amended affidavit satisfied *both* the timeliness requirement and the amount-of-the-claim requirement only to the extent of the $2.9 million claim it substantially recited. We therefore reject the builder's argument that its

first amended affidavit satisfied the timeliness requirement as to all subsequent affidavits.

Although the bank does not dispute the timeliness of the first amended lien affidavit, we cannot grant a partial summary judgment that this affidavit imposed a valid mechanic's lien. As an initial matter, approximately $1.7 million of the first amended lien was for pre-release expenses that we have **[**43]** held the builder could not reassert against Parcel A. Because the first amended affidavit only mentioned Parcel A, it was ineffective to re-impose a lien for the pre-release expenses, and the builder is entitled to partial summary judgment to that extent. The remaining $1.1 million in the first amended affidavit appears to have been for post-release expenses. As we discuss below, however, the record does not conclusively establish whether the builder could obtain a mechanic's lien for those or other post-release expenses. As a result, notwithstanding the apparent timeliness of the first amended affidavit, fact questions preclude summary judgment as to its effectiveness regarding post-release expenses.

**3. Whether the builder's post-release expenses were for "material furnished for construction" presents fact questions**.

*HN21* Mechanic's liens secure payment for, among other things, "the labor done or material furnished for the construction or repair." *Tex. Prop. Code Ann. § 53.023*. As to the post-release liens, there is no contention that the builder "d[id] labor." Rather, the builder argues that its services after construction ceased were "material furnished."

*HN22* "Material" **[**44]** means all or part of:

(A) the material, machinery, fixtures, or tools incorporated into the work, consumed in the direct prosecution of the work, or ordered and delivered for incorporation or consumption;
(B) rent at a reasonable rate and actual running repairs at a reasonable cost for construction

equipment used or reasonably required and delivered for use in the direct prosecution of the work at the site of the construction or repair; or

(C) power, water, fuel, and lubricants consumed or ordered and delivered for consumption in the direct prosecution of the work.

*Tex. Prop. Code Ann. § 53.001(4)*.

The builder generally contends that its post-release expenses fall into these categories. The builder's affidavit states that the expenses were for "maintain[ing] its office facilities at the Project, continu[ing] to store materials and equipment at the Project, and maintain[ing] water, sewer, power, phones and data connections at the office complex."[15]

 [*241]  The bank contends that none of these post-work expenses are "materials" because, once work ceased, nothing was "used" or "consumed" in the "direct prosecution of the work." *See id*. We disagree because *HN23* the definition of materials does not always require actual use or consumption in the direct prosecution of the work. Instead, mechanic's liens are also available when items are "delivered for" use or consumption. *Id*. In this way, the availability of a mechanic's lien becomes a question of how the parties *intended* to use equipment and services delivered to the project, which is generally a question of fact. *State ex rel. Perrin v. Hoard, 94 Tex. 527, 62 S.W. 1054, 1056 (Tex. 1901)*.[16]

Here, we cannot determine conclusively from the summary judgment evidence exactly when the developer and builder ceased intending to prosecute the  [**46]  work. Therefore, we cannot

tell the extent to which the builder's expenses were for equipment or services delivered for that purpose. Standing alone, the fact that no work ultimately occurred does not answer these questions.

Moreover, *HN24* to obtain a mechanic's lien for rental expenses, the equipment must be not only "delivered for use," but also "reasonably required" for use in the direct prosecution of the work. *Tex. Prop. Code Ann. § 53.001(4)(B)*. In this case, the builder continued to incur rental expenses for several months after work had ceased even though the developer already owed over $1.7 million and the project had no apparent prospect of adequate financing. At some point, continuing to incur these expenses may have become unreasonable, regardless of the parties' intent. Whether and at exactly what point these expenses stopped being "reasonably required" are questions of fact that cannot be answered conclusively on this record. *Universe Life Ins. Co. v. Giles, 950 S.W.2d 48, 56 n.6 (Tex. 1997)* ("[R]easonableness is ordinarily a question of fact.").

* * *

For these reasons, we affirm the trial court's grant of summary judgment insofar as it held that the builder's lien against Parcel  [**47]  A for the unpaid portion of the pre-release debt is junior to the bank's deed of trust lien. Otherwise, to the extent the trial court's granted summary judgment for the bank based on the release, the summary judgment cannot stand.

**III. Although the bank's failure to comply with the tax lien transfer statutes does not prevent its subrogation to a tax lien, there are fact questions regarding whether equity requires subrogation here**.

---

[15]    Aside from the issues noted below, the parties have not briefed whether each of these categories of expenses fall within the statutory definition of "materials." We therefore express no opinion on whether they otherwise qualify as expenses for  [**45]  materials.

[16]    *See also Spoljaric v. Percival Tours, Inc*., 708 S.W.2d 432, 434 (Tex. 1986) ("Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony."); *Viscardi v. Pajestka*, 576 S.W.2d 16, 19 (Tex. 1978) ("The intent of the grantor is a question of fact.").

The parties' other principal dispute concerns whether the bank became subrogated to a senior tax lien that it satisfied with part of its loan proceeds. With a few exceptions that are not relevant here, **HN25** tax liens are senior to other liens. *See Tex. Tax Code Ann. § 32.05(b)*. Thus, if the bank became subrogated to tax liens, these liens would be senior to the builder's mechanic's liens. As a result, foreclosure of the subrogated tax liens would have extinguished the builder's mechanic's lien because the foreclosure sale proceeds were insufficient to satisfy both. *See I-10 Colony, Inc., 393 S.W.3d at 472*. The bank would therefore own the property free of the builder's liens, and it would be entitled **[*242]** to final summary judgment regardless of the issues discussed in **[**48]** Part II above.

**HN26** Subrogation is liberally applied and is broad enough to include every instance where one person, not acting voluntarily, pays another's debt. *Lancer Corp. v. Murillo, 909 S.W.2d 122, 127 (Tex. App.—San Antonio 1995, no writ)*. As used here, subrogation "essentially allows a subsequent lienholder to take the lien-priority status of a prior lienholder" by satisfying the prior lien's associated debt. *Bank of Am. v. Babu, 340 S.W.3d 917, 925 (Tex. App.—Dallas 2011, pet. denied)*. One who pays another's real property taxes often asserts a right to be subrogated to the taxing authority's lien. *E.g., Smart, 597 S.W.2d at 337-38*.

The bank's subrogation arguments focus on a clause in its deed of trust signed by the developer.

The deed states that the bank "is subrogated to all rights, liens or interests in any of the Mortgaged Property securing the payment of any obligation satisfied or paid off out of the proceeds of [its] loans." A tax lien was "paid off out of the proceeds of" the bank's loan, so it contends this provision entitles it to subrogation under a contractual subrogation theory. As we explain below, however, the bank's right to subrogation also depends upon equitable **[**49]** considerations.

The builder counters that the bank is not subrogated to the tax lien because (1) the bank failed to comply with a statutory procedure for transferring tax liens, and (2) equitable considerations make subrogation inappropriate here.[17] We disagree with the builder's first argument but conclude there are fact issues regarding the second that preclude summary judgment on this record.

**A. The tax lien transfer statutes do not eliminate contractual or equitable subrogation of tax liens**.

The builder first argues that the bank is not subrogated to the tax lien because it failed to comply with *sections 32.06* and *32.065* of the Tax Code.[18] The principle of subrogation is well established, however. *LaSalle Bank Nat'l Ass'n v. White, 246 S.W.3d 616, 619 (Tex. 2007)*. "Perhaps the courts of no state have gone further in applying the doctrine of subrogation than ha[ve] the court[s] of this state." *Faires v. Cockrill, 88 Tex. 428, 31 S.W. 190, 194 (Tex. 1895) overruled in part on*

---

[17]    The builder also argues that the bank failed to identify the tracts on which it paid taxes. The bank submitted a tax map, however, as an exhibit to one of its summary judgment filings (located at volume 5, page 1111 of the clerk's record). The account identification number on a tract that appears to contain Parcels A and B corresponds to the number on checks issued from the title company to the relevant taxing authorities.

We note, however, that the area of the tract on the tax map appears to be .01 acres smaller than the combined areas of Parcels A and B on the builder's map. We cannot tell whether this discrepancy results from rounding or if, in fact, the tract on the tax map excludes a small portion of the contested parcels depicted in the builder's map. To the extent this discrepancy creates **[**50]** a fact issue, the parties can address it on remand.

[18]    The builder claims that the version of the statute in effect when the bank satisfied the tax lien prevented subrogation. We therefore analyze the builder's arguments **[**51]** under that version, *see* Tex. Tax Code Ann. § 32.06, .065 (West 2008), rather than the current version, *see* Tex. Tax Code Ann. § 32.06, .065 (West Supp. 2012).

*other grounds by Fox v. Kroeger, 119 Tex. 511, 35 S.W.2d 679, 680 (Tex. 1931)*. Moreover, **HN27** the doctrine has long been applied to tax liens. *See Stone v. Tilley, 100 Tex. 487, 101 S.W. 201, 201 (Tex. 1907)*. Thus, to address the builder's argument, we must determine whether the tax lien transfer statutes provide an exclusive means for acquiring the taxing authority's **[*243]** priority, thereby abrogating common law subrogation of tax liens.

"Of course, **HN28** statutes can modify common law rules, but before we construe one to do so, we must look carefully to be sure that was what the Legislature intended."[19] *Energy Serv. Co. of Bowie, Inc. v. Superior Snubbing Servs., Inc., 236 S.W.3d 190, 194 (Tex. 2007)*. When evaluating an argument that a statute deprives a person of a common law right, we will not extend the statute beyond its plain meaning or apply it to cases not clearly within its purview. *Id. at 194 n.17* (citing *Cash Am. Int'l Inc. v. Bennett, 35 S.W.3d 12, 16 (Tex. 2000))*. With this rule in mind, we construe the tax lien statutes, looking first to the plain and common meaning of their words. *See State ex rel. State Dep't of Highways & Pub. Transp. v. Gonzalez, 82 S.W.3d 322, 327 (Tex. 2002)*.

***1. The statutes' text shows that they supplement, rather than abrogate, common law subrogation doctrines for tax liens.***

We conclude that the statutes upon which the builder relies **HN29** do not abrogate common law subrogation doctrines for several reasons. The statutes contain language permitting statutory transfers, but not requiring them. Moreover, the statutes expressly limit their foreclosure and notice requirements to statutory transfers; by their terms, the statutes do not apply to subrogated lienholders.

Finally, the statutes make tax lien priority available to parties that could not acquire it at common law, suggesting an intent to supplement rather than abrogate pre-existing avenues for obtaining the taxing authority's priority.

We begin with the text of the statutes themselves. The Tax Code permits **[**53]** tax lien transfers by providing that "[a] person may authorize another person to pay the delinquent taxes imposed by a taxing unit," and "[a] tax lien may be transferred to the person who pays the taxes." *Tex. Tax Code Ann. § 32.06(a-1)*, *(a-2)*. Parties wishing to transfer a tax lien under this statute must substantially comply with several requirements. *See Genesis Tax Loan Servs. Inc. v. Kothmann, 339 S.W.3d 104, 108-111 (Tex. 2011)*. For example, the transferee—the party receiving the tax lien—must file "a sworn document" with "the collector for the [taxing] unit." *Tex. Tax Code Ann. § 32.06(a-1)*. The document must, among other things, authorize payment of taxes, and it must identify the transferee and the encumbered property. *Id*.

The transferee's compliance with the authorization section triggers obligations for the tax collector. "If a transferee authorized to pay a property owner's taxes pursuant to [the statute's authorization section] pays the taxes," the tax collector must issue a receipt, certify that the taxes are paid, and "identify . . . the date of the transfer" "in a discrete field in the applicable property owner's account." *Id. § 32.06(b)*.

After receiving this certification, **[**54]** the transferee must notify "any mortgage servicer and . . . each holder of a recorded **[*244]** first lien encumbering the property" of the transfer. *Id. § 32.06(b-1)*. In addition, the transferee must "record a tax lien transferred as provided by this section

---

[19]  We understand "common law" in this context to mean "[t]he body of law derived from judicial decisions, rather than from statutes or constitutions." BLACK'S LAW DICTIONARY 313 (9th ed. 2009). Thus, although equitable subrogation is technically an equitable remedy as distinguished **[**52]** from a remedy at law, we nonetheless look carefully to determine whether the Legislature intended abrogation. *Cf. LaSalle Bank, 246 S.W.3d at 619* (construing amendment to Texas Constitution not to abrogate equitable subrogation); *Smart, 597 S.W.2d at 338* (describing the "right to *equitable* subrogation" as "aris[ing] in accordance with certain well-established rules *of law*" (emphases added)).

with the [tax collector's certification] . . . in the deed records of each county in which the property . . . is located." *Id*. *§ 32.06(d)*.

There are also special requirements to foreclose tax liens transferred under the statute. For example, absent agreement to the contrary, "foreclosure of a tax lien transferred as provided by *[section 32.06]* may not be instituted within one year from the date on which the lien is recorded." *Id*. *§ 32.06(i)*. Moreover, the foreclosure must be either "in the manner provided by law for foreclosure of tax liens" or by court order pursuant to *Texas Rule of Civil Procedure 736*, which governs expedited foreclosure proceedings. *Tex. Tax Code Ann. § 32.06(c)*. When proceeding under *Rule 736*, the transferee must still comply with *section 51.002 of the Property Code*, concerning deed of trust foreclosures, and *section 32.065 of the Tax Code*. *Tex. Tax Code Ann. § 32.06(c)(2)*. *Section 32.065* requires, among other things, **[**55]** that any holder of a recorded lien on the property receive a notice that "THE FORECLOSURE SALE REFFERED TO IN THIS DOCUMENT IS A SUPERIOR TRANSFER TAX LIEN." *Id*. *§ 32.065(b)(6)*.

This statutory scheme makes the transfer of a tax lien an option and discusses the rules that apply if the lien is transferred. But nothing in the text of the statute addresses what happens if the lien is not transferred or suggests a legislative intent to prohibit common law subrogation if a party pays a tax lien without transferring it. For example, the statutes provide that parties "may authorize" payment of taxes, and with such authorization "[a] tax lien may be transferred," but transfer is not required. *Tex. Tax Code Ann. § 32.06(a-1)*, *(a-2)*. The statutes also provide foreclosure requirements, but they specifically limit these requirements to

"transferee[s] [who] seek[ ] to foreclose a tax lien on the property under [the statute's foreclosure subsection]"; they do not mention subrogated lienholders at all. *Id*. *§ 32.06(c-1)*. The statutes create recording requirements, but only for "tax lien[s] transferred as provided by *[Section 32.06]*." *Id*. *§ 32.06(d)*.[20] The permissive language and narrowly defined scope **[**56]** of these statutory provisions demonstrates that the statutes do not provide the exclusive means of acquiring the taxing authority's priority position.

The statutes also broaden the ability of a party who pays a tax lien to protect itself, but this policy choice to supplement common law subrogation doctrines does not indicate an intent to supersede those doctrines. Specifically, the statutes enable tax lien transfers when common law subrogation would not apply if parties satisfy conditions that common law subrogation **[**57]** would not require. At common law, for example, a "mere volunteer" with no prior interest in the property could not obtain equitable subrogation. *Smart, 597 S.W.2d at 337*. Under the statute, anyone can obtain the taxing authority's **[*245]** priority position by meeting the statutory requirements. At common law, the taxpayer's authorization is unnecessary to obtain subrogation. *See id. at 335, 338* (discussing subrogation where taxpayer did not authorize). Under the statute, it is required. *See Tex. Tax Code Ann. § 32.06(a-2)*. At common law (as our next section details), the right to subrogation may depend partially upon equitable considerations, making entitlement to subrogation unpredictable. The statute eliminates this uncertainty. These features make the transfer statutes a useful alternative to traditional subrogation doctrines and demonstrate that *HN31* the statutes were intended to supplement, rather than eliminate, common law subrogation.

---

[20] The builder argues that section 32.065 of the Tax Code governs all contracts for the payment of taxes. In fact, that section's *HN30* requirements are specifically limited to "contract[s] . . . between a transferee and the property owner under Section 32.06." Tex. Tax Code Ann. § 32.065(b). Thus, section 32.065 only applies to contracts involving statutory lien transfers. Moreover, section 32.065 specifically notes that "Section 32.06 does not abridge the right of an owner of real property to enter into a contract for the payment of taxes." *Id*. § 32.065(a). We therefore reject the builder's argument that all tax payment contracts must comply with section 32.065's requirements.

### 2. Most courts agree that the statutes do not eliminate common law subrogation.

The Texas Supreme Court has endorsed the view that prior versions of the tax lien transfer statutes did not abrogate common law subrogation. In particular, it refused the writ in **[\*\*58]** a case holding that a lender was equitably subrogated to a tax lien, as well as a case holding that such subrogation was not affected by the transfer statutes. *See Chicago Title Ins. Co. v. Lawrence Invs., Inc., 782 S.W.2d 332 (Tex. App.—Fort Worth 1989, writ ref'd)* (holding lender was equitably subrogated to tax liens, but not discussing transfer statutes); *McDermott v. Steck Co., 138 S.W.2d 1106, 1109 (Tex. Civ. App.— Austin 1940, writ ref'd)* ("It is not material whether the bank acquired a lien upon the property under [the tax lien transfer statute]. . . . [A party asserting the bank's interest] was in equity entitled to subrogation to that lien as against a junior incumbrancer . . . .");[21] *see also Yancy v. United Surgical Partners Int'l, Inc., 236 S.W.3d 778, 786 n.6 (Tex. 2007)* ("writ refused" cases have same precedential value as Texas Supreme Court opinions). Relying upon one of these cases, *Dotson v. Pahl* also reached the result we do today. *206 S.W.2d 272, 273 (Tex. Civ. App.—Austin 1947, no writ)* (parties were "entitled to invoke the doctrine of subrogation, notwithstanding the failure to comply with [the prior version of the tax lien transfer statute]").[22]

Furthermore, in discussing tax-lien subrogation, the Texas Supreme Court has noted **[\*\*60]** that *HN32* "[e]ven in the absence of statutory or contractual authorization, a limited right to equitable subrogation may arise in accordance with certain well-established rules of law." *Smart, 597 S.W.2d at 338*. Thus, "[u]nder various circumstances [a non-volunteer who satisfies a tax lien] may be subrogated to the taxing authority's lien to the extent necessary for his own equitable protection." *Id*. In reaffirming this equitable entitlement, the **[\*246]** court specifically discussed statutory transfer procedures, further demonstrating that these procedures do not abrogate common law subrogation.

In *Genesis Tax*, however, the Texas Supreme Court said of a prior version of *section 32.06* "that a tax lien is enforceable only if transferred in accordance with the section's requirements." *339 S.W.3d at 108*. The builder contends this quote signals the end of common law subrogation doctrines.

We disagree for two reasons. First, subrogation was not at issue in *Genesis Tax*. The case addressed the effectiveness of a *section 32.06* tax lien transfer when the party failed to comply strictly with certain statutory requirements. *See id. at 109-11*. The opinion does not mention subrogation, nor does it cite the subrogation **[\*\*61]** authorities that we analyze above. Thus, read in context, the case's statement that "a tax lien is enforceable only if transferred in accordance with *[Section 32.06]*" refers only to transfers, not to subrogation. *See id. at 108-09*.

Second, the statutory language that *Genesis Tax* interpreted differs from that at issue here. The statute in *Genesis Tax* provided: "'To be enforceable, a tax lien transferred as provided by

---

[21]  In *McDermott*, **[\*\*59]** the tax collector "transferred" tax liens at the verbal request of a bank, but the transfer statute required written authorization from the party owing the taxes. *138 S.W.2d at 1107*. The court held that the effectiveness of this intended transfer "[wa]s not material" because equity required subrogation based upon satisfaction of the tax lien. *Id. at 1109*. Because the court expressly stated that compliance with the statute was not material, the case holds that equitable subrogation may entitle a party to a priority tax lien notwithstanding failure to transfer the lien under statutory procedures. *See id*.

[22]  The builder contends that "[the bank] failed to cite *any* case giving a lender first-priority-lien status based upon subrogation to a taxing authority's 'special lien' rights." We disagree. The bank cites *McDermott*, which gave an otherwise junior lienholder the taxing authority's senior priority based upon equitable subrogation. *138 S.W.2d at 1109*. *Chicago Title*, although not cited by either party, also equitably subrogated a junior lienholder to the taxing authority's priority position. *782 S.W.2d at 335*.

this section must be recorded . . . .'" *Id. at 108* & n.15. The version we now consider alters this language and provides: "A transferee shall record a tax lien transferred as provided by this section . . . ." *Tex. Tax Code Ann. § 32.06(d)*. In this way, while the *Genesis Tax* version arguably conditioned enforceability of tax liens on recordation, the version at issue here clarifies that only *transferees* (as distinguished from subrogees, for example) must comply with statutory recording requirements. The version here also specifically limits the statutory recording requirements to liens transferred "as provided by *[Section 32.06]*." *Id*.

We have found only one Texas case holding that the tax lien transfer statutes eliminate common law subrogation, and we disagree with its interpretation [**62] of the relevant precedents. In *Cameron Life Insurance Co. v. Pactiv Corp.*, the court concluded "there is nothing . . . indicating that [the section giving tax liens superior priority] applies to anyone other than the taxing authorities [and their statutory transferees]." *No. 13-05-760-CV, 2007 Tex. App. LEXIS 6773, 2007 WL 2388906, at *5 (Tex. App.—Corpus Christi Aug. 23, 2007, pet. denied)* (mem. op.). We disagree because the above-cited cases bind us and directly contradict this conclusion. Indeed, many cases not only "indicate" but directly hold that **HN33** a party can obtain the taxing authority's lien priority through equitable subrogation.[23]

We also disagree with *Cameron Life*'s analysis of the writ-refused *Chicago Title* case, which granted equitable subrogation to a tax lien. *Cameron Life* dismissed *Chicago Title* by saying "[i]t is unclear . . . what procedure the bank [in *Chicago Title*] used to pay the tax lien." *Id*. The court thus implied that the subrogation rights at issue in *Chicago Title* may, in fact, have been acquired by statutory transfer. *Id*.

But *Chicago* [**63] *Title* does not even mention the transfer statutes and expressly grounds it holding in equitable subrogation. *See 782 S.W.2d at 332-35*. If the subrogated party in *Chicago Title* had actually acquired its lien by statutory transfer, it would have been unnecessary to rely upon—or even discuss—equitable subrogation. *See Genesis Tax, 339 S.W.3d at 108-11* (not discussing subrogation doctrines where party relied upon statutory transfer). **[*247]** *Chicago Title* did discuss equitable subrogation, however, and its holding rested exclusively upon that doctrine. *782 S.W.2d at 334-35*. Thus, we disagree with *Cameron Life*'s conclusion that *Chicago Title* may have actually turned upon statutes not mentioned in the opinion.

* * *

For these reasons, we hold that **HN34** the tax lien transfer statutes do not abrogate common law subrogation doctrines. We note, however, that parties who rely exclusively upon equity to obtain the taxing authority's priority may face additional obstacles not present under the statutes.

For example, equitable subrogation is only available to "the extent necessary [for the subrogee's] equitable protection." *Smart, 597 S.W.2d at 338*. "When not compelled by the equities of the situation, full subrogation [**64] to all special privileges accompanying the taxing authority's constitutional and statutory lien will be denied." *Id*. This rule limits the extent of subrogated rights.

In addition, as we explain in the next section, **HN35** subrogation to a tax lien can materially alter the lien's terms and thereby prejudice intervening lienholders. *See Providence Inst. for Sav. v. Sims, 441 S.W.2d 516, 520 (Tex. 1969)*. Here, this prejudice triggers a factual inquiry to resolve the equities. Proceeding by statute avoids

---

[23] In addition to the authorities already cited, see *LaSalle Bank Nat'l Ass'n*, 246 S.W.3d at 620; *Benchmark Bank v. Crowder*, 919 S.W.2d 657, 662 (Tex. 1996).

the time and expense of determining title in this manner.[24]

**B. Because subrogation would prejudice the builder, an equitable inquiry is required, and fact questions prevent us from resolving the equities on this record**.

Having concluded that the bank's failure to comply with the transfer statutes does not foreclose common law subrogation, we turn to whether the bank is entitled to the taxing authority's priority here.

As an initial matter, the bank argues that a subrogation provision in its deed of trust entitles it to contractual subrogation as a matter of law and that we cannot examine the equities of subrogation. We disagree because even though the bank and the developer agreed to subrogation under the terms of the deed of trust, the builder was not a party to that agreement. Our analysis therefore involves equitable considerations as well.

*HN36* When two parties have a subrogation contract, "equitable considerations that might control . . . in the absence of an agreement" cannot invalidate it. *Fortis Benefits v. Cantu, 234 S.W.3d 642, 650 (Tex. 2007)*. This rule works between the parties because "[t]he parties hav[e] fixed their rights by contract" and "additional rights . . . will not be created by judicial intervention." *Smart, 597 S.W.2d at 338*.

This **[**66]** reasoning's force diminishes in cases like this one, however, where enforcing a subrogation contract would alter a nonparty's rights. *See Chase Home Fin., L.L.C. v. Cal W. Reconveyance Corp., 309 S.W.3d 619, 631 (Tex. App.—Houston [14th Dist.] 2010, no pet.)*. "In

these **[*248]** cases, the right of subrogation is not wholly dependent on the application of a contract." *Id*. Instead, as to the nonparty, subrogation depends partially on equitable principles. *Id*. Thus, "such cases fall into a third, hybrid category." *Id*.

The cornerstone of this equitable analysis is prejudice to the intervening lienholder that is not a party to the subrogation contract. *See Providence Inst. for Sav., 441 S.W.2d at 520*; *Med Ctr. Bank v. Fleetwood, 854 S.W.2d 278, 286 (Tex. App.—Austin 1993, writ denied)*. For example, merely changing the identity of the senior lienholder does not affect the intervening lienholder's rights and therefore is not prejudicial. *Med Ctr. Bank, 854 S.W.2d at 285-86*. Although subrogation may alter who holds the senior lien, the junior lienholder is still junior and still in the same amount. *See id*. Whether subrogation prejudices intervening interests is determined as of the time of the transaction **[**67]** supporting subrogation. *Id. at 285*. The consequences of subsequent transactions or events are not relevant to this inquiry. *Id*.

*HN37* In many cases, subrogation changes *only* the intervening lienholder's identity. This change creates no prejudice, so subrogating the intervening lienholder is appropriate as a matter of law. *See, e.g., id.*; *Chase Home Fin., L.L.C., 309 S.W.3d at 631-32*; *Texas Commerce Bank Nat'l Ass'n v. Liberty Bank, 540 S.W.2d 554, 556-57 (Tex. Civ. App.—Houston [14th Dist.] 1976, no writ)*; *see also Providence Inst. for Sav., 441 S.W.2d at 520*. Indeed, one court has stated that "there is no prejudice to intervening interest holders" "absent a showing that subrogation results in [(1)] additional debt having priority over or parity with the intervening interest, [(2)] a material change in the terms of the superior interest, or [(3)] other

---

[24]   The builder contends that if the tax lien transfer statutes do not eliminate common law subrogation, "these [statutes] would *never* apply." That is, parties will never use statutory procedures when equity may entitle them to the same rights without the statutory hoop-jumping. We doubt this is the case. Compliance with statutory procedures guarantees the lender's ability to enforce the taxing authority's priority lien. Subrogation doctrines guarantee—at best—a shot at this position and high potential for litigation. Notwithstanding the viability of common law subrogation, we believe many lenders will continue to obtain tax liens through **[**65]** statutory transfers.

pecuniary loss resulting from the subrogation.″[25] *Med Ctr. Bank, 854 S.W.2d at 286*.

In the absence of prejudice, subrogation must be allowed, but **[**68]** the mere presence of prejudice does not necessarily prevent subrogation. *See Fleetwood v. Med Ctr. Bank, 786 S.W.2d 550, 555 n.2 (Tex. App.—Austin 1990, writ denied)*. Rather, ″when prejudice exists, the trial court should, in exercising its equitable discretion, consider the totality of the circumstances, of which the existence of prejudice to one or more parties is a part.″ *Id*. Factors to consider include the extent of prejudice, its foreseeability, and whether the party claiming prejudice could have avoided it. *Id*.

***1. Subrogation would prejudice the builder by materially changing the terms of the superior interest***.

Applying this analysis, we conclude that subrogating the bank to the tax liens would prejudice the builder because it would alter the foreclosure requirements that otherwise apply to tax liens. Statutory and constitutional constraints dictate a tax lien's terms. For example, with the exception of abandoned property, tax liens must be foreclosed judicially rather than by trustee's sale. *See Tex. Tax Code Ann. § 33.41* (West 2008); *City of Wichita Falls v. ITT Commercial Fin. Corp., 827 S.W.2d 6, 10 (Tex. App.—Fort Worth 1992)* (″[A]d valorem tax liens must be judicially foreclosed **[**69]** . . . .″), *aff'd in part, rev'd in part on other grounds*, *835 S.W.2d 65 (Tex. 1992)*. *Texas Rule of Civil Procedure 39* requires the taxing authority to join any party with an interest in the property in **[*249]** the foreclosure suit. *Murphee Prop. Holdings, Ltd. v. Sunbelt Sav. Ass'n of Texas, 817 S.W.2d 850, 852 (Tex. App.— Houston [1st Dist.] 1991, no writ)*; *see also Kothari v. Oyervidez, 373 S.W.3d 801, 810 (Tex. App.—Houston [1st Dist.] 2012, pet. denied)* (″[A]t least generally, 'a lienholder must be joined

in a delinquent tax suit in order to be bound by it.'″). The *Due Process Clause of the United States Constitution* also requires that such lienholders receive actual notice of foreclosure. *Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 798-99, 103 S. Ct. 2706, 77 L. Ed. 2d 180 (1983)*. If the foreclosure suit succeeds, all parties to the suit must then receive notice of the foreclosure sale. *Tex. Tax Code Ann. § 34.01* (West 2008).

These foreclosure requirements protect intervening lien holders, and the bank's deed of trust eliminated them here. The deed of trust does not require the trustee to notify junior lien holders prior to foreclosure, and the builder had no statutory right to notice. *See Jones v. Bank United of Texas, FSB, 51 S.W.3d 341, 344 (Tex. App.— Houston [1st Dist.] 2001, pet. denied)*; **[**70]** *Kothari, 373 S.W.3d at 808-09*.

In sum, before subrogation, the tax lien could only be foreclosed through a judicial proceeding requiring the builder as a party, but after subrogation, the bank could foreclose (thereby extinguishing the builder's lien) without even notifying the builder. Indeed, the builder has offered evidence that it had no knowledge that any tax lien existed or that the bank was asserting the taxing authority's priority position in its foreclosure.

*HN38* Eliminating protections that existed prior to subrogation constitutes a ″material change in the terms of the superior [tax lien],″ triggering an equitable inquiry. *See Med Ctr. Bank, 854 S.W.2d at 286*; *cf. First Nat'l Bank of Kerrville v. O'Dell*, 856 S.W.2d 410, 416 (Tex. 1993) (where ″[b]ank through its 'secret' (as to [junior lienholder]) foreclosure would obtain the title and extra equity″ and deprive junior lienholder of his interest, court ″would not allow such an inequitable result under the guise of 'equitable' subrogation″).

---

[25] Because we conclude that one of these circumstances exists here, we decline to address whether these are, in fact, the only circumstances that may demonstrate prejudice to an intervening lienholder.

### 2. Questions of fact regarding the equities of subrogation preclude summary judgment.

*HN39* Although summary judgment is available in equitable actions, certain factors counsel against summary dispositions **[**71]** in equitable subrogation cases. *Fleetwood, 786 S.W.2d at 556-57*. For example, the "material facts" in these cases are difficult to define precisely. *Id. at 556*. "The main guiding principle is the prevention of an unfair or unjust result." *Id*. Trial courts have a "measure of discretion" in weighing the circumstances and adjusting the remedy to accomplish this main goal. *See id. at 555-57* & n.2.

But a trial court does not have unfettered discretion to determine the equities of subrogation. Rather, the right to subrogation must be determined in light of its purpose: preventing unjust enrichment. *See Smart, 597 S.W.2d at 337*. Thus, the principal issue is the extent to which subrogation is necessary to prevent the bank's property tax payments from unjustly enriching the builder. *See id. at 337-38*.

The unresolved factual issues here become clearer when one understands the usual basis for finding unjust enrichment in this type of case.[26] When a junior lienholder **[*250]** satisfies a tax lien to protect its own interest, everyone with an interest in the property benefits as a result. Instead of a tax-lien foreclosure potentially extinguishing all interests, everyone keeps what they have. Subrogating **[**72]** the party who actually satisfies the senior debt places the parties where equity would have them. The junior interest holders who declined to satisfy the lien remain subject to it. The party who paid the senior debt gets what it paid for.

Factual questions regarding whether this reasoning applies here cannot be resolved on this record.

The prejudice to the builder if subrogation is allowed, the extent of unjust enrichment to the builder if subrogation is not allowed, and the extent to which subrogation is necessary for the bank's equitable protection all play a role in the analysis as discussed above. For example, whether the builder knowingly allowed the bank to protect the property from any foreclosure, the imminence of a tax foreclosure suit without the bank's intervention, **[**73]** and the developer's potential alternatives to foreclosure may be relevant considerations. *Cf. World Help v. Leisure Lifestyles, Inc., 977 S.W.2d 662, 682 (Tex. App.—Fort Worth 1998, pet. denied)* (holding party who purchased vendor's and deed of trust liens knowing taxes were due on property and subsequently paid taxes was not equitably subrogated to tax liens).

Whether the bank intended to be subrogated to the tax lien initially is also relevant. *See Fleetwood, 786 S.W.2d at 556* (remanding to consider, among other things, whether parties initially intended subrogation). If the bank sought subrogation initially, its reason for not complying with the tax lien transfer statute would be relevant. For example, if the bank intentionally avoided a statutory transfer to surprise the builder, this fact would likely cut against subrogation.

With a more developed record, these and other fact issues that bear on the equities of subrogation can be better addressed. *See id. at 557* (reversing summary judgment where the "record does not fully develop the facts on which the trial court's equitable discretion must be exercised, and where the facts that are developed, [even if] uncontroverted, can give **[**74]** rise to more than

---

[26]   Equitable subrogation is generally used to avoid unjustly enriching the debtor (here, the developer). *See First Nat'l Bank of Kerrville, 856 S.W.2d at 415*. But as discussed above, *HN40* the equitable balance necessary to determine whether prejudice to an intervening lienholder prevents subrogation focuses upon the would-be subrogee (the bank) and the intervening lienholder (the builder). *See Fleetwood, 786 S.W.2d at 556-57*.

one reasonable inference").[27] For now, **HN41** "[a]s long as there is a probability that a case has for any reason not been fully developed, [we] ha[ve] the discretion to remand rather than render a decision." *Pena v. Smith, 321 S.W.3d 755, 759 (Tex. App.—Fort Worth 2010, no pet.)*; *see also Scott Bader, Inc., v. Sandstone Prods., Inc., 248 S.W.3d 802, 822 (Tex. App.—Houston [1st Dist.] 2008, no pet.)*.[28] Because the bank is not entitled to **[*251]** summary judgment on this record on the ground that it is subrogated to the tax liens, we reverse the remainder of the summary judgment in favor of the bank and remand for further proceedings consistent with this opinion.

CONCLUSION

For these reasons, there are fact issues regarding the parties' claims that largely preclude summary judgment. We therefore sustain in part the builder's first issue on appeal, in which it argues that the trial court erred in granting summary judgment for the bank. Nonetheless, neither the builder nor the bank has established an entitlement to final judgment as a matter of law. Thus, we overrule the builder's **[**76]** second issue, in which it argues its entitlement to summary judgment.

Specifically, fact issues preclude final summary judgment for either party based upon the builder's mechanic's liens because we cannot determine when the contract was terminated or abandoned and whether the builder's post-release expenses entitle it to mechanic's liens. The release does

establish, however, that the builder was not entitled to re-file a mechanic's lien against Parcel A to secure the unpaid portion of the pre-release debt. We therefore affirm in part the trial court's grant of summary judgment for the bank, holding that the bank's interest in Parcel A is not subject to the builder's lien for the unpaid pre-release debt.

As to the bank's contention that the tax liens entitle it to summary judgment, fact issues regarding the equities of subrogating the bank to these liens preclude summary judgment on the present record. We therefore reverse the remainder of the trial court's summary judgment and remand this case for further proceedings consistent with this opinion.[29]

/s/ J. Brett Busby

Justice

**Appendix**

[EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; however, this pagination accurately reflects the pagination of the original published document.]

Following are excerpts from the Released Lien affidavit and each of the four **[*256contd]** amended lien affidavits. The amending language in each amended lien affidavit is emphasized.

**AFFIDAVIT FOR MECHANIC'S AND MATERIALMAN'S LIEN**

---

[27] On remand, the parties and the trial court should consider which facts material to the equitable analysis are uncontroverted, as well as which are disputed and may need to be found by a jury. *See State v. Tex. Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex. 1979) (**HN42** "Although a litigant has the right to a trial by jury in an equitable action, only ultimate issues of fact are submitted for jury determination. The jury does not determine the expediency, necessity, or propriety of equitable relief."). We recognize the possibility **[**75]** that additional discovery may resolve some or all of the fact questions that now prevent summary judgment. This opinion does not prevent the parties from filing future motions for summary judgment, including motions that seek to narrow or resolve the subrogation dispute.

[28] The builder argues it is nevertheless entitled to summary judgment based upon *Conroy Mortgage Corporation v. Fielder*, 375 S.W.2d 344 (Tex. App.—Fort Worth 1964, writ ref'd n.r.e.). We disagree because the equities in *Conroy* were much clearer than those here. The party seeking subrogation in *Conroy* appears to have been a volunteer, and the intervening lienholder had no notice whatsoever of the foreclosure sale that extinguished its interest in the property. Neither of those circumstances are present here.

[29] We do not intend this opinion to dictate how the trial court should proceed in addressing the live issues in this case. The trial court **[**77]** should exercise its discretion to address these issues in the order and manner it deems most appropriate.

BEFORE ME, the undersigned authority, personally appeared Brian Duncan, who upon his oath, deposed and stated the following:

. . .

4. The labor, materials and work furnished by Claimant are generally described as follows: labor and materials necessary for the construction of the Park 8, Tower B, Houston, Harris County, Texas.

5. The real property sought to be charged with a lien by Claimant is generally described [as] the Park 8, Tower B, 8018 W. Sam Houston Parkway South, Houston, Texas 77072 and more particularly described as follows:

> TRACT I: Being a 0.8664 acre (37,739 square foot) tract of land out of the remainder of 62.01 acre tract of land . . . .

> TRACT II: Being a 0.1072 acre (4,669 square foot) tract of land out of the remainder of a 62.01 acre tract of land . . . .

. . .

7. After all just credits, offsets and payments, the amount **[**78]** of $3,228,444.50 remains unpaid and is due and owing to Claimant under its contract with Park 8 Place, L.P., and Claimant claims a lien on said property and improvements under the provisions of *Texas Property Code § 53.001 et seq*. to secure payment of said amount.

**FIRST AMENDED AFFIDAVIT FOR MECHANIC'S AND MATERIALMAN'S LIEN**

BEFORE ME, the undersigned authority, personally appeared Brian Duncan, who upon his oath, deposed and stated the following:

. . .

*3. This First Amended Affidavit for Mechanic's and Materialman's Lien amends the Affidavit*

*for Mechanic's and Materialman's Lien originally filed for record on October 10, 2007 at Document No. 20070615856, Volume 050-84, Pages 0564, et. seq. of the Real Property Records of Harris County, Texas.*

. . .

5. The labor, materials and work furnished by Claimant are generally described as follows: labor and materials necessary for the construction of the Park 8, Tower B, Houston, Harris County, Texas.

6. The real property sought to be charged with a lien by Claimant is generally described [as] the Park 8, Tower B, 8018 W. Sam Houston Parkway South, Houston, Texas 77072 and more particularly described as follows:

> TRACT I: Being a 0.8664 acre (37,739 **[**79]** square foot) tract of land out of the remainder of 62.01 acre tract of land . . . .

> TRACT II: Being a 0.1072 acre (4,669 square foot) tract of land out of the remainder of a 62.01 acre tract of land . . . .

. . .

8. After all just credits, offsets and payments, the amount of $2,887,070.20 remains unpaid and is due and owing to Claimant under its contract with Park 8 Place, L.P., and Claimant claims a lien on said property and improvements under the provisions of *Texas Property Code § 53.001 et seq*. **[*257contd]** to secure payment of said amount.

**SECOND AMENDED AFFIDAVIT FOR MECHANIC'S AND MATERIALMAN'S LIEN**

BEFORE ME, the undersigned authority, personally appeared Brian Duncan, who upon his oath, deposed and stated the following:

. . .

*3. This Second Amended Affidavit for Mechanic's and Materialman's Lien amends the First Amended Affidavit for Mechanic's and Materialman's Lien originally filed for record on November 13, 2007 at Document No. 2007067266, Volume 051-78, Pages 1978, et. seq. of the Real Property Records of Harris County, Texas.*

. . .

5. The labor, materials and work furnished by Claimant are generally described as follows: labor and materials necessary for the construction of the Park 8, Tower **[\*\*80]** B, Houston, Harris County, Texas.

6. The real property sought to be charged with a lien by Claimant is generally described [as] the Park 8, Tower B, 8018 W. Sam Houston Parkway South, Houston, Texas 77072, consisting of six (6) adjacent tracts of land, more particularly described in Exhibit A attached hereto and incorporated herein.

. . .

8. After all just credits, offsets and payments, the amount of $5,845,532.00 remains unpaid and is due and owing to Claimant under its contract with Park 8 Place, L.P., and Claimant claims a lien on said property and improvements under the provisions of *Texas Property Code § 53.001 et seq.* to secure payment of said amount.

EXHIBIT "A"

TRACT I

BEING A 0.8664 ACRE (37,739 SQUARE FOOT) TRACT OF LAND OUT OF THE REMAINDER OF A 62.01 ACRE TRACT . . . .

TRACT II

BEING A 0.1072 ACRE (4,669 SQUARE FOOT) TRACT OF LAND OUT OF THE REMAINDER OF A 62.01 ACRE TRACT . . . .

TRACT III

BEING A 10.4179 ACRE (453,803 SQUARE FOOT) TRACT OF LAND OUT OF THE REMAINDER OF A 62.01 ACRE TRACT . . . .

TRACT IV

BEING A 0.4236 ACRE (18,450 SQUARE FOOT) TRACT OF LAND OUT OF THE REMAINDER OF A 62.01 ACRE TRACT . . . .

TRACT V

BEING A 1.2451 ACRE (54,235 SQUARE FOOT) TRACT OF LAND OUT OF THE REMAINDER **[\*\*81]** OF A 62.01 ACRE TRACT . . . .

TRACT VI

BEING A 3.4235 ACRE (149,128 SQUARE FOOT) TRACT OF LAND OUT OF THE REMAINDER OF A 62.01 ACRE TRACT . . . .

**THIRD AMENDED AFFIDAVIT FOR MECHANIC'S AND MATERIALMAN'S LIEN**

BEFORE ME, the undersigned authority, personally appeared Brian Duncan, who upon his oath, deposed and stated the following:

. . .

*3. This Third Amended Affidavit for Mechanic's and Materialman's Lien* **[\*258contd]** *amends the First Amended Affidavit for Mechanic's and Materialman's Lien originally filed for record on November 13, 2007 at Document No. 2007067266, Volume 051-78, Pages 1978, et. seq. of the Real Property Records of Harris County, Texas [sic].*

. . .

5. The labor, materials and work furnished by Claimant are generally described as follows: labor and materials necessary for the construction of the Park 8, Tower B, Houston, Harris County, Texas.

6. The real property sought to be charged with a lien by Claimant is generally described [as] the Park 8, Tower B, 8018 W. Sam Houston Parkway South, Houston, Texas 77072, consisting of six (6) adjacent tracts of land, more particularly described in Exhibit A attached hereto and incorporated herein.

. . .

8. After all just credits, offsets and payments, **[**82]** the amount of $6,098,768.07 remains unpaid and is due and owing to Claimant under its contract with Park 8 Place, L.P., and Claimant claims a lien on said property and improvements under the provisions of *Texas Property Code § 53.001 et seq*. to secure payment of said amount.

[Exhibit A, identical to that described *supra* is attached.]

### FOURTH AMENDED AFFIDAVIT FOR MECHANIC'S AND MATERIALMAN'S LIEN

BEFORE ME, the undersigned authority, personally appeared Brian Duncan, who upon his oath, deposed and stated the following:

. . .

*3. This Fourth Amended Affidavit for Mechanic's and Materialman's Lien amends the Third Amended Affidavit for Mechanic's and Materialman's Lien originally filed for record on October 23, 2008 in RP Vol. 060-60, Pages 0587, et. seq., Document No. 20080530463 of the Real Property Records of Harris County, Texas.*

. . .

5. The labor, materials and work furnished by Claimant are generally described as follows: labor and materials necessary for the construction of the Park 8, Tower B, Houston, Harris County, Texas.

6. The real property sought to be charged with a lien by Claimant is generally described [as] the Park 8, Tower B, 8018 W. Sam Houston Parkway South, Houston, Texas **[**83]** 77072, consisting of six (6) adjacent tracts of land, more particularly described in Exhibit A attached hereto and incorporated herein.

. . .

8. After all just credits, offsets and payments, the amount of $6,771,386.45 remains unpaid and is due and owing to Claimant under its contract with Park 8 Place, L.P., and Claimant claims a lien on said property and improvements under the provisions of *Texas Property Code § 53.001 et seq*. to secure payment of said amount.

[Exhibit A, identical to that described *supra* is attached.]

**Dissent by:** Adele Hedges

## Dissent

In Part II of its opinion, the majority concludes that appellant Lyda Swinerton Builders, Inc. (the "Builder") fully released its materialman's and mechanic's ("M&M") lien, but "did not waive its right to file new M&M liens covering other property or securing payment for post-release expenses." I would hold that these post-release amended M&M lien affidavits could not have created a new M&M lien. I would affirm summary judgment in favor of Cathay Bank (the "Bank") on the basis that it established its lien priority as a matter of law because the Builder's amended lien affidavits were ineffective to create new M&M liens. Therefore, I respectfully dissent.

## Supplemental [**84] Background[1]

[EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; however, this pagination accurately reflects the pagination of the original published document.]

This case involves a parcel of land consisting of six contiguous tracts making up nearly 16.5 acres (the "Property"). According to the Builder's M&M lien affidavits, these tracts are described as follows: Tract I — 0.8664 acre in area; Tract II — 0.1072 acre in area; Tract III — 10.4179 [*252] acres in area; Tract IV — 0.4236 acre in area; Tract V — 1.2451 acres in area; and Tract VI — 3.4235 acres in area.[2]

The Property was owned by Park 8 Place, L.P. (the "Developer"), which, as noted by the majority, is not a party to this suit. *See ante*, at 2. The Builder executed a contract with the Developer to make improvements to the Property in February 2007 (the "Project"). At the time that the Builder executed the contract, it had already begun working on the Project in January 2007. Further, [**85] the Builder acknowledges that, when it began work on the Project, the Bank had a deed of trust lien recorded on March 15, 2004, covering Tracts III, IV, and V, *i.e.*, approximately 12.0866 acres of the property. The Bank's deed of trust lien secured repayment of approximately $1.4 million it had loaned to the Developer's predecessor-in-interest.

After the Builder began work, the Bank loaned the Developer additional funds. In May 2007, the Bank filed a deed of trust lien against Tract VI, securing the repayment of a loan of $800,700.00 made to the Developer. In August, the Bank filed another deed of trust lien, covering the entire Property, securing the repayment of $502,000.00 loaned to the Developer.

The Developer stopped paying the Builder for its work on the Project in August 2007. Because of these payment issues, the Builder ceased working on the Project on October 4, 2007. On October 10, 2007, the Builder filed its first M&M lien affidavit, reflecting a lien of approximately $3.2 million and encumbering Tracts I and II of the property. Apparently, around this same time, the Builder, the Bank, and the Developer engaged in meetings regarding obtaining funding for the Project. On October [**86] 19, 2007, the Builder's Houston operations manager, Brian Duncan, sent the following email to the Bank's representatives:

> We [the Builder] suspended all work on October 4th due to the outstanding payment issues. All of the subcontractors have demobilized from the site. No additional work has been performed since our meeting. We are preparing to take down the tower crane and remove the concrete forms for the tower structure by the end of the month.

Previous emails indicate that Duncan had met with at least one of the Bank's representatives earlier in October. The first email is dated October 11, 2007 and is from Duncan. In it, Duncan inquires about the availability of "the $1.5M funding," asks for an update on the "status of the loan," and requests that "the funds" be wired to the Builder's bank. The subject line of this email, and the rest of the emails contained in the string, is "Park 8 [the Developer] Funding Status."

The Bank subsequently loaned the Developer approximately $1.9 million. This loan closed on

---

[1] I include my own background section to supplement the majority's facts and to focus on those facts that are important to my resolution of this dispute.

[2] The Builder numbers these tracts differently in an exhibit. The majority uses the numbers as referenced in the Builder's exhibit, but I use the tract numbers referenced in the lien affidavits. This difference in numbering has no impact on the analysis.

October 31, 2007.[3] The HUD settlement statement from the closing of the Bank's loan to the Developer reflects that the Builder received $1,086,914.62 from the loan funds.[4] The **[*253]** record **[**87]** contains a "Release of Lien," executed by the Builder, which reflects that, in consideration of $1.5 million,[5] the Builder released its October 10, 2007 M&M lien described above (the "Released M&M Lien"). This lien release was signed on October 31 and filed on November 5, 2007 in the Harris County Property Records. Also on October 31, the Developer signed a deed of trust in favor of the Bank, covering the entirety of the Property and securing the Bank's $1.9 million loan. This deed of trust was filed of record on November 5, 2007 (the "November deed of trust").

After releasing its original M&M lien, the Builder maintained a presence on the Property and continued to submit bills to the Developer, but *never* recommenced work on the Project. On November 13, 2007, the Builder filed a "First Amended Affidavit for Mechanic's and Materialman's Lien," which in its body specifically described and purported to amend the Released M&M Lien. This M&M lien purportedly encumbered Tracts I and II and claimed an indebtedness of $2,887,070.20, which included indebtedness of $2,141,529.88 remaining from the Released M&M Lien that was not paid through the loan funds. This amended M&M lien affidavit was followed by three more amended M&M lien affidavits, filed on June 12, 2008, October 23, 2008, and January 16, 2009, each encumbering Tracts I and II, as well as adding Tracts III through VI, each specifically referencing and purporting to amend a prior **[**89]** M&M lien affidavit, and each for an increased amount. The final indebtedness the Builder claimed is over $6.7 million.

On October 24, 2008, while still maintaining a presence on the Property and still incurring expenses, the Builder filed suit against the Developer for breach of contract and to foreclose on its M&M lien. In December 2008, the Bank intervened in the lawsuit, asserting a superior interest in some or all of the Property. The Builder finally demobilized from the Project in March 2010—nearly eighteen months after filing suit against the Developer. The Developer filed for bankruptcy protection, which temporarily abated proceedings in the underlying suit.

The Bank moved to sever the lien priority issues from the underlying suit in December 2009 and lift the stay. This severance was granted in January 2010 and the abatement previously ordered was lifted to be effective March 20, 2010. On March 16, 2010, the Bank served a Notice of Substitute Trustee's Sale Under Deed of Trust, indicating that the Bank intended to sell the Property on April 6, 2010 "unless all indebtedness owing to the [Bank]" was settled before the foreclosure date. The notice of sale indicated that it was based **[**90]** upon the Bank's November deed of trust.

The Builder filed a supplemental petition seeking to temporarily enjoin the foreclosure sale until the lien priority dispute between it and the Bank had been fully and finally adjudicated. The Bank

---

[3]   The record contains another email from Duncan, dated October 30, 2007, to an individual at the title company handling the closing of the loan between the Bank and the Developer. Attached to this email is an unexecuted release of the Builder's lien. In the email, Duncan asks "what time tomorrow" he should come to the title company to sign the release and pick up the Builder's check for $1,086,914.62.

[4]   The majority states that the Bank paid the Builder these funds. *See ante*, at 4. More accurately, the money for this payment came from funds the Bank *loaned* to the Developer. This amount was paid during settlement of the loan directly **[**88]** to the Builder by the title company handling the loan closing. Thus it is more precise to state that the Developer paid these amounts.

[5]   Another subcontract, not a party to this dispute, was paid $413,085.38 out of the Developer's loan funds and also released its M&M lien, which is why the release reflects $1.5 million.

responded, asserting a general denial. It further alleged that the Builder did not meet the requirements for obtaining injunctive relief because the Builder had, *inter alia*, (1) released its M&M lien and agreed to subordinate any potential liens in favor of the Bank and was estopped **[*254]** from claiming lien priority over the Bank, (2) unclean hands because it had accepted $1.5 million dollars advanced by the Bank in return for a release of all liens it had against the Project and then, less than two weeks after it had accepted these funds, purported to re-file liens against the Project, and (3) failed to timely file and perfect any M&M liens against the Property, except the one it had released. After a hearing, the trial court denied the Builder's request for a temporary injunction. The Bank then purchased the property at the foreclosure sale for $10,000.00. The Builder did not attend the sale.

Meanwhile, the Bank and the Builder proceeded to dispute lien **[**91]** priority in the severed suit. They filed cross-motions for final summary judgment, replies, and responses. In the Builder's motion, it asserted it was entitled to lien priority based on its final amended M&M lien filed on January 16, 2009, which it contended related back to the start of work in January 2007. It argued that the Bank's purchase of the property at the foreclosure sale was subject to the Builder's senior lien.

As is relevant to this dissent, the Bank contended that the Builder had released its October 2007 M&M lien and could not amend this M&M lien once it was released. Although both the Bank's and Builder's summary-judgment motions were denied twice by two different judges, the Bank's motion was later granted and the Builder's was denied. The trial court held that the Bank owned the property "free and clear" of the Builder's claims. After the Builder's motion for new trial was overruled by operation of law, this appeal timely followed.

**Analysis**

I agree with the majority that the Builder fully released its October 10, 2007 M&M lien. *See ante*, at 10-11. This lien encumbered Tracts I and II. Once released, this M&M lien could not be revived. *See Apex Fin. Corp. v. Brown, 7 S.W.3d 820, 830 (Tex. App.—Texarkana 1999, no pet.)*; **[**92]** *Collinsville Mfg. Co. v. Street, 196 S.W.284, 287 (Tex. Civ. App.—Amarillo 1917, no writ)* (stating that a statutory M&M lien may be waived and that once waived, it cannot be revived). Moreover, the Bank has a superior interest in Tracts III, IV, and V pursuant to its deed of trust filed prior to the Builder starting the project. *See ante*, at 3 n.1.

I disagree, however, with the majority's conclusion that the subsequently filed amended M&M lien affidavits functioned as new liens for newly incurred or unpaid expenses relating back to the inception of work. The majority concludes that these amended M&M lien affidavits function substantively as new M&M liens because they substantially comply with the requirements of *Texas Property Code section 53.054*. *See ante*, at 16-18. This section details the requirements of a mechanic's lien. *See Tex. Prop. Code § 53.054(a)*. I do not agree that the simple fact that these amended M&M lien affidavits, which may have complied with the statutory requirements, were transformed into *new* M&M liens because they clearly and unequivocally state that they are *amended* M&M liens.

The majority misconstrues my point. I am not promoting form over substance: as noted **[**93]** above and as is evident in the attached Appendix, in each of the amended M&M lien affidavits, Brian Duncan, on behalf of the Builder, states *under oath* that the M&M lien affidavit amends either the original or a subsequent

Ian Ghrist

amended M&M lien affidavit.[6] When the Builder **[*255]** itself claims, *under oath*, that each one amends, or replaces, the previous one, we should take the Builder at its word. *Cf. Lazo v. RSI Int'l, Inc., No. 14-06-00432-CV, 2007 Tex. App. LEXIS 7077, 2007 WL 2447299, at *4 (Tex. App.— Houston [14th Dist.] Aug. 30, 2007, no pet.)* (mem. op.) (holding that endorsement that purported to amend insurance policy issued after policy was cancelled was a nullity because "there was nothing to amend").

In fact, in the first amended M&M lien affidavit, Duncan avers that he is amending the original M&M lien.[7] In the second and third amended M&M lien affidavits, he similarly states under oath **[**94]** that he is amending the first amended M&M lien. Finally, in the fourth amended M&M lien affidavit, he declares that he is amending the third amended M&M lien affidavit. In short, each of the amended M&M lien affidavits rests on a previously filed M&M lien affidavit, tracing its way back to the Released M&M Lien.[8]

In my view, these four M&M lien affidavits are exactly what they purport to be: amended M&M lien affidavits. If there is nothing for an amended instrument to amend, then such an amended instrument is itself ineffectual nullity. *Cf. id.* The Builder has rested its amended lien affidavits **[**95]** on a non-existent foundation.

In short, the Builder filed amended M&M lien affidavits, rather than new M&M liens. But because the original M&M lien upon which all the amendments rest was released, there was nothing to amend. *See Apex Fin. Corp., 7 S.W.3d at 830* (explaining that, once waived, a statutory lien cannot be revived);[9] *Collinsville Mfg. Co., 196 S.W. at 287* (same); *cf. Lazo, 2007 Tex. App. LEXIS 7077, 2007 WL 2447299, at *4*. The Builder constructed a house of cards out of amended lien affidavits, with each amended affidavit resting on a previous affidavit, and all of them relying on the non-existent foundation of the Released Lien. Ultimately, the Builder's amended lien affidavits built upon the Released Lien tumble down like a house of cards.

## Conclusion

For the foregoing reasons, I would affirm the trial court's summary judgment because none of the post-release amended M&M lien affidavits were effective to create a new M&M lien. Accordingly, the Bank established its lien priority as a matter of law. I therefore respectfully dissent.

/s/ Adele Hedges

Chief Justice

---

[6]  These statements are not mistakes or surplusage. These statements specifically reference the document numbers of the lien affidavits they purport to amend, the dates these lien affidavits were filed for record, and the volume and page numbers of the Harris County Real Property Records where these lien affidavits may be located.

[7]  The majority implies that this first amended M&M lien was ineffective because it asserted a lien only against the same parcels as the Released Lien. *See ante*, at 14.

[8]  The majority notes in footnote 11 that my "rule" would apply "with equal force" if an M&M lienholder received payment and filed the statutorily required release and then filed lien affidavits as amendments. My "rule" would apply only if this lienholder, *in the body of his lien affidavit*, averred that he was amending the previously released lien. I simply do not believe that this particular fact pattern would occur in many instances.

[9]  I recognize that the waiver filed in *Apex* was broader than the release filed here. The waiver filed of record in *Apex* stated that it released the contractor's "right to a statutory lien based on labor or materials furnished or *to be furnished*." *Apex*, 7 S.W.3d at 830. Here, as the majority notes, there is no language in the release indicating that the Builder intended to refrain from filing *new* M&M liens. *See ante*, at 15. I believe, however, that the fact that **[**96]** the Builder filed *amended*, rather than new, M&M lien affidavits, is dispositive of this issue.

# Appendix G

## *Benchmark Bank v. Crowder*

Supreme Court of Texas

September 6, 1995, Argued ; March 7, 1996, Delivered

No. 95-0052

**Reporter**

919 S.W.2d 657; 1996 Tex. LEXIS 26; 39 Tex. Sup. J. 361

BENCHMARK BANK, PETITIONER v. FRANK L. CROWDER AND MARION N. CROWDER, RESPONDENTS

**Prior History:** [**1] ON APPLICATION FOR WRIT OF ERROR TO THE COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS.

## Core Terms

homestead, liens, foreclosure, subrogated, summary judgment, federal tax lien, trust deed, tax lien, taxes, foreclosed, insurance agency, third party, trial court, penalties, totalled, rights, homestead interest, unpaid taxes, appeals, invalid, abated, notice

## Case Summary

### Procedural Posture

Petitioner bank sought review of a judgment of the Court of Appeals for the Fifth District of Texas, which denied petitioner's motion for summary judgment that petitioner was subrogated to a valid federal tax lien against respondents', husband and wife, homestead interest and that its foreclosure was not wrongful under *Tex. Const. art. XVI, § 50*.

### Overview

Respondents, husband and wife, paid loan proceeds from petitioner bank to the IRS and the IRS released its lien against respondent husband's corporation. Petitioner had a lien against respondents' homestead and subrogation rights to any lien the loan proceeds were used to pay. Respondents defaulted on the loan and petitioner foreclosed and sold the property at a nonjudicial sale. The appellate court concluded that petitioner was precluded from enforcing the IRS lien by the homestead protection under *Tex. Const. art. XVI, § 50*. The court reversed the part of the judgment that denied petitioner's motion for summary judgment because petitioner was subrogated to the IRS's federal tax lien and was entitled to enforce the lien against respondents' homestead by foreclosure. The IRS' release of its lien against respondent husband did not extinguish petitioners right to subrogation. The court affirmed and remanded the part of the judgment that reversed the summary judgment to respondent wife's claim for compensation for the loss of her homestead because petitioner was required to compensate respondent wife, a nondelinquent spouse, for the forced sale of her interest in the homestead.

### Outcome

The court reversed the part of the judgment that denied petitioner bank's motion for summary judgment because petitioner was subrogated to the IRS' tax lien and was entitled to enforce the lien against respondents', husband and wife, homestead by foreclosure. The court affirmed the part of the judgment that required petitioner to compensate respondent wife for the forced sale of her interest in the homestead.

# LexisNexis® Headnotes

Real Property Law > Exemptions & Immunities > Homestead Exemptions

Tax Law > Federal Tax Administration & Procedures > Tax Credits & Liabilities > General Overview

Tax Law > ... > Tax Credits & Liabilities > Tax Liens > General Overview

***HN1*** *Tex. Const. art. XVI, § 50* protects a homestead from forced sale except for the payment of debts for purchase money, ad valorem taxes due on the property, or work or materials used in constructing improvements on the property. No mortgage, trust deed, or lien is ever valid on the homestead unless such lien secures payment of one of these three debts.

Constitutional Law > Supremacy Clause > General Overview

Real Property Law > Exemptions & Immunities > Homestead Exemptions

Tax Law > Federal Tax Administration & Procedures > Tax Credits & Liabilities > General Overview

Tax Law > ... > Tax Credits & Liabilities > Tax Liens > General Overview

***HN2*** Under U.S. Const. art. VI, cl.2, the Supremacy Clause of the United States Constitution, the IRS may obtain a valid federal tax lien and enforce its lien against a Texas homestead.

Real Property Law > Exemptions & Immunities > Homestead Exemptions

Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

Tax Law > Federal Tax Administration & Procedures > Tax Credits & Liabilities > General Overview

Tax Law > ... > Tax Credits & Liabilities > Tax Liens > General Overview

***HN3*** A third party who refinances a debt secured by a valid mechanic's lien against a homestead may be subrogated to the lien.

Real Property Law > Exemptions & Immunities > Homestead Exemptions

Tax Law > ... > Tax Credits & Liabilities > Tax Liens > General Overview

***HN4*** Homestead owners must have the ability to renew, rearrange, and readjust the encumbering obligation to prevent a loss of the homestead through foreclosure.

Real Property Law > Exemptions & Immunities > Homestead Exemptions

Real Property Law > ... > Liens > Nonmortgage Liens > Tax Liens

Tax Law > Federal Tax Administration & Procedures > Tax Credits & Liabilities > General Overview

Tax Law > ... > Tax Credits & Liabilities > Tax Liens > General Overview

***HN5*** Where a bank is subrogated to the federal government's tax lien, the bank may enforce its lien against the homestead through foreclosure.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview

Business & Corporate Law > ... > Corporate Finance > Franchise Tax > Penalties for Noncompliance

***HN6*** *Tex. Tax Code § 171.255(a)* provides that corporate officers are liable for debts of the corporation incurred after the corporation has forfeited its privileges.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview

Criminal Law & Procedure > ... > Fraud Against the Government > Tax Fraud > Penalties

Tax Law > ... > Tax Credits & Liabilities > Civil Penalties > General Overview

Business & Corporate Compliance > ... > Tax Credits & Liabilities > Civil Penalties > Failure to Collect & Pay Tax

Tax Law > ... > C Corporations > Shareholder Taxation > General Overview

*HN7* 26 U.S.C. S. § 6672 of the federal tax laws provides that a corporate officer or employee may be personally liable for unpaid corporate taxes if the individual is a person responsible for the collection and payment of taxes and the person willfully fails to do so.

Tax Law > Federal Tax Administration & Procedures > Tax Credits & Liabilities > General Overview

Tax Law > ... > Tax Credits & Liabilities > Deficiencies > General Overview

Tax Law > ... > Tax Credits & Liabilities > Tax Liens > General Overview

Tax Law > ... > Tax Credits & Liabilities > Tax Liens > Neglect & Refusal to Pay Taxes

Tax Law > ... > Tax Liens > Duration of Liens > Times Liens Arise

*HN8* Federal tax liens do not arise automatically and are not self-executing. Such tax liens arise only after the IRS assesses a deficiency, gives notice to the taxpayer of the deficiency, and the taxpayer refuses the demand for payment. 26 U.S.C. S. § 6321.

Estate, Gift & Trust Law > Estate Administration > Allowances > General Overview

Estate, Gift & Trust Law > Estate Administration > Allowances > Homesteads

Family Law > Marital Duties & Rights > Property Rights > Homestead Rights

Real Property Law > Exemptions & Immunities > Homestead Exemptions

Real Property Law > ... > Liens > Nonmortgage Liens > Tax Liens

*HN9* When a homestead is subject to foreclosure of a federal tax lien on an indebtedness owed by a taxpayer, the taxpayer's spouse, who does not owe any of that indebtedness, has a separate homestead interest and must be compensated for the loss of the homestead estate.

**Counsel:** For PETITIONER: Love, Mr. G. Roland, Gudgel, Mr. Trent A., McCauley MacDonald Love & Devin, Dallas, TX. Fossi, Mr. Lawrence J., Malin, Mr. Steven C., Carter, Mr. John L., Vinson & Elkins, Houston, TX.

For RESPONDENTS: Yarbrough, Jr., Mr. George M., Yarborough & Elliott, Dallas, TX.

**Judges:** JUSTICE ENOCH delivered the opinion of the Court.

**Opinion by:** CRAIG T. ENOCH

## Opinion

 **[\*659]** The principal issue in this case is whether a third party may be subrogated to a federal government tax lien and thus, entitled to enforce the lien against the taxpayer's homestead. We conclude that the answer is yes, but that in selling the property through foreclosure, the third party must compensate a nondelinquent spouse for his or her interest in the homestead estate. We reverse in part and affirm in part the judgment of the court of appeals. 889 S.W.2d 525.

Frank Crowder operated an insurance agency, first as a sole proprietorship and then as a corporation, Crowder Insurance Agency, Inc. He was the sole officer, director, and shareholder of the corporation. The corporation did not pay **[\*\*2]** its federal payroll taxes and the Internal Revenue Service assessed liens for the unpaid taxes, interest, and penalties against Frank Crowder's property and the corporation's property.

Frank Crowder obtained a loan from Benchmark Bank's predecessor to pay off the tax debts. Frank

and his wife, Marion, signed a promissory note payable to the Bank and gave the Bank a deed of trust purporting to create a lien against the Crowders' 1.85 acre estate, which the Crowders claimed as their homestead. The deed of trust also provided to the extent the loan proceeds were used to pay any outstanding liens, the Bank was to be subrogated to any and all rights and liens. The Crowders paid the loan proceeds to the IRS and the IRS released its liens against Frank Crowder and the corporation. The Crowders defaulted on the loan and the Bank eventually foreclosed on their property and sold the property at a nonjudicial sale. The Bank purchased the property at the foreclosure sale subject to a first lien.

The Crowders sued the Bank, seeking a declaration that (1) the lien granted by the deed of trust was invalid, (2) the deed of trust did not authorize a nonjudicial foreclosure, and (3) the foreclosure [**3] was wrongful. In addition, the Crowders sought damages for wrongful foreclosure alleging, among other things, that the Bank's lien was invalid against the homestead or, alternatively, if the lien were valid, the foreclosure was wrongful because the Bank did not conduct a judicially supervised sale as required by federal law. *See 26 U.S.C. § 7304*. The Crowders sought a partial summary judgment on liability only. The Bank sought summary judgment that it was subrogated to a valid lien against the homestead interest of both Frank and Marion Crowder and that its foreclosure was not wrongful. The Bank also sought summary judgment that the Crowders' post-foreclosure conduct in agreeing to try to sell the property for the Bank constituted a novation or accord and satisfaction that affirmed the validity of the lien and the foreclosure. The trial court denied the Crowders' motion for partial summary judgment and granted the Bank's motion for summary judgment. In its judgment, the trial court determined that the deed of trust given by the Crowders **[*660]** created a valid lien against their homestead and rendered a take-nothing judgment on their claims against the Bank.

The Crowders **[**4]** appealed, asserting that summary judgment was improper because the lien against the homestead was invalid and the Bank did not seek to partition the non-exempt portion of the property; the Bank had no lien against Marion Crowder's homestead interest; the Bank did not follow the procedures applicable to foreclosure of a federal tax lien; and the Bank's defenses of novation and accord and satisfaction were unavailable or there were fact issues as to these defenses that precluded summary judgment. By cross-points, the Bank argued summary judgment was proper because it had a valid lien against the Crowders' homestead and the Crowders' summary judgment affidavits were inadmissible. The court of appeals reversed the trial court's take-nothing judgment. That court concluded that the Bank's attempt to obtain or enforce the IRS's tax lien was precluded by the homestead protection afforded under the Texas Constitution. 889 S.W.2d at 529. The court of appeals did not consider the remaining issues.

**I**

*HN1* The Texas Constitution protects a homestead from forced sale except for the payment of debts for purchase money, ad valorem taxes due on the property, or work or materials used in constructing **[**5]** improvements on the property. *TEX. CONST. art. XVI, § 50*. No mortgage, trust deed, or lien is ever valid on the homestead unless such lien secures payment of one of these three debts. *Id.*; *Thompson v. Thompson, 149 Tex. 632, 236 S.W.2d 779, 788 (Tex. 1951)*. While the federal tax liens are not within those specifically identified as valid in Article XVI, Section 50, the Bank argues that a federal tax lien is valid against the Crowders' homestead and that it was both equitably and contractually subrogated to the federal tax liens assessed against the Crowders' estate.

At the outset we note that Texans approved by election on November 7, 1995, a constitutional amendment that would permit an encumbrance against a homestead for the refinance of a lien

against a homestead, including a federal tax lien. *TEX. CONST. art. XVI, § 50* (1876, amended 1973 and 1995). That amendment, however, has no bearing on our disposition of this case because the tax lien and the Bank's subrogation rights were fixed before the amendment's adoption. *See TEX. CONST. art. XVII, § 1* (amended 1972) (an amendment becomes a part of the Constitution upon the majority of votes cast in favor of the **[**6]** amendment and proclamation made by the Governor). We must determine whether, in the absence of the amendment to Article XVI, Section 50, the Bank obtained through subrogation a valid and enforceable lien against the Crowders' homestead.

*HN2* Under the Supremacy Clause of the United States Constitution, the IRS may obtain a valid federal tax lien and enforce its lien against a Texas homestead. U.S. Const. art. VI, cl. 2; *United States v. Rodgers, 461 U.S. 677, 701-02, 76 L. Ed. 2d 236, 103 S. Ct. 2132 (1983)*; *Staley v. Vaughn*, 50 S.W.2d 907, 911-12 (Tex. Civ. App.--Amarillo 1932, writ ref'd). The Crowders argue, however, that although the federal government has a valid tax lien against the homestead, that lien is invalid and unenforceable in the hands of a third party who has financed a loan to discharge that lien. We disagree.

In *Staley v. Vaughn*, 50 S.W.2d at 912, we suggested that a third party could be subrogated by deed of trust to a federal tax lien. There, the Staleys gave Vaughn a deed of trust to secure payment of a judgment rendered on a foreclosed materialmen's lien and to secure payment of a federal income tax lien assessed against the Staleys' homestead. The **[**7]** deed of trust subrogated Vaughn to all the government's rights in the Staleys' homestead. Vaughn eventually foreclosed on the lien and purchased the property at the foreclosure sale. The Staleys sued Vaughn, asserting that the materialmen's lien and federal tax lien were void against the homestead. After concluding that the federal tax lien was valid against the homestead under the Supremacy Clause, the Court concluded, without discussion, that Vaughn was the owner of the federal tax lien and was subrogated to the government's rights. *Staley*, 50 S.W.2d at 912.

**[*661]** While *Staley* is some authority that a third party may be subrogated to a federal government tax lien, it is not clearly dispositive. Because of the lack of discussion on the issue, there is nothing to suggest that the parties in that case contested the propriety of subrogation in these circumstances. Rather, *Staley* suggests that the parties simply contested the validity of a federal tax lien against a homestead and assumed that if the tax lien were valid, Vaughn was subrogated to that valid lien. We believe *Staley* correctly, if cursorily, concluded that subrogation in these circumstances is proper.

**[**8]** We have previously held that *HN3* a third party who refinances a debt secured by a valid mechanic's lien against a homestead may be subrogated to the lien. *Farm & Home Sav. & Loan Ass'n. v. Martin, 126 Tex. 417, 88 S.W.2d 459, 469-70 (Tex. 1935)*. We see no difference between the refinancing of debt secured by a mechanic's lien and the refinancing of debt secured by a federal tax lien. Once valid, the lien does not become invalid against the homestead simply because the original debt has been refinanced. To hold otherwise, in fact, would defeat the very purpose of the homestead protection. *HN4* Homestead owners must have the ability to renew, rearrange, and readjust the encumbering obligation to prevent a loss of the homestead through foreclosure. *Machicek v. Barcak, 141 Tex. 165, 170 S.W.2d 715, 717 (Tex. 1943)*. We hold that the Bank was contractually and equitably subrogated to the federal government's tax lien against the Crowders' homestead.

## II

*HN5* Because the Bank was subrogated to the federal government's tax lien, the Bank may enforce its lien against the homestead through

foreclosure. The Crowders argue, however, that in this instance the Bank must compensate Marion [**9] Crowder for her interest in the homestead because the IRS had assessed no taxes against Marion Crowder and had no liens against her property. *Rodgers, 461 U.S. at 697*. We agree that *Rodgers* requires compensation to a nondelinquent spouse for the forced sale of his or her interest in a homestead.

The summary judgment evidence shows the IRS assessed taxes (including interest and penalties) only against Crowder Insurance Agency, Inc. and Frank Crowder and asserted its liens securing payment of those taxes only against the property of the corporation and Frank Crowder individually. The IRS did not assess any taxes or liens against Marion Crowder or her property. The Bank argues that the tax liens are valid against Marion Crowder's homestead interest because she is personally liable for the unpaid taxes under *section 171.255 of the Texas Tax Code* and *26 U.S.C. § 6672*. We disagree.

*HN6* *Section 171.255 of the Texas Tax Code* provides that corporate officers are liable for debts of the corporation incurred after the corporation has forfeited its privileges. *TEX. TAX CODE § 171.255(a)*. According to the Bank, the corporation incurred unpaid taxes in 1985 when the corporation had forfeited [**10] its privileges in Texas for nonpayment of franchise taxes. *HN7* *Section 6672* of the federal tax laws provides that a corporate officer or employee may be personally liable for unpaid corporate taxes if the individual is a person responsible for the collection and payment of taxes and the person willfully fails to do so. *26 U.S.C. § 6672*; *Slodov v. United States, 436 U.S. 238, 244-45, 56 L. Ed. 2d 251, 98 S. Ct. 1778 (1978)*. The IRS assessed penalties under *section 6672* against Frank Crowder as a person responsible. The Bank argues that Marion Crowder is personally responsible under *section 6672* for at least a portion of the unpaid taxes because she had significant control over the finances of the corporation. Accordingly, the Bank claims, the government's lien extends to her interest in the homestead.

Even assuming there may be some basis for Marion Crowder's personal liability to the IRS for the unpaid taxes, subrogation does not entitle the Bank to assert and enforce nonexistent liens. *HN8* Federal tax liens do not arise automatically and are not self-executing. Such tax liens arise only after the IRS assesses a deficiency, gives notice to the taxpayer of the deficiency, and the taxpayer [**11] refuses the demand for payment. *26 U.S.C. § 6321*; *United States v. Blakeman, 997 F.2d 1084, 1088* [*662] *(5th Cir. 1993)*. None of these preconditions apply to Marion Crowder. When the Bank refinanced the original tax debt, and thus, when the Bank succeeded to the federal government's rights and liens, the IRS had assessed no taxes against Marion Crowder and no tax liens attached to her property. In short, there were no liens against Marion Crowder's property to which the Bank could be subrogated.

*HN9* When a homestead is subject to foreclosure of a federal tax lien on an indebtedness owed by a taxpayer, the taxpayer's spouse, who does not owe any of that indebtedness, has a separate homestead interest and must be compensated for the loss of the homestead estate. *Rodgers, 461 U.S. at 680*; *see also* *Paddock v. Siemoneit, 147 Tex. 571, 218 S.W.2d 428, 436 (Tex. 1949)* (spouse has a *vested* estate in the land of which she cannot be divested during her life except by abandonment or a voluntary conveyance in the manner prescribed by law). Accordingly, while the Bank is subrogated to a valid federal tax lien against the Crowders' homestead and may enforce its lien through [**12] foreclosure, the Bank must compensate Marion Crowder for the loss of her separate, vested interest in the homestead upon foreclosure. The trial court's take-nothing summary judgment for the Bank as to Marion Crowder was improper.

**III**

Our inquiry does not end here. The Crowders contend that even if the Bank is subrogated to the IRS's liens and may foreclose on their homestead, the foreclosure was wrongful in its entirety because the Bank did not follow federal procedures for foreclosure of a federal tax lien. *26 U.S.C. § 7403*. In particular, the Crowders assert that at a minimum, the Bank was required to conduct a judicially supervised sale of the property, as is required of the federal government. *Id*. We disagree.

The Bank was both equitably and contractually subrogated to the federal government's tax liens. The Bank obtained contractual subrogation through the deed of trust issued by the Crowders in favor of the Bank. The deed of trust did not create a new lien against the Crowders' property. Rather, the deed of trust preserved and extended the existing tax lien, but also prescribed new terms and conditions for foreclosure. *Providence Institution for Sav. v. Sims* **[**13] , 441 S.W.2d 516, 520 (Tex. 1969)*; *Continental State Bank of Big Sandy v. Pepper, 130 Tex. 71, 106 S.W.2d 654, 658-59 (Tex. 1937)*. One of the new terms agreed to by the Crowders in the deed of trust to the Bank was the power of sale. Foreclosure in accordance with the terms of the Bank's deed of trust was valid. *See* *W.C. Belcher Land Mortgage Co. v. Taylor, 212 S.W. 647, 650* (Tex. Comm'n App. 1919, judgm't adopted) (foreclosure against homestead under power of sale in deed of trust on debt originally secured by lien without power of sale was valid as the new deed of trust did not create a new debt or lien but continued the original debt and lien securing that debt and provided new terms for foreclosure).

In a related argument, the Crowders assert that the Bank's foreclosure was wrongful because the Bank foreclosed on a debt greater than the value of the liens assessed against the property. Federal law, the Crowders submit, precludes the IRS from collecting on a tax debt more than the value of the property interests that are actually liable for the debt. *Rodgers, 461 U.S. at 691*. The Crowders assert that the liens on Frank Crowder's property totalled considerably **[**14] less than the amount of the loan; therefore, the Bank improperly foreclosed on a debt in excess of the liens against Frank Crowder's property.

The Crowders misconstrue *Rodgers*. *Rodgers* states that "the Government may not ultimately *collect*, as satisfaction for the indebtedness owed to it, more than the value of the property interests that are actually liable for that debt." *Rodgers, 461 U.S. at 691* (emphasis added). When, as in this case, another person has an interest in the property subject to the liens and that person is not liable on the tax debt, *Rodgers* simply limits the government's enforcement to the value of only the delinquent taxpayer's interest in the property. In other words, the government may not collect **[*663]** against the other person's interests in the property.

Although it is unclear from their briefing, the Crowders appear to suggest that *Rodgers* would preclude foreclosure if the government or its subrogee collected more than the amount of the liens assessed against the property. As the Supreme Court noted in *Rodgers*, however, "the right to collect and the right to seek a forced sale are two quite different things." *Id.* The **[**15] fact that the debt foreclosed upon may exceed the value of the liens assessed against the property interest of the delinquent taxpayer does not render the foreclosure wrongful. It simply would give rise to a right of reimbursement from the proceeds of sale collected in excess of the amount necessary to satisfy the liens.

In this case, the Bank's summary judgment evidence shows the IRS had assessed a lien against Frank Crowder as sole proprietor totalling $ 6,071.76; a lien against Frank Crowder doing business as Crowder Insurance Agency totalling $ 35,811.16; and a lien against Frank Crowder individually for the $ 27,392.87 penalty assessment as a responsible person under *26 U.S.C. § 6672*.

These liens totalled $ 69,275.79. The debt owing and satisfied by foreclosure and sale of the property totalled $ 54,809.48. On this summary judgment record, the Bank did not foreclose on a debt exceeding the value of the liens assessed against the property.

The Crowders argue that the liens against Frank Crowder's property total only $ 8,935.48. They argue that upon payment of the delinquent taxes, interest, and penalties, the IRS abated or reversed the $ 27,392.87 penalty assessment against [**16] Frank Crowder. Once abated or reversed, the Crowders assert, the lien against Frank Crowder's property in that amount no longer existed and could not support the Bank's foreclosure for the full $ 54,809.48. In addition, the Crowders assert that the liens assessed against Frank Crowder, doing business as Crowder Insurance Agency, were for taxes owed only by the corporation. Thus, the Crowders contend, these liens were not assessed against Frank Crowder individually. We disagree.

The summary judgment evidence shows the IRS released its lien for the $ 27,392.87 penalty assessment. The only evidence that the lien was abated is by affidavit of David F. McCool, a Certified Public Accountant, in which he gives his opinion that the IRS abated the penalty assessment. Even assuming there is some material significance to abatement, as opposed to the release of a lien, McCool's testimony is not part of the summary judgment record. McCool's affidavit was filed two days before the summary judgment hearing. Summary judgment evidence may be filed late, but only with leave of court. *TEX. R. CIV. P. 166a(c)*. There is no order in this record granting the Crowders leave to file McCool's affidavit late. [**17] McCool's affidavit was not properly before the trial court on the motions for summary judgment. *See INA of Texas v. Bryant, 686 S.W.2d 614, 615 (Tex. 1985)* (where nothing appears of record to indicate that late filing of summary judgment response was with leave of court, it is

presumed that trial court did not consider the response). The only summary judgment evidence is that the IRS released its liens against Frank Crowder and the corporation. The Bank's subrogation rights are not extinguished simply because the IRS released its liens after payment of the proceeds of the loan to satisfy the outstanding tax liability.

The Crowders' argument that the liens against the property exclude those assessed against Frank Crowder, doing business as Crowder Insurance Agency, likewise is without merit. The IRS lien notice for the $ 35,811.16 in delinquent taxes unequivocally identifies Frank Crowder as the taxpayer against whom the lien is assessed. The notice states:

> Notice is given that taxes (including interest and penalties) have been assessed against the following-named taxpayer. Demand for payment of this liability has been made, but it remains unpaid. Therefore, there is [**18] a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the [*664] amount of these taxes, and additional penalties, interest, and costs that may accrue.

Name of Taxpayer

Frank L. Crowder d/b/a Crowder Insurance Agency

When giving notice of liens against the corporation, the IRS identified Crowder Insurance Agency, Inc. as the named taxpayer.

The summary judgment record shows that the IRS had liens totalling $ 69,275.79 against the property of Frank Crowder. The debt collected by the Bank through foreclosure did not exceed the value of the tax liens against the property. The trial court did not err in granting summary judgment for the Bank on Frank Crowder's claims.

* * * *

We hold that the Bank was properly subrogated to the federal government's tax liens and that the Bank was entitled to foreclose upon the Crowders' homestead. We affirm the judgment of the court of appeals only to the extent that it reversed the summary judgment as to Marion Crowder's claim for compensation of the loss of her homestead interest upon foreclosure and remand her claim to the trial court for further proceedings consistent **[**19]** with this opinion. We otherwise reverse the judgment of the court of appeals and render judgment that Frank Crowder take nothing.

Craig T. Enoch

Justice

Opinion delivered: March 7, 1996

# Appellant's Exhibit A

No. 05-15-01002-CV

## FIFTH COURT OF APPEALS

## DALLAS, TEXAS

2012 PROPERTIES, LLC,

Appellant

V.

DALLAS COUNTY, CITY OF GARLAND, GARLAND ISD, CHARLES
HOBBS, TONYA BROYLES, LISA GREUNKE, AND CROW'S NEST, INC.

Appellees

FROM THE 134TH JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS
CAUSE NO. TX-12-40136

## RULE 11 AGREEMENT

It is agreed by the parties that the issue of how much taxes have been paid by 2012 Properties, LLC can be resolved on remand such that it is unnecessary for either appellants or appellees to brief this issue to the Court of Appeals.

**Appellant**

2012 Properties, LLC

**Counsel for Appellant**

Ian Ghrist
State Bar No. 24073449
ian@ghristlaw.com

Ghrist Law Firm
1210 Hall Johnson Road, Suite 100C
Colleyville, Texas 76034

Telephone: (817) 778-4136
Fax: (817) 485-1117

**Appellees**                    **Counsel for Appellees**

Dallas County, Texas

_____
Evelyn Conner Hicks / Edward Lopez, Jr.
State Bar No. 09575900 / # 125 63520
Linebarger, Goggan, Blair & Sampson
2777 Stemmons Freeway, Suite 1000
Dallas, Texas 75207
Phone: (214) 880-0089
Fax (469) 221-5171
dallas.litigation@lgbs.com


City of Garland
Garland Independent School District

_____
Dustin L. Banks
State Bar No. 24064344
Perdue, Brandon, Fielder, Collins & Mott, LLP
1919 S. Shiloh Road, Suite 310, LB 40
Garland, Texas 75042
Phone: (972) 278-8282
Fax   (972) 278-8222
dbanks@pbfcm.com


Attorney Ad Litem for

for Lisa Greunke and Crow's Nest, Inc.

_____
G. Walter McCool
McCool Law Firm, P.C.
9090 Skillman, Suite 182-A-256
Dallas, Texas 75243-8262
Phone:       (214) 256-3673

Fax    (214) 206-1081
walt@mccoollaw.com

Charles Hobbs

_____
James Bellevue
Law Office of James Bellevue
6705 W Hwy 290, Suite 502-295
Austin, Texas 78735
Phone : (512) 288-0317
Fax    (512) 288-0317
jim@landlawtexas.com

Tonya Broyles

_____
Michael Savage
Ackerman and Savage, LLC
8226 Douglas Ave, Suite 330
Dallas, Texas 75225
Phone:     (214) 346-4201
Fax    (214) 346-4201
mtsavage@ackermansavage.com

Telephone: (817) 778-4136
Fax: (817) 485-1117

**Appellees**                          **Counsel for Appellees**

Dallas County, Texas

Evelyn Conner Hicks
State Bar No. 09575900
Linebarger, Goggan, Blair & Sampson
2777 Stemmons Freeway, Suite 1000
Dallas, Texas 75207
Phone: (214) 880-0089
Fax (469) 221-5171
dallas.litigation@lgbs.com

City of Garland                     Dustin L. Banks
Garland Independent School District State Bar No. 24064344
Perdue, Brandon, Fielder, Collins & Mott,
LLP
1919 S. Shiloh Road, Suite 310, LB 40
Garland, Texas 75042
Phone: (972) 278-8282
Fax   (972) 278-8222
dbanks@pbfcm.com

Attorney Ad Litem for

for ~~Lisa Greunke and Crow's Nest,~~
~~Inc.~~
*HEIRS AND UNKNOWN*
*HERS OF LENA M*
*HIBBS*

G. Walter McCool
McCool Law Firm, P.C.
9090 Skillman, Suite 182-A-256
Dallas, Texas 75243-8262
Phone:      (214) 256-3673